UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN STATE A. PHILIP RANDOLPH
INSTITUTE, MARY LANSDOWN,
ERIN COMARTIN, DION WILLIAMS, and
COMMON CAUSE,

Plaintiffs,

v.

RUTH JOHNSON, in her official capacity
as Michigan Secretary of State,

Defendant.

_____/

Case No. 16-cv-11844

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
MONA K. MAJZOUB

**AMENDED OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION [4]**

**I. INTRODUCTION**

Plaintiffs Mary Lansdown, Erin Comartin, Dion Williams, and the Michigan

State A. Philip Randolph Institute ("Plaintiffs") commenced this action against the

Michigan Secretary of State, Ruth Johnson ("Defendant") on May 24, 2016.[1] *See*

Dkt. No. 1. Plaintiffs allege that the passage of Public Act 268 ("P.A. 268")

impermissibly burdens the right to vote under the Equal Protection Clause of the

_____

[1]Plaintiffs filed an Amended Complaint on June 1, 2016. Dkt. No. 9. However,
Plaintiffs inadvertently filed the Amended Complaint as an Answer. The Court,
finding that Plaintiffs may amend their complaint within 21 days after serving it,
will consider the June 1, 2016 filing as Plaintiffs' First Amended Complaint. FED.
R. CIV. P. 15(a)(1)(A).

Fourteenth Amendment of the U.S. Constitution, and the Voting Rights Act, 52 U.S.C. § 10301.

On May 27, 2016, Plaintiffs filed a Motion for a Preliminary Injunction, to prevent the enforcement of P.A. 268. A hearing was held on July 14, 2016 at 11:00 a.m. The matter is fully briefed. For the reasons discussed below, the Court will **GRANT** the preliminary injunction.

## II. BACKGROUND

The current litigation centers on legislation to ban "straight-party voting" on Michigan ballots. Straight-party voting allows citizens to vote for all of the partisan candidates of a particular party by filling a single bubble on their ballot. The most common reasoning behind the use of straight-party voting is that it reduces the amount of time needed to complete a ballot. Dkt. No. 4 at 19 (Pg. ID No. 336).

Voters in Michigan have had the option to cast a straight-party vote for the last 125 years. Complaint, ¶ 23. However, there have been several attempts to abolish the practice. First in 1964, the Michigan Legislature enacted P.A. 240. However, during the November 1964 election, the citizens rejected P.A. 240 via referendum. In 2001, the Legislature tried again with P.A. 269. However, the law was again struck down by voters.

Most recently, on January 20, 2015, Senator Marty Knollenberg introduced Senate Bill 13 to eliminate straight-party voting in Michigan. The Legislature

passed P.A. 268 on December 16, 2015. On January 5, 2016, Governor Snyder signed P.A. 268 into law. P.A. 268 will go into effect for the first time in the November 2016 U.S. Presidential Election. Attached to P.A. 268 is an appropriation, thereby blocking a referendum. *See Michigan United Conservation Clubs v. Secretary of State*, 464 Mich. 359 (2001).

The new ballots for the 2016 election look identical to the 2014 ballots, except that the section for straight-party voting has been removed. Critically however, the new 2016 ballots still contain vignettes of the major political parties, thus raising further concerns about voter confusion. Complaint, ¶ 3.

There is no dispute that straight-party voting helps to save time in the voting process. Several elections officials in Oakland County, Detroit and Lansing have filed affidavits asserting that the elimination of straight-party voting will increase line lengths and waiting times for voters. Complaint (Exhibit 14). They claim they are most concerned with wait times in urban settings, predominantly populated by African-American voters.

Kurt Metzger, a Regional Information Specialist with the U.S. Census Bureau in Detroit, Michigan, conducted an analysis (the "Metzger Report") of the likely impact of P.A. 268 on African-American and white voters. *See* Complaint (Exhibit 10). In addition, the Metzger Report also provided an analysis of socioeconomic, housing and voting data for Michigan. *Id.*

Metzger acquired the voting results by precinct for nine of the largest counties in Michigan for which straight-party voting data were available. These counties included Genesee, Ingham, Kalamazoo, Kent, Macomb, Muskegon, Oakland, Saginaw and Wayne. *Id.* (Pg. ID No. 224). Metzger also used 2010 Census data on the racial/ethnic composition of the voting age population for all communities within the nine counties. *Id.* The Metzger Report found that there was a direct correlation between the use of straight-party voting within a community and the African-American population within that community. Generally, as the African-American population increases in a county, so does the use of straight-party voting.

Within the county data, Metzger documented the voting patterns of each city. Metzger found fifteen cities in Michigan with a straight-party voting rate of about 65% or higher. Metzger Report, Appendix A. Of those fifteen cities, only two, Hamtramck and Mount Morris, were majority white. *Id.* The five cities with straight-party voting rates greater than 75%, were all majority African American. *Id.*

| City | Percent Black | Percent Straight-Party Vote in 2014 |
|---|---|---|
| Royal Oak Charter Township | 95.6% | 82.1% |
| Highland Park | 93.1% | 82.0% |
| Detroit City | 82.3% | 75.5% |
| Inkster City | 70.8% | 78.2% |

-4-

| Flint City | 53.4% | 75.2% |
|---|---|---|

*Id.* In fact, although the average straight-party voting rate in Michigan is about 50%, the straight-party voting rate in African-American majority districts was 67% in 2012, and 73.5% in 2014. *Id.*

From this finding, Metzger concluded that African-American voters were much more likely to use straight-party voting than white voters, and that P.A. 268 would have a larger impact on African-American populations than white ones. *Id.* (Pg. ID No. 231).

### III. LEGAL STANDARD

Temporary restraining orders and preliminary injunctions are extraordinary remedies designed to protect the status quo pending final resolution of a lawsuit. *See University of Texas v. Camenisch*, 451 U.S. 390 (1981); *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (finding that preliminary injunctive relief "is an extraordinary measure that has been characterized as 'one of the most drastic tools in the arsenal of judicial remedies.' "). Whether to grant such relief is a matter within the discretion of the district court. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007). The same factors are considered in determining whether to grant a request for either a temporary restraining order or a preliminary injunction. *See Sandison v. Michigan High School Athletic Assoc.,* 64 F.3d 1026, 1030 (6th Cir. 1995).

The four factors that must be balanced and considered before the court may issue a temporary restraining order or preliminary injunction include: (1) the likelihood of the plaintiff's success on the merits; (2) whether the plaintiff will suffer irreparable injury without the injunction; (3) the harm to others which will occur if the injunction is granted; and (4) whether the injunction would serve the public interest. *Certified Restoration*, 511 F.3d at 542; *In re Eagle-Pitcher Industries, Inc.*, 963 F.2d 855, 858 (6th Cir. 1992); *N.A.A.C.P. v. City of Mansfield, Ohio*, 866 F.2d 162, 166 (6th Cir. 1989).

"None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996). Nevertheless, in this Circuit "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

## IV. DISCUSSION

In response to Plaintiffs' motion, the Defendant makes several arguments for its denial. First, the Defendant argues that the doctrine of laches should apply. Second, the Defendant argues that the Court should abstain from ruling on this matter under the *Burford* doctrine. Third, the Defendant argues that there is no federal subject matter jurisdiction. Fourth, the Defendant argues that the Plaintiffs lack standing to bring their claims. Finally, the Defendant argues that the four

factors considered when analyzing a motion for preliminary injunction favor the Defendant. The Court shall address each argument in turn.

## A. Laches

Defendant argues that Plaintiffs' claim should be dismissed under the doctrine of laches. This argument is without merit. P.A. 268 was signed into law on January 5, 2016. Plaintiffs brought this lawsuit on May 24, 2016 and filed a Motion for Preliminary Injunction three days later. The election does not take place until November. Defendant has failed to show that any actions have been taken that would justify barring this claim under the doctrine of laches. Defendant has also failed to produce evidence that the Plaintiffs purposefully delayed, or exhibited a lack of diligence. Accordingly, this argument fails. *See Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 538 (6th Cir. 2014) ("*Husted II*"); *see also Ohio Organizing Collaborative v. Husted*, No. 2:15-cv-1802, 2016 WL 3248030 at *12 (S.D. Ohio May 24, 2016).

## B. The *Burford* Abstention Doctrine

Defendant next argues that the Court should abstain from hearing the case under the *Burford* doctrine. Dkt. No. 20 at 13 (Pg. ID No. 548). This argument is also without merit.

The Supreme Court has explained that "*Burford* abstention is appropriate where timely and adequate state-court review is available and (1) a case presents

-7-

'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the case at bar,' or (2) the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.' " *Caudill v. Eubanks Farms, Inc.*, 301 F.3d 658, 660 (6th Cir. 2002) (quoting *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 361 (1989)). The decision of whether to abstain is a matter of judicial discretion. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 718 (1996). The doctrine should be applied narrowly. *Id.* at 728.

The present matter does not involve a state law claim. Plaintiffs have only alleged federal claims. *See* Complaint, at 18–21 (Pg. ID No. 18–21). Moreover, federal review of similar cases has never been overly disruptive of state efforts to develop a coherent voting policy. *See Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004); *Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008). Moreover, "*Burford* abstention should be denied where constitutional violations are alleged," as they are here. *Warf v. Board of Elections of Green County, Ky.*, No. 1:08–CV–72–R, 2009 WL 530666, *3 (W.D. Ky. March 3, 2009). Accordingly, this argument fails.

## C. Federal Subject Matter Jurisdiction

Defendant argues that there is no federal subject matter jurisdiction because the U.S. Constitution authorizes the states to prescribe the time, places, and manner of holding elections. Dkt. No. 20 at 15–17 (Pg. ID No. 550–552). The Court disagrees. The states are authorized to regulate elections, but that authorization does not allow states to violate the Constitutional rights of citizens. The federal court clearly has jurisdiction to decide the issue of whether a state law unconstitutionally infringes on a citizen's right to vote. *See Sandusky*, 387 F.3d at 574.

## D. Standing

"Before bringing a case in federal court, a plaintiff must establish standing to do so." *Klein v. U.S. Dept. of Energy*, 753 F.3d 576, 579 (6th Cir. 2014). The law of Article III standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* (citing *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1146 (2013)). "To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.' " *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

### a. Injury-in-Fact

"An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* (quoting *Lujan*, 504 U.S. at 560). "An allegation of future injury may suffice if the injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.' " *Id.* (quoting *Clapper*, 133 S.Ct. at 1148).

Defendant argues that Plaintiffs have not pled any concrete or particularized injuries. Dkt. No. 20 at 19 (Pg. ID No. 552). Defendant contends that "Plaintiffs raise only general grievances regarding what may occur to every voter in the State." *Id.* Defendant also argues that "any alleged injury that the elimination of straight-party voting creates is pure speculation." Dkt. No. 20 at 17 (Pg. ID No. 552). Therefore, Defendant contends the claim should be dismissed under *Lance v. Coffman*, 549 U.S. 437, 441 (2007). The Court disagrees.

In *Lance*, four Colorado voters filed a complaint alleging that "Article V, § 44 of the Colorado Constitution . . . violated [the Elections Clause] of the U.S. Constitution by depriving the state legislature of its responsibility to draw congressional districts." *Id.* The Supreme Court found that "[t]he only injury plaintiffs allege[d] is that the law—specifically the Elections Clause—[had] not been followed." *Id.* at 442. The *Lance* court held that the Plaintiffs held "no particularized stake" in the litigation, and thus did not have standing.

-10-

The allegations in this case are different. Plaintiffs have not alleged general grievances applicable to every voter in the state. Here, Plaintiffs allege that P.A. 268 will disproportionately impact African-Americans in urban areas in the form of longer wait times.  Complaint at ¶ 54. Therefore, Plaintiffs Mary Lansdown and Dion Williams—who are African-American, and live in the predominantly African-American cities of Flint and Detroit, Michigan, respectively—do have a stake in the litigation, as the alleged harm would disproportionately impact them. Furthermore, Plaintiffs have submitted an expert report that corroborates these allegations. Therefore, the harms are not speculative.

Moreover, the fact that the alleged harm has yet to materialize is not dispositive in this case. "[C]ourts have continued to recognize that the increased risk of harm constitutes an injury sufficient to support standing." *Stewart v. Blackwell*, 444 F.3d 843, 844 (6th Cir. 2006); *see also Metro-North Commuter R. Co. v. Buckley*, 521 U.S. 424 (1997) (considering the merits of asbestos-related claims brought by a plaintiff who had yet to manifest symptoms asbestos-related disease).

In the voting context, the Sixth Circuit has recognized that voters can have standing based on an increased risk that their voting rights will be infringed. *Sandusky*, 387 F.3d at 574. In *Sandusky*, the Sixth Circuit held that the Sandusky County Democratic Party had standing to bring a claim on behalf of Michigan

voters. The organization alleged that the Secretary of State's directives regarding provisional ballots in Ohio elections violated the Help America Vote Act ("HAVA"). The Act allowed voters to cast provisional ballots in those instances where their names could not be located on the list of qualified voters. *Id.* at 569. The Secretary of State issued a directive that would prohibit voters from casting provisional votes unless the poll worker was able to confirm that the voter was eligible to vote in that specific context. *Id.* at 571.  The plaintiffs argued that the directive violated the HAVA because the directive would allow "poll workers to withhold a provisional ballot from anyone who is not—according to the poll worker's on-the-spot determination at the polling place—a resident of the precinct in which the would-be voter desires to cast a provisional ballot." *Id.*

The Sixth Circuit held that failure to identify which specific voters that would be harmed was "understandable." *Id.* (" . . . by their nature, mistakes cannot be specifically identified in advance."). That because Election Day is fixed, and because human error is likely inevitable, the issues raised were "real and imminent." *Id.* at 574.

Here, the same logic applies. Plaintiffs have submitted testimony establishing that there is a substantial likelihood that wait times for voting would lengthen due to the adoption of P.A. 268. Furthermore, Plaintiffs have articulated

which geographical and demographic populations are at greatest risk of suffering this harm. Therefore, Plaintiffs have alleged facts establishing injury-in-fact.

There does not appear to be a dispute that Plaintiffs' harm would be redressed by the termination of P.A. 268. Accordingly, Plaintiffs have established all of the elements required for Article III standing.

### b.  Standing to Bring Claims under the Voting Rights Act

Defendants argue that the Michigan State A. Philip Randolph Institute, as an institutional plaintiff, does not have standing to bring a Voting Rights Act claim, which grants a right of action to "aggrieved persons." The argument asserts that because the Institute is not a person, it therefore does not have standing. This argument is without merit. Associations are able to bring claims under the Voting Rights Act on behalf of their members if their members would have standing to bring the claims themselves. *Holder v. E.K. Hall, Sr.*, 512 U.S. 874 (1994) (deciding a Voting Rights Act claim, brought by an institutional plaintiff, on the merits). In this case, the Institute is bringing claims on behalf of its members. Some of the Institute's members are African-American and would have standing to challenge P.A. 268. Accordingly, the Institute has standing to continue on the Voting Rights Act claim.

-13-

### c. *Standing to Bring Claims under the Americans with Disabilities Act*

Defendant argues that Plaintiffs cannot bring the ADA claims because "none of the individual Plaintiffs claim to be an individual covered by the ADA." Dkt. No. 20 at 19 (Pg. ID No. 554). Defendant is correct.

The ADA prohibits discrimination against "qualified individuals with disabilities." *See* 42 U.S.C. § 12132. A "qualified individual with a disability" is defined as

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity

42 U.S.C. § 12131(2). An individual is "disabled" if the person (A) has or mental impairment that substantially limits one or more major life activities; (B) has a record of such an impairment; or (C) is regarded as having such an impairment. 42 U.S.C. § 12102(1).

None of the listed Plaintiffs are described as having any disabilities as recognized by the ADA. *See* Complaint, at 3–4 (Pg. ID No. 3–4). Therefore, these claims aren't likely to succeed unless the Plaintiffs can demonstrate that they are entitled to continue under third-party standing.

A party seeking third-party standing must show that they have a "close relationship" with the person who possesses the right, and there is a "hindrance" to

the possessor's ability to protect his own interests. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). No facts have been pled to establish that either exist in the present case. Accordingly, it does not appear likely that Plaintiffs have standing for their ADA claims.

## E. The Likelihood of Success on the Merits

### a. The Use of Metzger's Expert Report

As a preliminary matter, the Court addresses the use of the Metzger Report as a part of this analysis. It is common in cases such as this for judges to use expert reports when hearing a motion for a preliminary injunction on a voting law. *See Husted II*, 768 F.3d at 533–34; *see also Ohio Organizing Collaborative*, 2016 WL 3248030 at *3–8. Typically in these cases, expert reports are submitted by both parties. *Id.* Here, only the Plaintiffs have submitted an expert report.

Plaintiffs submitted Metzger's report with their Complaint on May 24, 2016. Dkt. No. 1 (Exhibit 10). They filed the present motion three days later on May 27, 2016. Dkt. No. 4. Defendants filed a Response on June 17, 2016, along with an *Ex Parte* Motion for Leave to File Excess Pages. *See* Dkt. Nos. 14, 15. Their final amended Response Brief was filed on June 28, 2016. The final Amended Reply Brief was not filed until July 6, 2016,[2] forty-four days after the filing of the

---

[2] Attached to the Reply Brief was the expert report of the Plaintiffs' second expert witness, Dr. Theodore Allen, Ph.D. At the July 14, 2016 hearing, the Court ruled

Complaint. Dkt. No. 21. At no point during those forty-four days did Defendant ever request leave of the Court to extend any deadlines or to hire an expert of their own. It was not until July 13, 2016, the day before the Court held a hearing on this matter, that Defendant made a request to conduct limited discovery. *See* Dkt. No. 22.

This motion has been pending for seven weeks. Time is of the essence. The election is less than four months away, and election officials need to have adequate opportunity to prepare. *See* Dkt. No. 20 (Thomas Affidavit at ¶ 10, Pg. ID No. 628) ("On information and belief, individuals responsible for programming, coding and printing ballots will begin setting ballots no later than 70 days prior to Election Day (by August 30, 2016), and some may begin as early as the date the results of the primary election are Certified by the County Board of Canvassers for local-level candidates (by August 16, 2016 per MCL 168.822)."). The Defendant's request to reopen discovery and to present a counter-expert was not made in a timely fashion. Therefore, the Defendant has waived the opportunity to submit an expert report for consideration on the Motion. The Court shall evaluate the Motion with the facts before it in the record.

---

that the report of Dr. Allen would not be taken into consideration because it was not filed with the original motion, and thus it was untimely.

### b. Equal Protection Claim

"The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000). Two aspects of "the manner of its exercise" warrant special attention: "[t]he Equal Protection Clause applies when a state either classifies voters in disparate ways or places restrictions on the right to vote." *Obama for America*, 697 F.3d at 428 (citing *League of Women Voters of Ohio*, 548 F.3d at 478).

"State regulations that do not treat similarly situated voters differently *and* do not burden the fundamental right to vote are assessed through rational basis review." *Husted II*, 768 F.3d at 538.[3] "On the other end of the spectrum, strict scrutiny applies to state regulations that impose 'severe' burdens on the fundamental right to vote." *Id.* "For the majority of cases falling between these extremes, we apply the 'flexible' *Anderson-Burdick* balancing test." *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012) (quoting *Obama for America*, 697 F.3d at 429). The law at issue does, as discussed below,

---

[3] *Husted II* was later vacated by the Sixth Circuit when the United States Supreme Court stayed the decision pending a petition for writ of certiorari. The Sixth Circuit noted that the preliminary injunction that was the subject of the appeal was limited to the 2014 election, which no longer had any effect due to the Supreme Court's stay. The parties later settled. Accordingly, *Husted II* is not binding, but due to the factual similarity, the Court considers *Husted II* as persuasive authority.

to a certain extent burden the right to vote, although not severely. Therefore, the Court finds the *Anderson-Burdick* test to be appropriate.

> The *Anderson-Burdick* test provides as follows:
>
> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiffs' rights."

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). "There is no 'litmus test' to separate valid from invalid voting regulations; courts must weigh the burden on voters against the state's asserted justifications and 'make the "hard judgment" that our adversary system demands.' " *Obama for America*, 697 F.3d at 429 (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008)). "Even a minimal burden 'must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.' " *Husted II*, 768 F.3d at 538 (quoting *Crawford*, 553 U.S. at 191).

### 1. The Asserted Injury

P.A. 268 eliminates the straight-party voting option on ballots. Prior to the adoption of P.A. 268, voters could mark a single bubble to vote for all of the candidates affiliated with a particular party. With that option eliminated, voters

would have to mark each individual bubble for the candidates that they wish to vote for.

Plaintiffs argue that the elimination of straight-party voting will burden all voters, and disproportionately harm African-American voters who are more likely to use straight-party voting. Plaintiffs contend that because voters will no longer be able to vote for partisan candidates by marking a single bubble, it will take voters longer to complete their ballots, thus causing longer wait times, and more congestion. Moreover, Plaintiffs contend that confusion about the ballot could lead to a disproportionate amount of African-American voters not having their votes counted.

The Court finds that P.A. 268 presents a disproportionate burden on African Americans' right to vote. As discussed above, the Metzger Report shows that, among the most populous counties in Michigan, there are "extremely high" correlations between the size of the African-American voting population within a district, and the use of straight-party voting in that district. Complaint (Exhibit 10, Pg. ID No. 229–30). Accordingly, as Metzger concludes, the elimination of straight-party voting would likely have a larger impact on African-American voters.

Joseph Rozell, an officer in the Elections Division of the Office of the Oakland County Clerk, testified that "[t]he use of straight party voting significantly

reduces the amount of time that it takes a voter to mark his or her ballot and its elimination will significantly increase the amount of time that it takes to vote the ballot." Rozell Declaration, ¶ 9 (Pg. ID No. 283). Rozell further notes that according to the "MIT line optimization calculator," the elimination of straight-party voting could increase wait time as much as forty minutes in Oakland County, which is only 13% African-American. *Id.* at ¶ 14; Metzger Report at 6 (Pg. ID No. 225).

At oral argument, the Defendant argued that the State has taken measures to combat long wait times by adding a $5 million appropriation, presumably to be spent on more voting booths and staff. *See* Dkt. No. 1 (Exhibit 1, Pg. ID No. 31). However, Defendant has not provided the Court any information on how this money will be allocated amongst the different counties. For example, allocating the money evenly will do nothing to mitigate the fact that African-Americans would still be disproportionally harmed by P.A. 268. Moreover, it appears that the $5 million appropriation is woefully insufficient. There is evidence that it would actually take $30 million, six times the amount appropriated, to adequately combat the long lines. Dkt. No. 1 (Exhibit 13 at p. 5, Pg. ID No. 278).

Additionally, the new ballots would still include political party vignettes across the top. The Gongwer Report, published on May 23, 2016, concluded that voters that are used to straight-party voting may end up having their votes

-20-

discounted due to voter confusion. Complaint (Exhibit 15, Pg. ID No. 306–07) ("The concern is that voters accustomed to voting a straight-party ballot will circle or make some type of mark next to the vignette in an attempt to cast their vote . . . if the voter made a mark next to the vignette and voted in any other race, then the machine would accept the ballot with no vote recorded for the partisan races and the voter unaware of the error."); *see also* Rozell Declaration, ¶ 18 (Pg. ID No. 284–85) ("The uniform opinion among the county clerks is that this is going to cause great confusion and that voters, used to being able to vote straight-party, will circle the party they want or otherwise seek to mark this new ballot display, thinking that this is the way to vote straight-party as they have done in the past."). Thus, there is also a risk that votes will simply not be counted due to voter confusion. Obviously, because African-American voters are statistically more likely to use straight-party voting, they face a disproportionate risk of this harm as well.

### 2. State Interests

The Defendant's stated reasons for P.A. 268 are 1) to follow the trend among states away from the straight-ticket voting option; 2) to demand voters be more knowledgeable about candidates; and 3) to encourage voters to make selections based on criteria other than party affiliation. Dkt. No. 20 at 34–35 (Pg. ID No. 569–70). Defendant argues that the elimination of straight-party voting will

help "preserve the purity of elections," and "to guard against abuses of the elective franchise." Dkt. No. 20 at 27 (Pg. ID No. 562). These interests are tenuous at best.

First, the mere wish to follow "the trend" among other states is problematic for several reasons. The record indicates that P.A. 268 would have a disparate impact on African-Americans in the State of Michigan. The fact that some other states do not allow straight party voting changes none of the facts that are before this Court. Furthermore, and more importantly, the behaviors of other states are *irrelevant* to the question of constitutionality. If the Ohio Legislature successfully instituted poll-taxes and literacy tests without challenge, it would not change the fact that poll-taxes and literacy tests are still clearly unconstitutional burdens on the right to vote.

Second, Defendant has not demonstrated that P.A. 268 necessarily demands that voters will rely on anything more than party affiliation while voting. As depicted in the Complaint, the new ballot will still inform the voters of the party affiliation of every partisan candidate. *See* Complaint at 13 (Pg. ID No. 13). Even Defendant concedes that "[r]emoving the straight ticket option does not prevent voters from voting only for members of one political party. Instead, it prevents the voter from doing so with a single vote." *Id.* at 34 (Pg. ID No. 569). Therefore, it seems the *only* purpose behind P.A. 268 is to require voters to spend more time filling more bubbles.

-22-

Finally, Defendant has not demonstrated how straight-party voting has damaged, or could possibly damage, the "purity" of the election process. There is nothing "impure" or "disengaged" about choosing to vote for every candidate affiliated with, for example, the Republican Party. A voter may base their vote on any criteria he or she wishes, including party affiliation. *See Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214 (1986) ("The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom.").

Moreover, the idea that voting one's party reflects ignorance or disengagement is, ironically, disconnected from reality. Voters may, and often do, have substantive reasons for voting only for members of certain political parties. Even if "disengaged" voting was problematic—and it is not—the Court finds that P.A. 268 does *nothing* to encourage voters to be any more "engaged." Unless there are plans to use the $5 million appropriation to host free civics classes across the state (which does not appear to be the case), there is nothing in the record to suggest that changing the ballot form will encourage voters to become political science scholars before voting.  Therefore, functionally P.A. 268 is "disengaged" from its own justifications.

Accordingly, because the state's interest do not outweigh the burdens imposed by the law, Plaintiffs are likely to succeed on the merits of their Equal Protection Claim.

### c. Voting Rights Act

Section 2 of the Voting Rights Act provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a). According to Plaintiffs, P.A. 268 violates § 2 because it "would have a disproportionately negative impact on African-American voters." Dkt. No. 4 at 43 (Pg. ID No. 360).

Section 2, unlike other federal legislation that prohibits discrimination, does not require proof of discriminatory intent. *Moore v. Detroit School Reform Bd.*, 293 F.3d 352, 365 (6th Cir. 2002). Instead, a plaintiff need only show that the challenged action or requirement has a discriminatory effect on members of a protected group:

> A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate

> to participate in the political process and to elect representatives of
> their choice.

52 U.S.C. § 10301(b); *Moore*, 293 F.3d at 365; *see also Mixon v. Ohio*, 193 F.3d 389, 407 (6th Cir. 1999) ("Section 2 of the voting rights Act requires only a showing of discriminatory effect.").

In total, "Section 2 applies to any 'standard, practice, or procedure' that makes it harder for an eligible voter to cast a ballot, not just those that actually prevent individuals from voting." *Husted II*, 768 F.3d at 552. Thus, Plaintiffs' claim that P.A. 268 "disproportionately place[s] burdens on African-American voters that make it harder for them to exercise their right to vote than other groups of voters is encompassed within Section 2." *Id.* "It does not matter that Plaintiffs do not argue that they are completely prevented from voting." *Id.*

Section 2 requires proof of two elements for a vote denial claim. "First, as the text of Section 2(b) indicates, the challenged 'standard, practice, or procedure' must impose a discriminatory burden on members of a protected class, meaning that members of the protected class 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.' " *Id.* at 554; 52 U.S.C. § 10301(b). "Second, the Supreme Court has indicated that that burden must in part be caused by or linked to 'social and historical conditions' that have or currently produce discrimination against members of the protected class." *Id.* (citing *Thornburg v. Gingles*, 478 U.S. 30, 47

(1986)). "In assessing both elements courts should consider the totality of circumstances." *Id.* (quotations omitted).

### 1. Discriminatory Burden on Members of a Protected Class

Plaintiffs must first prove that members of the protected class "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). "The benchmark is thus quite straightforward—under the challenged law or practice, how do minorities fare in their ability 'to participate in the political process' as compared to other groups of voters?" *Husted II*, 768 F.3d at 556. If the Plaintiffs are able to demonstrate that the challenged law makes it disproportionately harder for the protected class to vote, then the Plaintiffs will have satisfied this element.

When analyzing this first element, a district court may use expert testimony and statistical reports submitted by the parties. *Id.* at 555 (finding no clear error in the district court's use of statistical evidence). In *Husted II*, the district court relied on expert reports submitted by the plaintiff and the defendant to find that a law limiting early voting disproportionately and negatively affected African-American voters. *Id.* at 532. The Sixth Circuit affirmed this finding, noting that African-Americans were more likely to use early voting, and its reduction would place "disproportionate burdens" on their communities. *Id.* at 555.

-26-

Here, as discussed *supra*, Plaintiffs have demonstrated that African-Americans are more likely to use straight-party voting than white voters, and "its elimination will disproportionately affect African-American voters." Complaint (Exhibit 10 at p.1, Pg. ID No. 220). Specifically, voter wait times will increase greatly in African-American communities in comparison to other communities. Accordingly, Plaintiffs have satisfied this element. *Ohio Organizing Collaborative*, 2016 WL 3248030 at *40 (finding that a burden sufficient to satisfy the *Anderson-Burdick* test is sufficient to satisfy the first element of a Section 2 claim under the Voting Rights Act).

### 2. Link to Social and Historical Conditions

The Plaintiffs now must show that the burden must in part be caused by or linked to "social and historical conditions" that have or currently produce discrimination against members of the protected class. *Gingles*, 478 U.S. at 47. In doing so, the Court should look to the "totality of the circumstances" surrounding the legislation. When analyzing this element, the Supreme Court has endorsed the use of nine factors (the "Senate Factors") as relevant to assessing "the totality of the circumstances" in Section 2(b):

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction;

8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

9. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36–37. The Supreme Court added, however, that the Senate Factors are "neither comprehensive nor exclusive" and that " 'there is no requirement that any particular number of factors be proved, or that a majority of

them point one way or the other.' " *Id.* at 45. The Court finds factors 2, 5, 6, 7, 8 and 9 as being relevant. *See* Dkt. No. 4 at 46 (Pg. ID No. 363).

          i.  Factor 2: the extent to which voting in the elections of the state or political subdivision is racially polarized

This factor favors Plaintiffs. Racially polarized voting, "the situation where different races . . . vote in blocs for different candidates," *Gingles*, 578 U.S. at 62, exists in Michigan. African-Americans in Michigan, as in the rest of the country, tend to vote overwhelmingly for Democrats.

          ii.  Factor 5: the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process

It's no secret that racial discrimination in the state of Michigan has had traumatic effects on education, employment and health in the African-American community. Plaintiffs have provided evidence that African-Americans continue to bear the harmful effects of past discrimination. Dkt. No. 4 at 47–49 (Pg. ID No. 364–66); Metzger Report, pp. 13–15 (Pg. ID No. 232–34). It is not difficult to imagine how these effects, particularly in the employment setting, have made it more difficult for African-Americans to participate in the political process. For example, African-Americans are more likely to move from year to year, and are less likely to be home owners. Metzger Report, p. 27 (Pg. ID No. 246). Thus, making it more difficult to gain political capitol within a district. The Court finds

that the effects of discrimination hinder African-Americans' ability to participate effectively in the political process.

              iii. Factor 6: whether political campaigns have been characterized by overt or subtle racial appeals

Recent political campaigns in Michigan, particularly in regions with large black population centers, have been marred with direct and indirect racial appeals. For example, during the Detroit mayoral election of 2013, the lone white candidate, Mike Duggan—who would go on to win the election—was characterized by an opponent, Tom Barrow, as "not having a Detroit accent." Julie Banovic, *Drama unfolds at Detroit mayoral debate*, WXYZ DETROIT (June 4, 2013, updated June 5, 2013).[4] Another racial incident occurred in 2015, when in Southfield, Michigan, flyers reading, "Let's get the blacks out of Southfield," were circulated throughout the city on multiple occasions in the months before the mayoral election. Gus Burns, *Racist flyer: 'Let's get the blacks out of Southfield'*, MLIVE.COM (August 24, 2015).[5]

The racially charged rhetoric has not been limited to local and state election campaigns. The 2016 U.S. Presidential Election has been punctuated with similar

---

[4] Accessed at: http://www.wxyz.com/news/drama-unfolds-at-detroit-mayoral-debate.

[5] Accessed at: http://www.mlive.com/news/detroit/index.ssf/2015/08/racist_flyer_lets_get_the_blac.html.

racial appeals from its candidates. Some of those appeals have been implicitly ethnocentric. *Full text: Donald Trump announces a presidential bid*, THE WASHINGTON POST (June 16, 2015) ("When Mexico sends its people, they're not sending their best . . . They're rapists. And some, I assume, are good people.");[6] Eugene Scott, *Trump defends inflammatory comments, asks 'Who is doing the raping?'*, CNN.COM (July 2, 2015);[7] *see also* Brent Kendall, *Trump Says Judge's Mexican Heritage Presents 'Absolute Conflict'*, THE WALL STREET JOURNAL (June 3, 2016);[8] *see also* Leigh Ann Caldwell, *After Orlando, Donald Trump Would Expand Muslim Immigrant Ban*, NBC NEWS (June 13, 2016) ("In a speech reacting to the massacre in Orlando . . . Donald Trump doubles down on his proposal to ban immigration of Muslims, and he expanded his proposal to 'suspend immigration from areas of the world where there is a proven history of terrorism against the United States, Europe or allies.' ").[9]

---

[6] Accessed at: https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/

[7] Accessed at: http://www.cnn.com/2015/07/01/politics/donald-trump-immigrants-raping-comments/

[8] Accessed at: http://www.wsj.com/articles/donald-trump-keeps-up-attacks-on-judge-gonzalo-curiel-1464911442

[9] Accessed at: http://www.nbcnews.com/storyline/orlando-nightclub-massacre/donald-trump-would-expand-muslim-immigrant-ban-n591416

Other appeals have implicitly used race to capitalize on controversy here in the state of Michigan and elsewhere. *See* Kathleen Gray, *Clinton at NAACP event: I'm candidate to tackle racism*, DETROIT FREE PRESS (May 1, 2016) ("Democratic presidential candidate Hillary Clinton appealed to a largely African-American crowd in Detroit on Sunday, saying that she was the best candidate to address the problems of systemic racism in America.");[10] Janell Ross, *Bernie Sanders says white people don't know what it's like to live in a 'ghetto.' About that…*, THE WASHINGTON POST (March 7, 2016).[11] This is all in addition to the emergence of the "Black Lives Matter" Movement, and the increased attention to relationships between minority communities and law enforcement. *See* Nick Gass, *Milwaukee sheriff at RNC: 'Blue lives matter'*, POLITICO.COM (July 18, 2016).[12]

In total, race and ethnicity have been brought to the forefront in contemporary political campaigns. Accordingly, this factor favors the Plaintiffs.

---

[10] Accessed at: http://www.freep.com/story/news/politics/2016/05/01/democratic-front-runner-clinton-speak-detroit/83796232/

[11] Accessed at: https://www.washingtonpost.com/news/the-fix/wp/2016/03/07/bernie-sanders-says-white-people-dont-know-what-its-like-to-live-in-a-ghetto-about-that/

[12] Accessed at: http://www.politico.com/story/2016/07/rnc-2016-sheriff-dave-clarke-225768

iv. Factor 7: the extent to which members of the minority group have been elected to public office in the jurisdiction

This factor is neutral. As Plaintiffs point out, although President Obama has won the state of Michigan twice, only one African-American has ever been elected to a major statewide partisan office in Michigan. However, as Defendant points out, many elected judges—including the Chief Justice of the Michigan Supreme Court—are African-American. Furthermore, there have been numerous African-American representatives in local governments and the State Legislature.

v. Factor 8: whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group

Plaintiffs point solely to the recent Flint Water Crisis as illustrative of the significant lack of responsiveness to the needs of minority groups. While the Flint Water Crisis certainly seems symptomatic of a government that is indifferent to the needs of the African-American community—the city of Flint, Michigan being a majority African-American city—it alone is not enough to demonstrate that there is a *significant* lack of responsiveness on the part of elected officials. *Ohio Organizing Collaborative*, 2016 WL 3248030 at *42–43. While the state government seemed to fail African-American residents in Flint, the same administration provided support to African-American residents during the Detroit bankruptcy—a city that is over 80% African-American—in 2014. *See* Chris Isidore, *Detroit gets $195 million closer to salvation*, CNN MONEY (June 20, 2014)

("Gov. Rick Snyder will sign a series of bills Friday to give the city the state funds, a key component of Detroit's plan to wrap up its bankruptcy reorganization later this year.").[13]   Accordingly, Plaintiffs have failed to demonstrate that this factor weighs in their favor.

> vi. Factor 9: whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous

As described above, the state's justifications for P.A. 268 are tenuous. Accordingly, this factor favors Plaintiffs.

Thus, four of the six relevant Senate Factors are favorable to the Plaintiffs. Having considered the Senate Factors, the Court now turns to the "totality of the circumstances" analysis of a VRA § 2 claim.

The real question that the Court must answer is whether the burdens caused by P.A. 268 "are in part caused by or linked to 'social and historical conditions' that have produced or currently produced discrimination against African Americans" in Michigan. *Husted II*, 768 F.3d at 557. This question is unavoidably answered in the affirmative. African-Americans are much more likely to vote Democrat than other ethnic groups, and many feel this is largely due to racially charged political stances taken by Republicans on the local, state and national level since the post-World War II era. Philip Bump, *When did black Americans start*

---

[13] Accessed at: http://money.cnn.com/2014/06/20/news/economy/detroit-bankruptcy-state-aid/

*voting so heavily Democratic?*, THE WASHINGTON POST (July 7, 2015).[14] Using straight-party voting is merely an efficient means of expressing identity with the Democratic Party.

Moreover, the disproportionate burdens of P.A. 268 are inexorably linked to racially discriminatory employment practices and housing policies that have created deeply segregated communities across Michigan. African-American communities will be impacted harder by P.A. 268 specifically because our metropolitan areas are so racially polarized. The racial polarization of our metropolitan areas can be tied directly to racist policies such as redlining and housing discrimination.

In sum, the Court concludes that P.A. 268 likely will "interact[] with the historical and social conditions facing African Americans" in Michigan "to reduce their opportunity to participate in" Michigan's political process "relative to other groups of voters." *Ohio Organizing Collaborative*, 2016 WL 3248030 at *44. Accordingly, Plaintiffs are likely to succeed on the merits of their Voting Rights Act claim.

---

[14] Accessed at: https://www.washingtonpost.com/news/the-fix/wp/2015/07/07/when-did-black-americans-start-voting-so-heavily-democratic/

**F.  Irreparable Injury**

"When constitutional rights are threatened or impaired, irreparable injury is presumed. A restriction on the fundamental right to vote therefore constitutes irreparable injury." *Obama for America*, 697 F.3d at 436 (citations omitted). The case at bar deals with the right to vote, and thus this factor is presumed satisfied. *Id.*

**G. Irreparable Harm to the State**

Defendant argues that the State's interest in enforcing its legislation is paramount in this matter. However, as the Sixth Circuit explained in *Obama for America*,

> While states have "a strong interest in their ability to enforce state election law requirements," *Hunter,* 635 F.3d at 244, the public has a "strong interest in exercising the 'fundamental political right' to vote." *Purcell v. Gonzalez,* 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (quoting *Dunn,* 405 U.S. at 336, 92 S.Ct. 995). "That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful." *Hunter,* 635 F.3d at 244.

697 F.3d at 436–37; *see also Husted II*, 768 F.3d at 560.

Considering that the burden on the state would be to merely reinstate the ballots used in the 2014 election cycle—and the record does not show that there were any problems with the old ballot—this factor also favors Plaintiffs.

**H. The Public Interest**

Here, an injunction would protect the public against burdens on the right to vote. There would be no harm to the greater public in having the state continue to use the 2014 ballot form. Accordingly, this factor is satisfied.

## V. CONCLUSION

In total, all four preliminary injunction factors favor the Plaintiffs. Accordingly, for the reasons discussed herein, the Court will **GRANT** the Plaintiffs' Motion for preliminary injunction [4].

IT IS SO ORDERED.

Dated: July 22, 2016                              s/Gershwin A. Drain
                                                  GERSHWIN A. DRAIN
                                                  United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on **July 22, 2016.**

                              s/Shawna Burns on behalf of Tanya R. Bankston
                              TANYA R. BANKSTON
                              Case Manager & Deputy Clerk