UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN STATE A. PHILIP
RANDOLPH INSTITUTE, COMMON          No. 2:16-cv-11844
CAUSE, MARY LANSDOWN, ERIN
COMARTIN and DION WILLIAMS,          HON. GERSHWIN A. DRAIN

      Plaintiffs,                MAG. MONA K. MAJZOUB

v                                    **DEFENDANT'S MOTION FOR
                                     SUMMARY JUDGMENT**

RUTH JOHNSON, in her official capacity
as Michigan Secretary of State,

      Defendant.

_____/

Mark C. Brewer (P35661)
Attorney for Plaintiffs
17000 West Ten Mile Road, 2nd Floor
Southfield, Michigan  48075
248.483.5000

Mary Ellen Gurewitz (P25724)
Attorney for Plaintiffs
2211 East Jefferson Avenue
Detroit, Michigan  48207
313.965.3464

Denise C. Barton (P41535)
Rock Wood (P41181)
Adam Fracassi (P79546)
Elizabeth R. Husa Briggs (P73907)
Kendell Asbenson (P81747)
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30736
Lansing, Michigan  48909
517.373.6434

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Ruth Johnson, by counsel, brings this motion under Fed. R. Civ. P. 56(a), and asks this Court to enter an order dismissing the complaint and granting summary judgment in her favor, based on the grounds set forth in her accompanying brief.

On October 12, 2017, counsel for Secretary Johnson contacted Plaintiffs' counsel to seek concurrence in this motion.  Plaintiffs' counsel did not concur.

Respectfully submitted,

BILL SCHUETTE
Attorney General

*s/Denise C. Barton*
Denise C. Barton (P41535)
Rock Wood (P41181)
Adam Fracassi (P79546)
Elizabeth R. Husa Briggs (P73907)
Kendell Asbenson (P81747)
Assistant Attorneys General
Attorneys for Defendant Secretary of
  State Ruth Johnson
P. O. Box 30736
Lansing, Michigan  48909
517.373.6434
Email:  bartond@michigan.gov
(P41535)

Dated:    October 16, 2017

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN STATE A. PHILIP
RANDOLPH INSTITUTE, COMMON          No. 2:16-cv-11844
CAUSE, MARY LANSDOWN, ERIN
COMARTIN and DION WILLIAMS,          HON. GERSHWIN A. DRAIN

     Plaintiffs,                         MAG. MONA K. MAJZOUB

v

                                **DEFENDANT'S BRIEF IN**

RUTH JOHNSON, in her official capacity   **SUPPORT OF MOTION FOR**
as Michigan Secretary of State,          **SUMMARY JUDGMENT**

     Defendant.

_____/

Mark C. Brewer (P35661)
Attorney for Plaintiffs
17000 West Ten Mile Road, 2nd Floor
Southfield, Michigan  48075
248.483.5000

Mary Ellen Gurewitz (P25724)
Attorney for Plaintiffs
2211 East Jefferson Avenue
Detroit, Michigan  48207
313.965.3464

Denise C. Barton (P41535)
Rock Wood (P41181)
Adam Fracassi (P79546)
Elizabeth R. Husa Briggs (P73907)
Kendell Asbenson (P81747)
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30736
Lansing, Michigan  48909
517.373.6434

_____/

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION
## FOR SUMMARY JUDGMENT

BILL SCHUETTE
Attorney General

Denise C. Barton (P41535)
Rock Wood (P41181)
Adam Fracassi (P79546)
Elizabeth R. Husa Briggs (P73907)
Kendell Asbenson (P81747)
Assistant Attorneys General
Attorneys for Defendant Secretary of
  State Ruth Johnson
P. O. Box 30736
Lansing, Michigan  48909
517.373.6434
Email:  bartond@michigan.gov
(P41535)

Dated:    October 16, 2017

# TABLE OF CONTENTS

Page

Table of Contents ............................................................................. i

Index of Authorities ....................................................................... iv

Concise Statement of Issues Presented ................................................ vi

Controlling or Most Appropriate Authority........................................... vii

Introduction ..................................................................................1

Statement of Facts ..........................................................................6

Argument......................................................................................7

I.      Legal Standard under Rule 56 .....................................................7

II.     The organizational and individual Plaintiffs lack standing. ............................8

    A.      The institutional Plaintiffs MI APRI and Common Cause have failed to identify any members with individualized standing. .............8

    B.      The individual Plaintiffs cannot show an injury. ................................12

III.    Plaintiffs have failed to establish an Equal Protection claim under the Anderson-Burdick standard. ...........................................................16

    A.      Plaintiffs bear a heavy burden here, having alleged a facial challenge to a validly enacted state law. .............................................16

    B.      States have broad power over the manner of voting, limited only to the extent it violates a specific Constitutional provision. .......18

        1.      The challenged law only affects the manner of voting............18

        2.      P.A. 268 imposes a slight change in the method by which voters could vote for all candidates within a political party...........................................................................19

        3.      The change brought about by P.A. 268 survived challenges in other states or went unchallenged.......................22

C.   P.A. 268 is nondiscriminatory...........................................................25

D.   Plaintiffs' assertion that P.A. 268 will cause long lines and prevent voters from voting is without merit.......................................26

    1.   Assumption that it takes longer to vote without the SPV option is a myth not established by verifiable facts.................27

    2.   Hypothesis that wait times disproportionately affect African-Americans is not supported. ........................................30

    3.   The fears about eliminating SPV are exaggerated...................33

    4.   Wait times do not necessarily lead to fewer voters at the polls and is a flawed theory. .....................................................34

    5.   SPV can cause voter confusion and result in ballot errors. ......35

E.   Important regulatory interests support the restriction imposed by P.A. 268............................................................................................37

IV.   Plaintiffs have failed to establish discriminatory intent to sustain an Equal Protection claim......................................................................................39

A.   P.A. 268 does not result in a disparate impact to African-American voters. ............................................................................................40

B.   The historical background of P.A. 268 does not demonstrate an invidious purpose. ....................................................................................41

C.   The specific sequence of events leading up to P.A. 268 does not demonstrate an invidious purpose.......................................................41

D.   The legislative history of P.A. 268 does not demonstrate an invidious purpose. ....................................................................................41

E.   Plaintiffs cannot prove that P.A. 268 was passed based on a discriminatory purpose and it survives rational basis scrutiny. ..........42

V.   Plaintiffs have failed to establish a Voting Rights Act claim........................43

A.   Legal Analysis under § 2 of the Voting Rights Act. ...........................43

B.   Plaintiffs have failed to establish disparate impact. ...........................45

C.    Plaintiffs have failed to establish that any burden was caused by
or linked to social and historical conditions.........................................47

Conclusion and Relief Requested .............................................................54

Certificate of Service ...............................................................................55

# INDEX OF AUTHORITIES

Page

## Cases

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) .........................................................19

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................... 7, 38

*Anthony v. Michigan*, 35 F. Supp. 2d 989 (E.D. Mich. 1999) .......................... 13, 49

*Burdick v. Takushi*, 504 U.S. 428 (1992) ......................................................... *passim*

*Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 576 Fed.
   Appx. 477 (6th Cir. 2014) ....................................................................................39

*Council of Alter. Political Parties v. Hooks,* 179 F.3d 64 (3d Cir. 1999) ........ 19, 38

*Crawford v. Marion City Elec. Election Bd.*, 553 U.S. 181 (2008)...... 16, 17, 20, 21

*Department of Labor v. Triplett,* 494 U.S. 715 (1990) ............................................16

*Thornburg v. Gingles,* 478 U.S. 30 (1986) ...................................................... 44, 45

*Green Party of Tenn. v. Hargett*, 791 F.3d 684 (6th Cir. 2015) ............................16

*Guarino v. Brookfield Township Trustees*, 980 F.2d 399 (6th Cir. 1992)................7

*Hyman v. City of louisville*, 53 Fed. Appx. 740 (6th Cir. 2002)...............................8

*In re Apportionment of State Legislature*, 486 N.W.2d 639 (Mich. 1992) ............48

*John Doe No. 1 v. Reed,* 561 U.S. 186 (2010) .........................................................16

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ..............................................................15

*Lance v. Coffman*, 549 U.S. 437 (2007) ..................................................................13

*League of Women Voters of N.C. v. North Carolina (LWVNC)*, 769 F.3d 224
   (4th Cir. 2014) ....................................................................................... 20, 23

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..............................................12

*Miyazawa v. City of Cincinnati*, 45 F.3d 126 (6th Cir. 1995) .................................13

*NAACP v. Austin*, 857 F. Supp. 560 (E.D. Mich. 1994) .................................... 48, 51

*Ne. Ohio Coal. for the Homeless v. Husted (NEOCH),* 837 F.3d 612 (6th Cir. 2016) ...................................................................................... 18, 19

*Ohio Democratic Party (ODP) v. Husted*, 834 F.3d 620 (6th Cir. 2016) .. 43, 45, 47

*Oh. Council 8 Am. Fed'n of State v. Husted,* 814 F.3d 329 (6th Cir. 2016) ..........19

*One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896 (W.D. Wis. 2016) ........................................................................................................ 2, 23

*Reynolds v Bureau of State Lottery*, 610 N.W.2d 597 (Mich. App. 2000) ..............41

*Singleton v. Wulff*, 428 U.S. 106 (1976) .................................................................16

*Spurlock v. Fox*, 716 F.3d 383 (6th Cir. 2013) .......................................................40

*Tex. Dep't of Hous. & Cmty. Aff. v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507 (2015) ..........................................................................................45

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) .................................................................................................... 39, 41, 40

*Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442 (2008) ................................................................................................... 17, 18, 26

*Weller v. Cromwell Oil Co.*, 504 F.2d 927 (6th Cir. 1974) .......................................8

*Werme v. Merrill*, 84 F.3d 479 (1st Cir. 1996) .......................................................38

*Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187 (6th Cir. 1997) ...............18

## Statutes

Voting Rights Act of 1965, 52 U.S.C. § 10101 ............................................. *passim*

## Other Authorities

P.A. 268 ......................................................................................................... *passim*

## CONCISE STATEMENT OF ISSUES PRESENTED

1.      To have standing on behalf of its members, organizational institutions must identify members who have suffered an injury-in-fact.  Where MI APRI and Common Cause have failed to identify a single member impacted by the elimination of SPV, do they lack standing to sue?

2.      An individual Plaintiff has standing when he or she has suffered a concrete and particularized injury that is more than purely speculative or hypothetical.  Where the Plaintiffs fail to establish they have suffered a concrete or particularized injury, do they lack standing?

3.      Whether a voting regulation violates the Fourteenth Amendment is determined by weighing the law's hindrance against the provisions' regulatory justifications.  Where the elimination of SPV is supported by important regulatory interests, should Plaintiffs' equal protection claims be denied?

4.      Where there is no direct evidence of intentional discrimination, the courts look to circumstantial evidence to determine whether the law intentionally discriminates against minorities.  Where no evidence of a racially discriminatory intent or purpose is presented, should the Plaintiffs' intentional discrimination claim be dismissed?

5.      To establish a Voting Rights Act claim, (1) the voting standard or practice must result in an adverse disparate impact; and (2) the challenged voting standard or practice must cause the discriminatory impact as it interacts with social and historical conditions.  Where the Plaintiffs have failed to establish that the elimination of SPV causes a discriminatory impact as it interacts with social and historical conditions, should their Voting Rights Act claim be dismissed?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Authority*:

Standing:  For an association's members to "otherwise have standing to sue in their own right," they must have" (1) "suffered an injury in fact--an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "the injury has to be fairly traceable to the challenged action of the defendant"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations and citations omitted).

Third party standing:  A party seeking third-party standing must establish they have a close relationship with the person they are seeking to represent, and that that person lacks the ability to protect his or her own interests. *Singleton v. Wulff*, 428 U.S. 106, 112 (1976).

Equal Protection:  When a constitutional challenge to an election regulation concerns the regulation of elections and voting, the Court apply the *Anderson-Burdick* framework which balances the injury asserted by the party challenging the law with the interests put forward by the State as justifications for the burden. *Ohio Democratic Party, et al v. Husted, et al.*, 834 F.3d 620 (6th Cir. 2016).

Intentional Discrimination:  Where there is no direct evidence of discrimination, the must Court look to circumstantial evidence to determine if a racially discriminary intent or purpose is a "motivating factor" before Plaintiffs can prove "a violation of the Equal Protection Clause."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-66 (1977).

Voting Rights Act:  A § 2 challenge has two prongs: (1) the law must result in an adverse disparate impact on protected class members' opportunity to participate in the political process; and (2) whether the challenged voting standard or practice causes the discriminatory impact as it interacts with social and historical conditions.  *Ohio Democratic Party, et al v. Husted, et al.*, 834 F.3d 620 (6th Cir. 2016).

# INTRODUCTION

Michigan is not the first state to eliminate straight-party voting (SPV).  Most states never allowed this practice or abandoned it a long time ago.[1]  When other states abandoned SPV, few legal challenges resulted, and those that were launched were rejected.  Michigan is only the second state where eliminating this practice has been challenged in court as a violation of the Voting Rights Act of 1965, 52 U.S.C. § 10101.

In 1994, during the Clinton Administration, Georgia eliminated straight-ticket voting (STV).[2]  At that time, Georgia was required to preclear voting changes with the United States Department of Justice (DOJ) under § 5 of the Voting Rights Act due to its racially discriminatory history.  The DOJ precleared Georgia's statute eliminating SPV and found that Georgia's law had "neither a discriminatory purpose nor a discriminatory effect."[3]

More recently, in Wisconsin the federal court rejected constitutional and voting rights challenges, upholding that state's law.  *One Wisconsin Inst., Inc. v.*

---

[1] National Conference of State Legislatures website, http://www.ncsl.org/research/elections-and-campaigns/straight-ticket-voting.

[2] The term straight-ticket voting (STV) and straight-party voting (SPV) are used interchangeably in this brief.

[3] Letter from Isabella Katz Pinzler, Acting Attorney General of the Civil Rights Division, to Michael J. Bowers, Attorney General for the State of Georgia, August 29, 1994, available from the Department of Justice files at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2540.pdf.

*Thomsen*, 198 F. Supp. 3d 896, 945-46 (W.D. Wis. 2016).  That court found that several of the state's reasons for the change, including that the presence of this option on the ballot, increased the likelihood of overvoting and that its elimination would encourage voters to become more informed about the candidates, were reasonable.

Like Wisconsin, Georgia and every other state that has eliminated SPV, Michigan should be allowed to implement this duly enacted statute, P.A. 268.

**Procedural History**

Beginning July 21, 2016, in a series of orders, this Court entered a preliminary injunction order enjoining the State of Michigan from "[e]nforcing Public Act 268 in any manner that prevents Michigan citizens from exercising the option to use straight-party voting."  (R. 30, Page ID # 835.)  In its order, the Court found that "P.A. 268 disproportionately burdens the right to vote of African Americans," and that the "espoused state interests do not justify the burden."  (R. 30, Page ID # 836.)  The record demonstrates otherwise.

With respect to the disproportionate burden, this Court relied largely on the report of Kurt Metzger, who found "extremely high" correlations between the size of the African-American population within a county and the use of SPV in that district.  (R. 25, Page ID # 724.)

It is evident now from Metzger's deposition testimony and the expert analysis of Laurence Rosen that this high correlation was a result of data selected for him, and provided to him, by Plaintiffs' counsel. Metzger's first report presented data from nine counties. Metzger testified for only these nine counties. (Metzger Dep. Tr., Ex. 1, p. 17:1-18:5.) The expert report of Laurence Rosen demonstrates that the use of the SPV option is common throughout Michigan, both in counties with relatively high African-American populations, "as well as in communities where there are few or no African-Americans of voting age..." (Rosen Report, Ex. 2, p. 20.) Rosen's opinion is that Metzger's omission is "troubling." (*Id.*)

Previously, this Court also cited the declaration from Joseph Rozell, the Oakland County Director of Elections, who asserted that wait times would increase without the SPV option on the ballot. (R. 25, Page ID # 725.)

During his deposition, it became clear that Rozell's declaration was drafted after a phone call with Plaintiffs' counsel that focused on alleged problems with removing the SPV option. (Rozell Dep. Tr., Ex. 3, p. 28-29.) Rozell and Plaintiffs' counsel "exchanged drafts" of this declaration, with apparently so much revision on Plaintiffs' counsel's part that she considered those drafts to be protected attorney work product. (Rozell Dep. Tr., Ex. 3, p. 24.) Rozell also acknowledged the lack of evidentiary support for his declaration, having never

3

administered an election without the SPV option, and relying on data from a line study during an election where the SPV option was on the ballot. (*Id.* at p. 102-103.) He was not aware of any study measuring an increased wait time due to the elimination of the SPV option. (*Id.* at p. 103.)

The expert report of Stephen Graves utilizes the queuing theory to explain that there may be no increase in wait time if SPV is eliminated. The reason is sound and rather obvious. Not every voter will necessarily take longer to vote the ballot, and any increase in time will likely be absorbed because the longest wait times are at the check-in or registration table. (Graves Report, Ex. 4, p. 16.)

With respect to the question of whether the State of Michigan has a rational interest, this Court found the State's reference to the majority of states that do have the SPV option on their ballot to be "problematic" because the issue is whether P.A. 268 "would have a disparate impact on African-Americans in the State of Michigan" and the "behaviors of other states are *irrelevant* to the question of constitutionality." (R. 25, Page ID # 727.)

In addition, the Court found the *only* purpose behind P.A. 268 was to require "voters to spend more time filling more bubbles," that there was no demonstration that SPV damaged the election process, and that the Court did not agree with "the idea that voting one's party reflects ignorance or disengagement." (*Id.*) But in fact, the only major field study conducted on ballot styles and voting technology

4

observes that the presence of a SPV option on the ballot, especially the Michigan ballot with the lack of instructions on the ballot itself, is more confusing, requires voters to ask for assistance more often, and could result in disenfranchisement of African-Americans.  (Herrnson Report, Ex. 5, p. 5.)

The reported disproportionate impact on African-American voters was apparently influential in this Court finding a likelihood of success in Plaintiffs' challenge under the Voting Rights Act as well.  (R. 25, Page ID # 729.)  This Court found a disproportionate burden caused by or linked to the "Senate Factors." Specifically, this Court found Factor 2 (racial polarization), Factor 5 (discrimination against African-Americans that hinders their ability to participate effectively in the political process), Factor 6 (whether racial campaigns have been characterized by over or subtly racial appeals), and Factor 9 (policy underlying P.A. 268 was tenuous) to weigh in Plaintiffs' favor.  (*Id.* at Page ID # 734-739.) Thus, this Court found Plaintiffs were "likely to succeed on the merits of their Voting Rights Act claim."  (*Id.* at Page ID # 741.)

The Sixth Circuit denied Defendant's motion for a stay of the preliminary injunction on largely the same grounds.  (R. 40.)  The appellate court found that P.A. 268 placed two burdens on voting, i.e., voter confusion due to the party vignettes and an increase in wait times for voting.  (R. 40, Page ID # 943.)  The appellate court also found Kurt Metzger's analysis to be "of particular

significance" as it demonstrated a higher utilization of the SPV option among African-Americans.  (R. 40, Page ID # 944.)

With respect to the claim under the Voting Rights Act, the Sixth Circuit accepted this Court's finding of a disproportionate impact on African-Americans, based on Metzger's report; however, the Sixth Circuit found it a "more challenging question" whether a substantial likelihood of success on the merits existed with respect to the Senate factors and, particularly, whether the socioeconomic disparities interact with the elimination of the SPV option.  (R. 40, Page ID # 950-51.)  The United States Supreme Court subsequently denied Defendant's request for emergency relief.  The trial court proceedings followed.

Defendant now moves for summary judgment to dismiss Plaintiffs' claims.

## STATEMENT OF FACTS

On January 20, 2015, Senator Marty Knollenberg introduced Senate Bill No. 13 to amend the Michigan election law by removing the SPV option from the ballot.

Proponents of the bill expressed concern that the SPV option "encourages voters to cast their ballots without examining the credentials and values of the individual candidates[,]" and may also result in voters neglecting the nonpartisan sections of the ballot.  (S. Fiscal Analysis of SB 13, Dec. 17, 2015, Ex. 6, p. 1.)

After referral to committee and hearings, it was passed by both legislative bodies and presented to Governor Snyder on December 22, 2015. The Governor signed the bill into law on January 5, 2016. The signing letter recognizes that through this legislation, "Michigan joins 40 other states that require voters to select an individual for each elective office rather than simply selecting a political party." (Gov. Signing Ltr., Ex. 7.) The new law also included an appropriation of $5 million dollars "to ease Election Day administration and future investments will be considered as needed." *Id*. This validly enacted law should be upheld.

## ARGUMENT

### I.   Legal Standard under Rule 56

Fed. R. Civ. P. 56(a) provides that this Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Once the moving party has pointed to evidence establishing the lack of a material issue of fact, the burden falls on the non-moving party to set forth "specific facts" through affidavit or otherwise supporting a finding that "there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 403-06 (6th Cir. 1992). When this standard is applied to the record in this case, summary judgment is warranted.

## II.     The organizational and individual Plaintiffs lack standing.

Plaintiffs bear the burden of establishing jurisdiction through the production of evidence demonstrating such. *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 929-30 (6th Cir. 1974). Discovery has unveiled that the Plaintiffs *all lack standing*. Specifically, the institutional Plaintiffs have failed to identify any members who have suffered or will imminently suffer a cognizable injury-in-fact, and none of the individual Plaintiffs have demonstrated such an injury.

### A.     The institutional Plaintiffs MI APRI and Common Cause have failed to identify any members with individualized standing.

In the earlier ruling, this Court stated that MI APRI had standing to bring the Voting Rights Act claims on behalf of *its individual members*. (Am. Ord. Gtg. Prelim. Inj., R. 25, Page ID # 718.) The individualized injuries of MI APRI's and Common Cause's members must be established before they assert standing on behalf of its members because standing must exist at the time of the *filing* of the complaint. *Hyman v. City of Louisville*, 53 Fed. Appx. 740, 745 (6th Cir. 2002). This Court has further framed the individualized standing issue to be African-American voters in urban areas who disproportionally suffer longer wait times as a result of the elimination of P.A. 268. (R.25, Page ID # 716.) Discovery makes it clear that the organizational Plaintiffs do not have standing to sue because they lack individual members who have been injured.

8

**Plaintiff Michigan State A. Philip Randolph Institute lacks standing**

MI APRI alleges to be the Michigan division of the national A. Philip Randolph Institute (APRI). (Second Am. Compl., R. 56, ¶ 6, Page ID # 1094.) But a search[4] for business entities on the Michigan Department of Licensing and Regulatory Affairs' (LARA) website shows that MI APRI was automatically dissolved in 1980 and is not currently a corporate entity. (LARA Search, Ex. 8.)

Even if they can sue, MI APRI has failed to identify with any degree of specificity any members who have standing—i.e., who would have been impacted by the elimination of SPV. Anita Dawson, the MI APRI president, claims that MI APRI has a statewide membership of approximately 300 members, but then said, "many were volunteers." (Dawson Dep, Ex. 10, p. 62:20-63:4.) It is unclear whether the 300 includes volunteers, or whether they are actual members.

But Dawson could not identify or name any MI APRI members within the State who were impacted by the elimination of SPV. (*Id.* at p. 19:7-12, 20:16-22.) In fact, she testified that no member of MI APRI approached her about the elimination of SPV until *after* Plaintiffs' counsel contacted her to become a Plaintiff in the lawsuit. (*Id.* at p. 70:21-71:9.) Notably, Dawson admitted that,

---

[4] The search terms "philip randolph" were used to "Search Database by Key Word" on the LARA website, located at http://wl.lara.state.mi.us/businessentitysearch/sr_corp.asp (last accessed Sept. 8, 2017; results attached as Ex. 9).

based upon her observations, many factors contribute to longer lines at the polling station, including missing staff or malfunctioning voting machines. (*Id.* at p. 27:5-11.) More significantly, Dawson denied that MI APRI had "any documents, records, or correspondence that relates basically to the data or the information upon which [MI APRI is] basing [its] claims that the elimination of straight party voting disproportionately impacts African Americans." (*Id.* at p. 22:19-24:3.) Accordingly, MI APRI lacks standing to sue on behalf of its members.

**Plaintiff Common Cause lacks standing.**

Common Cause faces a similar problem. Common Cause is a D.C. entity and every member listed on its board of directors is located there. No individual Plaintiffs in this lawsuit are members of either Common Cause or its Michigan chapter. (Lansdown Dep. Tr., Ex. 11, p. 16:17-22; Comartin Dep. Tr., Ex. 12, p. 17:24-18.1; Williams Dep. Tr., Ex. 13, p. 39:15-40:10.)

According to Allegra Chapman, Senior Counsel and Director of Voting and Elections for Common Cause, Common Cause had not performed any "tests or surveys to identify if in fact there would be a disparate impact on African-American voters in Michigan if straight-ticket voting were eliminated." (Chapman Dep. Tr., Ex. 14, p. 10:19-21.) Chapman denied that Common Cause had engaged in any independent analysis of the social or historical issues allegedly faced by African-American voters in this lawsuit (*id.* at p. 41:19-42:5), nor has Common

10

Cause engaged in any study of the various effects of the elimination of SPV on down-ballot non-partisan races. (*Id.* at p. 69:22-71:3.) Chapman admitted that Plaintiffs' counsel contacted Common Cause to gain its involvement (*id.* at p. 64:23-65:14), and that Common Cause relied on his comments and studies in joining this litigation. (*Id.* at p. 11:2-12:14.) Chapman also admitted that "get-out-the-vote efforts by various groups actually can increase voter turnout despite the elimination of straight-ticket voting." (*Id.* at p. 31:21-23.)

Chapman agreed that the elimination of SPV is not "inherently unconstitutional" (*id.* at p. 35:25-36:3); that SPV could result in "an undervote"—i.e., the failure to mark down-ballot non-partisan races (*id.* at p. 80:16-22); that there is "potential confusion or misreporting or underreporting of votes where a voter marks the straight-ticket single-mark option but then votes for a candidate in an opposing party later in the ballot" (*id.* at p. 87:5-10); and that even if straight-ticket voting was eliminated, all registered African-American voters may still "vote straight-ticket option by marking each of the boxes for the democratic party." (*Id.* at p. 96:16-23.)

Chapman has not identified or named any Common Cause members within the Michigan who were impacted by the elimination of straight-party voting. (*Id.* at p. 47:6-48:4.)

11

In fact, Chapman testified that Common Cause has not "actually identified any of its members in the State of Michigan that claim they would be negatively impacted by the elimination of straight-ticket voting." (*Id.* at p. 105:9-24.) Importantly, Common Cause had not even attempted to determine which of its Michigan members had been affected until approximately two months prior to the deposition. (*Id.* at p. 106:5-12.) Indeed, Common Cause's involvement in this case was solely because of Plaintiffs' counsel's solicitation—and not because of any injuries sustained by any members. (*Id.* at p. 11:2-12:14, 64:23-65:14.) Accordingly, Common Cause lacks standing to sue on behalf of its members.

Without sufficiently alleging an injury in fact to identified members, MI APRI and Common Cause cannot satisfy the elements for representational standing because:

> ...the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citations omitted).

### B.    The individual Plaintiffs cannot show an injury.

None of the individual Plaintiffs can demonstrate that P.A. 268 has injured them in a manner distinguishable from the alleged hypothetical harm incurred by any other resident within the State of Michigan. Rather, the individual Plaintiffs raise only general grievances regarding what *may* occur to every voter in the State.

12

Plaintiffs' claims are strikingly similar to those considered and easily rejected by the Supreme Court, the Sixth Circuit, and this Court. *See, e.g.*, *Lance v. Coffman*, 549 U.S. 437, 441 (2007); *Miyazawa v. City of Cincinnati*, 45 F.3d 126, 126-28 (6th Cir. 1995); *Anthony v. Michigan*, 35 F. Supp. 2d 989, 1003 (E.D. Mich. 1999).

**Plaintiff Mary Lansdown lacks standing.**

Mary Lansdown, a 78-year-old African-American registered to vote in Flint, cannot demonstrate an individualized injury. (Second Am. Compl., R. 56, ¶ 8, Page ID # 1096.) Lansdown has voted absentee since 1994. (Lansdown Dep. Tr., Ex. 11, p. 7:20-8:18.) Lansdown is the president of the Flint chapter of MI APRI and has been president for over 10 years. (Lansdown Dep. Tr., Ex. 11, p. 21:20-22:2.) Lansdown testified that she had never left a polling station because the lines were too long (*id.*, 14:1-3), and that "nothing" would stop her from going to the polls or waiting in line to vote. (*Id.* at p. 14:18-23.) Because Lansdown is over 60 years old, she is automatically eligible to vote absentee. (*Id.* at p. 7:25.) Lansdown testified that she is involved in getting-out-the-vote efforts, and admitted that the elimination of SPV does not affect her ability to go door-to-door, put up yard signs, get people to the polls, or register or educate voters. (*Id.* at p. 15:13-19:11). Lansdown stated that Dawson asked her to join the lawsuit. (*Id.* at p. 24:6-20.)

13

Because Lansdown does not vote in person, she would not endure any lines hypothetically caused by the elimination of SPV. Under these circumstances, Lansdown has simply not demonstrated that the elimination of SPV would prevent her from casting a ballot. Accordingly, Lansdown cannot demonstrate that she would suffer an individualized injury.

**Plaintiff Erin Comartin lacks standing.**

Comartin, who is white, is a registered voter in West Bloomfield Township. (Comartin Dep. Tr., Ex. 12, p. 18:20-19:10, 23:9-10.) Comartin testified that the elimination of SPV does not affect her right to vote "so much as it affects [her] benefits of democracy." (*Id.* at p. 42:8-9.) This is not a particularized injury recognized in standing jurisprudence. Accordingly, Comartin cannot demonstrate that she would suffer an individualized injury.

**Plaintiff Dion Williams lacks standing.**

Dion Williams is a 43-year-old African-American male registered to vote in Detroit. (Williams Dep. Tr., Ex. 13, p. 7:15-19, 11:21-22.) Although Williams "almost always" votes a straight ticket, he has testified that he would never not vote because of a long line at the polling station. (*Id.* at p. 21:7-22:1, 26:10-25.) Williams also admitted that he would be able to vote for the candidates of his preferred party even if he were not able to cast a straight-ticket ballot. (*Id.* at p. 28:3-6.) In Williams' most recent experience at the polling station, most of the

wait he encountered at the polling place was attributable to the check-in table—not at the voting booth. (*Id.* at p. 19:7-19, 23:7-16.) Although it took Williams about eight minutes to complete a straight-ticket ballot and 21 minutes to complete a non-straight-ticket ballot, the difference of 13 minutes is dwarfed by the one hour or so he spent at the check-in table. (*Id.* at p. 19:7-19, 23:7-16.) In short, Williams has not demonstrated that P.A. 268 would prevent him from voting.

None of the individual Plaintiffs can establish that the elimination of SPV prohibited or dissuaded them from voting. Thus, the individual Plaintiffs have failed to establish individualized injury. To the extent that the individual Plaintiffs attempt to assert an injury suffered by others,[5] they are attempting to raise third-party standing. But a party seeking third-party standing must show the following:

> [T]hey have a "close relationship" with the person who possesses the right, and there is a "hindrance" to the possessor's ability to protect his own interests. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).

(R. 25, Page ID # 719-720.) Here, no individual Plaintiffs have named or established the sort of "close relationship" with any identified injured individuals

---

[5] Lansdown testified that Dawson asked her to "speak on behalf of A. Philip Randolph, not just as a Flint Chapter" member (Lansdown Dep. Tr., Ex. 11, p. 24:6-20); and Comartin testified that she is bringing the suit on behalf of her work with minority communities (Comartin Dep. Tr., Ex. 12, p. 42:6-43:12.) Williams testified that he did not know what Common Cause is and is not a member of either Common Cause or APRI. (Williams Dep. Tr., Ex. 13, p. 39:15-40:10.)

that entitles them to bring a claim on their behalf.  *See Singleton v. Wulff*, 428 U.S. 106, 112 (1976); *Department of Labor v. Triplett,* 494 U.S. 715, 720 (1990).

### III.   Plaintiffs have failed to establish an Equal Protection claim under the *Anderson-Burdick* standard.

#### A.   Plaintiffs bear a heavy burden here, having alleged a facial challenge to a validly enacted state law.

Plaintiffs bear a "heavy burden of persuasion" here, having lodged a facial challenge to a validly enacted law.  *Crawford v. Marion City Elec. Election Bd*., 553 U.S. 181, 200 (2008).  *The fact that this is a facial challenge is almost beyond dispute.*  Plaintiffs request that the Court "permanently enjoin Defendant … from enforcing or giving any effect to the provisions of 2015 P.A. 268 that prohibit straight party voting[.]"  (Second Am. Compl.,  R. 56, Page ID # 1123.)  This is akin to the definition of a facial challenge: "an effort to invalidate the law in each of its applications, to take the law off the books completely."  *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 691-692 (6th Cir. 2015) (quotation omitted).  To the extent any of Plaintiffs' claims have characteristics of an "as-applied challenge," it is beyond dispute that their request for relief extends beyond their circumstances and, accordingly, the standards for a facial challenge apply.  *Id.* at 692 (citing *John Doe No. 1 v. Reed,* 561 U.S. 186, 194 (2010)).

The implication of these standards is significant.  A ruling in Plaintiffs' favor would declare a facially neutral and nondiscriminatory act of the State's

Legislature unconstitutional and, thereby, "frustrate[] the intent of the elected representatives of the people." *Crawford,* 553 U.S. at 203 (quotation omitted). Such challenges are disfavored by the Supreme Court for reasons apparent here.

Plaintiffs' allegations of the adverse effects from eliminating the SPV option rest on speculation. None of the clerks who submitted declarations in support of Plaintiffs' complaint administered an election without the SPV option. (Swope Dep. Tr., Ex. 16, p. 89:20-23.) As explained in detail below, the efforts they can take to reduce the speculative effects of eliminating SPV are the same efforts they have taken to alleviate long lines and voter confusion when voting changes occur. (*See, e.g.,* Baxter Dep. Tr., Ex. 16, p. 74:16-18, 89:3-93:18 (testimony regarding efforts to reduce the number of voters at each precinct and splitting precincts to reduce lines); *see also id.* at p. 102:6-19 (Baxter testifying that use of billboards when "photo identification was implemented in 2006" could be used to advise voters of elimination of SPV). And this challenge was brought before the State has had an opportunity to implement the law. In the words of the Supreme Court, such challenges "run contrary to the fundamental principle of judicial restraint" and "threaten to short circuit the democratic process." *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449-51 (2008) (internal quotations and citations omitted).

To succeed, Plaintiffs must establish that no set of circumstances exist under which the statute would be valid. *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 193-94 (6th Cir. 1997). The "challenge must fail where the statute has a plainly legitimate sweep." *Wash. State Grange,* 552 U.S. at 449 (quotation omitted). When evaluating this case, courts are not allowed to "go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id.* at 449-50.

### B.   States have broad power over the manner of voting, limited only to the extent it violates a specific Constitutional provision.

#### 1.   The challenged law only affects the manner of voting.

Article I, Section 4 of the United States Constitution vests the plenary authority to determine the "Times, Places and Manner of Holding Elections" with the State Legislature, unless overridden by an act of Congress.

At issue here is whether eliminating the SPV option places an undue burden on the right to vote under the Fourteenth Amendment. "The certainty that every election law places at least some burden on individual voters demands that courts weigh that hindrance against the provision's regulatory justification." *Ne. Ohio Coal. for the Homeless v. Husted (NEOCH),* 837 F.3d 612, 630 (6th Cir. 2016).

A flexible standard is to be applied. The first step in this analysis is to "consider the character and magnitude of the asserted injury to the rights protected by the … Fourteenth Amendment." *Council of Alter. Political Parties v. Hooks,*

18

179 F.3d 64, 74 (3d Cir. 1999). And, then, weigh this injury against the State's

interest in the regulation, taking into account the extent to which the State's

interest necessitates the burden. *NEOCH,* 837 F.3d at 630.

In practice, the level of scrutiny varies depending on the severity of the

restraint, specifically:

"Severe restrictions" must be narrowly drawn "to advance a state interest of
compelling importance." *NEOCH,* 837 F.3d at 631, quotation omitted),
while

"[M]inimally burdensome and nondiscriminatory" regulations are evaluated
with a scrutiny comparable to the rational basis review. *Oh. Council 8 Am.
Fed'n of State v. Husted,* 814 F.3d 329 (6th Cir. 2016).

Regulations falling between these two extremes are evaluated using the

*Anderson-Burdick* balancing test which weighs the burden on plaintiff "against the

state's asserted interest and chosen means of pursuing it." *NEOCH,* 837 F.3d at

631. A state's "important regulatory interests are generally sufficient to justify

reasonable, nondiscriminatory restrictions." *Anderson v. Celebrezze*, 460 U.S.

780, 788 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

> **2.   P.A. 268 imposes a slight change in the method by which
> voters could vote for all candidates within a political party.**

Dispositively, P.A. 268 imposes absolutely no additional restrictions or

barriers to *ballot access*. It does not address the qualifications or identification

needed to cast a vote or the times or places where such voting can occur. It affects

only how voters *fill out* the ballot by requiring that they actually cast a vote for their candidate of choice, rather than blindly endorsing a political party's choices.

This fact alone establishes that P.A. 268 does not impose an undue burden on voting for one's preferred candidates or that merely requiring voters to vote for their preferred candidates *burdens* their right to vote for their preferred candidates. It is not plausible that measures which *do* restrict access to the ballot—such as a photo ID requirement—do not impose a facial Fourteenth Amendment burden (*See Crawford*), but that this far less burdensome law does.  It is also not plausible that the ballots in the vast majority of states violate the Fourteenth Amendment, particularly since elimination of the SPV option has increased in modern times. Thernstrom's report indicates six states continue to have SPV.  (Thernstrom Report, Ex. 17, p. 2.)

For these reasons, no case anywhere has ever invalidated laws eliminating SPV or other laws dictating how voters *fill out* ballots and elimination of SPV has been upheld in cases that have continually struck down numerous other aspects of a state's elections laws.  *League of Women Voters of N.C. v. North Carolina (LWVNC)*, 769 F.3d 224 (4th Cir. 2014).

Since it cannot be seriously argued that checking a box next to a candidate's name is an undue burden on voting, Plaintiffs claim that the *collateral consequences* of this non-burdensome procedure somehow burden voting.

20

Plaintiffs speculate:  it takes somewhat longer to cast individual candidate votes and this *could* lead to longer wait times for voting and this *might* discourage impatient or time-pressed voters and this *hypothesized* delay is an unconstitutional burden.

But, particularly in facial challenges, it is improper to invalidate the Legislature's judgment based on a series of speculative connections.  *Crawford*, 553 U.S. at 189-204.  Were it otherwise, the federal judiciary, rather than state legislatures, would micro-manage the electoral process since *every* aspect of that process—from sign-in procedures to the number of clerks and tables at a precinct—has a far more tangible effect on voting wait-times than anything affected by P.A. 268.  But just as a federal court could not invalidate a state law requiring assistance or special procedures to assist disabled or illiterate voters fill out a ballot, based on "evidence" that this increases wait times at polling places, any such action is impermissible here.

This is particularly true because Plaintiffs have utterly failed to show that P.A. 268 will impose any cognizable unconstitutional burden on voters.  While the glaring defects in Plaintiffs' specific proofs are detailed below, a single data point is sufficient to refute their claim:  voting without the SPV option is the law in 44 states.  (Thernstrom Report, Ex. 17, p. 2.)  It is not remotely plausible that all (or most) of those states have been violating the Fourteenth Amendment without

21

anyone noticing. More to the point, Plaintiffs have not even attempted to show that the wait times in states without the SPV option are longer than those in (the handful of) states still using that outmoded system—which, standing alone, defeats any claim that voting with SPV predictably or meaningfully delays voting.

The more detailed analysis below specifically demonstrates that P.A. 268 has not been shown to impose a constitutionally cognizable burden and, in any event, any incidental inconvenience is more than justified by the obvious interests that have led the vast majority of states to abandon SPV.

Here, if P.A. 268 were allowed to take effect, the only change voters in Michigan would experience is a change in the method by which they could vote for all candidates from a single party. In most elections, the act may require a voter to make approximately 18-19 additional marks on a ballot. (Baxter Dep. Tr., Ex. 16, p. 113:12-21.) No voter would be turned away from the polls due to this law. Even if the voter took longer to complete the ballot, Michigan does not limit the amount of time any voter has to complete the ballot.

### 3. The change brought about by P.A. 268 survived challenges in other states or went unchallenged.

Michigan joins thirteen (13) states which removed the SPV option from their ballot within the last twenty-five years. (Thernstrom Report, Ex. 17, p. 2, 5 (Table 1).)

As explained earlier, the federal district court in Wisconsin considered constitutional and voting rights challenges. *One Wisc. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 906 (W.D. Wisc. 2016).

A few years ago, the Fourth Circuit considered constitutional challenges to a controversial bill to alter several aspects of election administration in North Carolina. *LWVNC*, 769 F.3d at 224. Included in this "Vote the Person Not the Party" Act was the elimination of the SPV option; however, this was not challenged. Session Law 2013-381; H.B. 589, part 32 (N.C. 2013).

In Georgia, the lack of a court challenge is not surprising given that a state with a "tainted civil rights history" obtained pre-clearance from the DOJ under President Clinton's administration. (Thernstrom Report, Ex. 17, p. 6.) But Michigan changed its election law in precisely the same way as Georgia. The same result should occur here: Michigan's SPV change should be implemented.

        **a.**    **The SPV is popular with approximately 48% of Michigan voters, this statistic also includes those voters who split their ticket.**

It is undisputed that the use of the SPV option is widespread *throughout* Michigan. Approximately 48% of voters who voted in the November general elections in 2012, 2014 and 2016 utilized SPV. This figure is somewhat misleading for purposes of determining the number of voters impacted by P.A. 268

because it includes all voters who used the SPV option, including those who filled in the oval for SPV and then split their ticket.

However, the impact of the change brought about by P.A. 268 is minimal. Voters who formerly voted the entire partisan portion of the ballot through the SPV option would be required to make additional marks on the ballot. Because SPV impacts the partisan section of the ballot, SPV does not cover nonpartisan offices (e.g., judgeships, school boards), so voters must mark their ballots if they intend to vote for those offices.

The additional marks needed to mark the entire ballot though is related to a change that preceded P.A. 268. More than a decade ago, the Michigan Legislature consolidated elections in order to reduce the number of election dates to four, provide consistency and predictability for voters, and centralize administration of elections under the city, township and county clerks. (2003 P.A. 298, House Fiscal Analysis, Ex. 18, p. 6.) As a natural consequence of consolidating these elections, the ballot lengthened for both partisan and nonpartisan sections. In the November 2016 general election, voters in the City of Detroit made 37 marks to vote the *nonpartisan* portion of the ballot. (Baxter Dep. Tr., Ex. 16, p. 113.) This large number was, at least in part, a result of efforts to consolidate elections that was not opposed by some of those who now cry foul with respect to P.A. 268. For example, Rozell testified in support of consolidating elections despite the fact that

24

he believed this change increased ballot length, the amount of time to complete the ballot, and wait times.  Nonetheless, Rozell testified that this did not pose a constitutional concern.  (Rozell Dep. Tr., Ex. 3. p. 156-157.)  The argument that increased wait times now poses a constitutional concern is somewhat disingenuous given the testimony from all of the Plaintiffs' witnesses as to efforts taken to increase voter registration and their failure to oppose (if not directly support) legislation for consolidating elections.  (Williams Dep. Tr., Ex. 13, p. 19-21, 33-36 (stating that he did not lobby against consolidation because he was not aware of the initiative but actively made efforts to register voters).)

### C.    P.A. 268 is nondiscriminatory.

P.A. 268 is facially neutral and nondiscriminatory, and applies to every voter in Michigan without regard to race.  Its plain language removes the SPV option from the ballot for every statewide election.

Opponents recognized this early on.  On November 20, 2015, Bill Zaagman, a lobbyist for the Michigan Association of County Clerks, asked all clerks to contact their legislative representative and voice opposition to SB 13 because the elimination of SPV "is not an urban problem" and will have a state-wide impact. (Rozell Dep. Tr., Ex. 3, p. 17-18.)

Election result data gathered from the 2012, 2014 and 2016 November general election in Michigan confirms the nondiscriminatory effect of this law.  In

25

the November 2016 general election, SPV accounted for at least 40% of the votes cast in more than 70% of Michigan's counties.  (Rosen Report, Ex. 2, p. 27.) Several of the counties with the highest percentages of SPV during this election have a very small population of African-Americans.

Perhaps more importantly, the data does not support a finding that the use of SPV is caused by race.  As Baxter testified during his deposition "there is nothing instinctive, intuitive that would drive an African-American to vote straight party versus a white person."  (Baxter Dep. Tr., Ex. 16, p. 123.)  Similarly, Christopher Swope, Lansing City Clerk, testified that he had no reason to believe that minorities were less likely to wait in line to vote or less likely to vote when faced with a long line, than non-minorities.  (Swope Dep. Tr., Ex. 15, p. 137-138.)

### D.    Plaintiffs' assertion that P.A. 268 will cause long lines and prevent voters from voting is without merit.

Plaintiffs' case is built on the hypothetical that eliminating SPV will require every voter to take more time to vote, thereby increasing longer lines, and dissuading voters, particularly African-American voters, from voting.  But there is no scientific support for this assertion.  The Supreme Court has cautioned against the reliance on hypotheticals to invalidate a state statute.  See *Wash. State Grange,* 552 U.S. at 449-51.  This case presents a good illustration of why.

## 1. Assumption that it takes longer to vote without the SPV option is a myth not established by verifiable facts.

First, there is no support for the proposition that it will take a voter more time to vote without SPV. None of the election officials who presented affidavits in support of Plaintiffs relied on a study or other data to support their opinion that the elimination of SPV would result in a longer time to complete the ballot. Their assumption appeared to be based on the potential for additional marks; however, none had done any field studies to support this.

Moreover, the expert reports of Stephen Graves and Paul Herrnson, attached as Exhibits 4 and 5, contradict this assumption. SPV may actually *increase* the time to vote for a voter who deliberates over the partisan races before deciding to use the SPV option (Graves Report, Ex. 4, p. 3), or for a voter who needs assistance due to the inherent confusion presented by the SPV option. (Herrnson Report, Ex. 5, p. 17, 41).

### a. Reliable scientific studies and analysis demonstrate that removal of SPV may not affect wait times or may reduce them.

The most reliable theories used to estimate wait times, and an actual scientific study on ballot design and election administration, lead to the conclusion that wait times in Michigan may be unaffected, or may actually decrease by removal of the SPV option.

27

i.      **The queuing theory suggests that eliminating the SPV option may not affect wait times.**

Perhaps the most widely recognized theory used to estimate wait times in polling places is the queuing theory described in Graves' expert report. This theory predicts wait times by examining three attributes – arrival time, service time and the number of service stations. Applying this theory appropriately, i.e., by accounting for interactions between these three stations and the possibility of a line occurring at any one of them, reveals that eliminating SPV may not result in longer wait times overall. The single check-in and the single tabulator result in the average wait time at these locations being greater than the average wait time for one of several voting booths at any given precinct. (Graves Report, Ex. 4, p. 5-6.) As explained below, the minimum number of voting booths per precinct is set by state law, and local officials have significant discretion to alter this given the needs of their precinct.

ii.     **Actual studies assessing the impact of voting technology and ballot design conclude that the SPV option may actually increase time to vote.**

Moreover, scientific research demonstrates that the SPV option actually increases time to vote, especially for voters who are of low literacy and share characteristics with disenfranchised groups. This mechanism for voting more often leads to voters asking questions or needing assistance, which in itself increases the time it takes to vote.

28

The analysis behind this is detailed in Herrnson's report, a political science professor at the University of Connecticut, who has been studying voting systems, ballot design and election administration for nearly two decades. (Herrnson Report, Ex. 5, p. 3.) Herrnson served as the principal investigator on an interdisciplinary team that conducted a field study to assess the impact of voting interfaces (i.e., ballot styles, methods of voting, and voting technology) on voters with various demographic characteristics. (*Id.* at p. 26-28.) This research was conducted with voters from three states, of which Michigan was one, and the ballot with the SPV option was one of the ballots tested. The purpose was to determine the impact of voting interfaces on carrying out the voter's intent. Thus, participants were asked to identify the candidate(s) for whom they intended to vote, vote on the voting system, and then evaluate several aspects of this system before moving on to another voting system. (*Id.* at p. 27.)

Herrnson and his colleagues discovered that a higher percentage of voters using the straight-party option felt the need to ask for assistance in the voting process (*id.* at p. 28), made more errors in voting (*id.* p. 30-35), and that these factors were more prevalent with those participants who were "African American with low literacy rates and associated background characterizations." (*Id.* at p. 41.) This study was published in 2008, before this litigation was filed, and the findings appear in a book and several published articles.

29

Herrnson's findings are more than just theoretical. He demonstrates the validity of them in his expert report for this case (Exhibit 5) by examining copies of actual ballots presented in two Michigan precincts. (*Id.* at 13-14.) The Michigan ballot with the SPV option is confusing and poses a "hurdle" for voters because it is unclear and confusing regarding what votes are counted for a voter who utilizes the SPV option in multi-member districts. (*Id.*)

Indeed, Plaintiffs themselves exhibited a misunderstanding here about SPV. Both Williams and Comartin testified that using the SPV option and, then, voting for a candidate from another party later on the ballot would result in a spoiled ballot. (Comartin Dep. Tr., Ex. 12, p. 24; Williams Dep. Tr., Ex. 13, p. 21.) This is not the case. Mich. Comp. Laws § 795c.

### 2. Hypothesis that wait times disproportionately affect African-Americans is not supported.

Even *if* the elimination of SPV caused an increase in wait times, the record does not support a finding that its elimination disproportionately affects African-Americans.

Plaintiffs' case is built primarily on Metzger's report. First, he represented to this Court that African-Americans "are more likely to use the [SPV]-option and that its elimination will disproportionately affect African American voters" by examining nine counties with a relatively high percentage of African-Americans and a relatively high percentage of the utilization of the SPV option. (Rule

26(A)(2)(B) Metzger Report, R. 1-11, Page ID # 231.)  Metzger cherry-picked the counties chosen.  He omitted several counties with high levels of SPV (e.g., Ottawa County, Washtenaw County and Livingston County) which is troubling from a reliability standpoint.  (Rosen Report, Ex. 2, p. 20.)  In fact, utilization of the SPV option is high throughout Michigan, even in those areas with a relatively small African-American population.  Yet Plaintiffs presented this cherry-picked data to this Court even though it appears that the data was publicly available from other counties.  (R. 98, Def. Johnson's Resp., Page ID #1680-1681; Rosen Report, Ex. 2, p. 14.)

The November 2016 general election data indicates that the SPV option was used by more than 50% of Michigan voters in seven Michigan counties during the election.  Three of these counties, Ottawa, Allegan and Montcalm, had a comparatively small African-American population, while Kalamazoo, Washtenaw, Muskegon, Macomb, Jackson and Lake Counties have a comparatively higher population of African-Americans, yet exhibit a significantly smaller percentage of straight-party voting.  (Rosen Report, Ex. 2, p. 28-29, Fig. 1a.)

Second, Metzger's analysis relies on the racial composition of *counties* to estimate SPV usage by race.  This is an imprecise and misleading proxy for race.  The fact that a county with a high percentage of African-American residents also exhibits a high percentage of SPV does not demonstrate that an individual African-

American voter is more likely to utilize the SPV option.  Even in a jurisdiction with 91% minority population, it is possible that the elimination of the SPV option would affect more white voters than non-white voters if raw numbers are used, and it cannot be said with absolute certainty that this is not the case here.  (Baxter Dep. Tr., Ex. 16, p. 139-141.)

Third, Plaintiffs' assumption that any increase in voting time and lines will disproportionately affect African-Americans in urban areas ignores the realities of election administration in Michigan.  State law caps the population of a precinct, and local clerks in the City of Detroit ensure that the precinct population remains even lower than the cap.  (Baxter Dep. Tr., Ex. 16, p. 74-77.)  There is a precinct in the City of Detroit, for example, which has only two voters, but still is required by law to have its own pollbook and tabulator.  (*Id.* at 7-11, 74-77.)  Baxter also testified that it is a relatively simple process to split a precinct, as has been done in the past, and plans are currently underway to reduce the size of the larger precincts. (*Id.* at p. 92-93.)  Michigan law also sets a minimum number of voting machines per precinct, and requires each have a pollbook and tabulator regardless of the precinct size.  Mich. Comp. Laws § 168.661.

In short, the record refutes any finding that the elimination of the SPV option necessarily has a disproportionate negative effect in areas with a high percentage of African-Americans.

### 3.    The fears about eliminating SPV are exaggerated.

Plaintiffs have relied upon a parade of horribles in order to justify why SPV should not be eliminated.  But those fears are not justified by the record. (Herrnson Report, Ex. 5.)  If elimination of the SPV option causes an increase in the time taken to vote and in the length of the line, there is no basis in the record to find that election administrators will not be able to adjust for it.

Every one of the witnesses who testified on behalf of Plaintiffs testified to significant efforts—both historically and currently—to reduce wait times in their jurisdictions.  Efforts include expanding the number of voting booths, splitting paper pollbooks at check-in to facilitate the registration of more than one person at a time, accessing the e-pollbook through two laptops synched together, adding or splitting precincts and recruiting election officials from the private and public sector.  (Rozell Dep. Tr., Ex. 3, p. 46-47, 60-68, 86-88; Baxter Dep. Tr., Ex. 16, p. 132, 88-93; Swope Dep. Tr., Ex. 15, p. 26-28, 43, 47, 54-56, 63-66, 77-82, 139.)

Some background about election administration is in order here.  The State of Michigan sets a minimum requirement for the number of voting booths in a given precinct; however, the clerks work to modify this according to the needs of their precinct.  (Swope Dep. Tr., Ex. 15, p. 54.)  Former Director of the Bureau of Elections Christopher Thomas also testified that the Bureau has been educating local clerks about on line management for a few years, including how to plan for

the number of voting stations and to monitor lines.  (Thomas Dep. Tr., Ex. 19, p. 37.)  If the SPV option were eliminated, the Bureau would have recommended to the local clerks to increase the number of voting stations or booths and, in his more than 30 years of experience as Director of the Bureau, Thomas has never seen a voting location where it was not possible to add voting booths.  (*Id.* at p. 35-36; 97-98.)  The cost can be modest – as low as $15—and the footprint for many voting stations can be small.  (Rozell Dep. Tr., Ex. 3, p. 80:11-18.)  Thomas testified that there are ways to remediate longer lines.  (Thomas Dep. Tr., Ex. 19, p. 93-94.)

With respect to alleviating voter confusion and anger with the process, both Swope and Baxter testified to communication efforts that have been successful in the past, preparing and posting a video on the clerk's website, mailings to each registered voter in the precinct or district, trainings, and billboards.  (Baxter Dep. Tr., Ex. 16, p. 96-97, 102-103; Swope Dep. Tr., Ex. 15, p. 112).

In sum, the fears associated with SPV are highly speculative and address measures that Michigan's local clerks have used in the past.

### 4.    Wait times do not necessarily lead to fewer voters at the polls and is a flawed theory.

Putting that aside, the claim that wait time deters voters is not supported by scientific data or analysis and is, in fact, flawed.  As explained in Herrnson's expert report, the rational choice theories, or a cost-benefit analysis to predict voting behavior is flawed because "the costs associated with voting almost always

34

outweigh the benefits." (Herrnson Report, Ex. 5, p. 8.) The improbability that one vote will, in fact, alter an election means that a voter "is unlikely to receive any tangible benefit from casting a ballot." Nonetheless, voting still occurs and the City of Lansing, at least, experienced higher voter turnout in 2016 than in previous elections. (Swope Dep. Tr., Ex. 15, p. 110-111.)

Socio-psychological factors, in fact, provide a "powerful explanation" for voter turnout. In other words, people vote because of the social environment or the civic obligation and this, in fact, presents the strongest explanation for why people vote. (Herrnson Report, Ex. 5, p. 9.) Mary Lansdown testified to this effect herself, acknowledging that voting was very important to her because of her mother's influence, so important that she had never left a voting place because the line was too long, nor did she believe she would do this. (Lansdown Dep. Tr., Ex. 11, p. 14.) Williams testified that he once left the polling place due to the length of the line, but returned to the same location later to vote. (Williams Dep. Tr., Ex. 13, p. 26.) And, while Baxter testified that he has observed voters going to the polls and returning home because of the longer lines, he has no knowledge of whether those persons returned to the voting booth. (Baxter Dep. Tr., Ex. 16, p. 126-127.)

### 5. SPV can cause voter confusion and result in ballot errors.

Although not widely known, the presence of straight-ticket voting with the split ticket option, as it is currently presented on the Michigan ballot, has been

shown to cause voter confusion – particularly for African-Americans. As explained above, in a published study conducted before this litigation was even filed, Herrnson and a team of independent researchers demonstrated this to be the case. (Herrnson Report, Ex. 5, p. 6)

Plaintiffs' witnesses also acknowledged this, and in some cases, even confirmed it. For example, Swope testified that it is possible for a straight party voter to vote for the wrong candidate. (Swope Dep. Tr., Ex. 15, p. 36:20-37:1.) Correcting such an error – if the voter notices the mistake – requires obtaining a new ballot from the election inspector. If the voter does not notice the mistake, the incorrect votes are tabulated. (Swope Dep. Tr., Ex. 15, p. 58-60.)

During the depositions in this case, some witnesses filled in an actual ballot based on where they were registered to vote. These witnesses were asked to complete a ballot using SPV and without SPV. During his deposition, Baxter utilized the SPV option to select a third-party that resulted in undervoting the rest of the partisan portion of the ballot. (Baxter Dep. Tr., Ex. 16, p. 41-42.) Neither Comartin nor Williams understood that the split ticket option was available in Michigan but testified, instead, that their ballot would be spoiled if they departed from the party chosen for the SPV option in any specific partisan race. (Comartin Dep. Tr., Ex. 12, p. 24; Williams Dep. Tr., Ex. 13, p. 21.) Comartin also failed to vote for any judicial candidate when using the straight-party voting option, and

Williams testified that he understood judicial candidates to be covered by exercising the SPV option.  But such races are non-partisan in Michigan.  These examples dispel a commonly held myth:  that the SPV does not disenfranchise voters or cause confusion.

Relatedly, Christopher Thomas testified that the SPV option provides for the opportunity to under-vote where a political party does not have a candidate for a particular office; or where there are more offices than candidates from a party in a multi-member district.  (Thomas Dep. Tr., Ex. 19, p. 89-90.)  In short, the record from the depositions taken in this case support Herrnson's conclusion.  The presence of the SPV option in Michigan adds to voter confusion and increases the possibility of disenfranchisement.

### E.  Important regulatory interests support the restriction imposed by P.A. 268.

A primary concern in passing P.A. 268 was to encourage the electorate to become more educated about the candidates, "more fully involved in the democratic process," and more deliberate in their voting choices.  (S. Fiscal Analysis of SB 13, Dec. 17, 2015, Ex. 6*; see also* letter from Governor Snyder to Michigan House of Representatives and the Michigan Senate, Jan. 5, 2016, Ex. 7.)  There was also a concern that persons would neglect to vote for the nonpartisan portion of the ballot.  (*Id.*)

37

The State need not establish that one of these factors was lacking prior to addressing it. *See Werme v. Merrill*, 84 F.3d 479, 486-87 (1st Cir. 1996) ("States are free to head off potential problems in the electoral system before they materialize, as long as the solutions that the state devises are reasonable and do not significantly intrude on constitutionally protected rights.")  Nor is it required to provide empirical evidence supporting an asserted interest prior to, or in connection with the legislation. *Council of Alt. Political Parties v. Hooks*, 179 F.3d 64, 78 (3d Cir. 1999).

Federal courts have repeatedly acknowledged the legitimacy of interests such as those Michigan expressed in passing P.A. 268.  "There can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election." *Anderson,* 460 U.S. at 79. The Third Circuit relied on this in *Council of Alternative Political Parties,* when rejecting against a challenge to a filing deadline in New Jersey.  179 F.3d at 78-80. That court recognized that the state's interest in a fair electoral process, voter education and political stability—even without statistical data supporting these at the time the legislation was passed—outweighed the "small burden" placed on rights under the First and Fourteenth Amendments.

More recently, the Western District of Wisconsin found it "reasonable" for the Wisconsin Legislature to eliminate SPV in order to "encourage[]" voters to

become more informed about the candidates or the issues and to ensure they do not

accidentally overlook items on a ballot. *One Wisc. Inst., Inc.*, 198 F. Supp. 3d at

946. Wisconsin was, apparently, unable to provide evidence that this occurred.

Here, the deposition testimony of two of the Plaintiffs (Comartin and Williams)

supports this finding. (Baxter Dep. Tr., Ex. 16, p. 41:4-42:8; Comartin Dep. Tr.,

Ex. 12, p. 25:12-30:18; Williams Dep. Tr., Ex. 13, p. 21:5-22:5.)

In sum, by passing 2015 P.A. 268, the Michigan Legislature changed a

manner of voting by removing the SPV option from the ballot. The law on its face

and in application is facially neutral, and important regulatory interests justified the

change. Plaintiffs' complaint should be dismissed.

**IV.   Plaintiffs have failed to establish discriminatory intent to sustain an Equal Protection claim.**

When there is no direct evidence of discriminatory intent, the court looks to

indirect evidence. *Coal. for Advancement of Reg'l Transp. v. Fed. Highway

Admin.*, 576 Fed. Appx. 477, 493 (6th Cir. 2014). In the present case, there is no

direct evidence of discrimination by any decisionmaker; therefore, the must Court

look to circumstantial evidence to determine if a racially discriminatory intent or

purpose is a "motivating factor" before Plaintiffs can prove "a violation of the

Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,

429 U.S. 252, 264-66 (1977).

The Supreme Court has enumerated several nonexhaustive evidentiary factors that must be examined to determine if there is a discriminatory intent or purpose. These factors are: (1) whether "[t]he impact of the official action" "'bears more heavily on one race than another'"; (2) "[t]he historical background of the decision[,] . . . particularly if it reveals a series of official actions taken for invidious purposes"; (3) "[t]he specific sequence of events leading up the challenged decision"; and, (4) the "legislative or administrative history" especially "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 266-68 (quotation omitted).

### A.   **P.A. 268 does not result in a disparate impact to African-American voters.**

Proof of disproportionate impact alone is not enough to demonstrate discriminatory intent. *Spurlock v. Fox*, 716 F.3d 383, 397 (6th Cir. 2013). To establish a disparate impact, the ultimate determination looks to the "impact of the official action whether it bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (quotation omitted). Plaintiffs cannot point to any reliable data to demonstrate that P.A. 268 affects one race any more than any other. This change impacts everyone, both white and minority voters, both urban and rural. (Swope email from Suzanne Courtade to Bill Zaagman dated 11/19/2015, Ex. 21.)

**B.    The historical background of P.A. 268 does not demonstrate an invidious purpose.**

Plaintiffs have no evidence that P.A. 268 has any discriminatory purpose and cannot demonstrate any history of discrimination behind P.A. 268.  Rather, the background is that SPV has been abandoned in a wide variety of states with varying racial compositions, and has been upheld by the DOJ as free of any discriminatory purpose (or effect).  (Thernstrom Report, Ex. 17, p. 6.)

**C.    The specific sequence of events leading up to P.A. 268 does not demonstrate an invidious purpose.**

Discriminatory intent cannot be inferred from the sequence of events leading up to the passage of P.A. 268.  The fact that similar proposals for SPV may have been somewhat politically unpopular in the past and rejected by voters during previous referenda, this does not mean that P.A. 268 was passed for discriminatory purposes.  (Second Amend. Compl., R. 56, ¶¶ 26-31, Page ID # 1101-1104.)  This is the political process at work.  In Michigan, there is no constitutional prohibition barring the Legislature from reenacting a law identical or similar to one disapproved by referendum.  *Reynolds v Bureau of State Lottery*, 610 N.W.2d 597 (Mich. App. 2000).  Once again, no discriminatory intent can be inferred here.

**D.    The legislative history of P.A. 268 does not demonstrate an invidious purpose.**

The final element looks to evidence of discriminatory intent or purpose in the legislative or administrative history.  *Arlington Heights*, 429 U.S. at 268.  This

can be demonstrated through records made "contemporary by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* Plaintiffs have not shown a racially discriminatory purpose. Their claim must fail as a matter of law.[6]

### E. Plaintiffs cannot prove that P.A. 268 was passed based on a discriminatory purpose and it survives rational basis scrutiny.

In addition to the dearth of any evidence of discriminatory purpose, there is significant evidence that P.A. 268 is "rationally related" to not only "legitimate," but also a "significant" government interest.

These government interests are, without limitation, encouraging an informed electorate, encouraging people to vote and read the entire ballot instead of simply making a straight ticket selection and emphasizing people and issues over parties. (Gov. Snyder Letter, Ex. 7.; Thernstrom Report, Ex. 17, p. 7.) SPV is confusing, even to Plaintiffs. Williams believed an SPV vote would record a vote for the Supreme Court. (Williams Dep. Tr., Ex. 13, p. 42:15-20.) Comartin thought if she overrode her SPV, it would spoil her ballot. (Comartin Dep. Tr., Ex. 12, p. 24:11-20.) The elimination of SPV actually increases voter participation because it discourages undervoting. (Baxter Dep. Tr., Ex. 16, P. 42:5-8.)

---

[6] At the last minute, Plaintiffs sought through subpoena to depose individual legislators who filed motions to quash. Those motions remain pending before the magistrate judge. For the reasons set forth in the motions to quash, those motions should be granted. Should a decision be made on the motions and the depositions occur subsequent to filing of the instant motion, Defendant reserves the right to amend her motion for summary judgment.

V.     **Plaintiffs have failed to establish a Voting Rights Act claim.**

A.     **Legal Analysis under § 2 of the Voting Rights Act.**

Section 2(a) of the VRA prohibits a state from "impos[ing]" or "appl[ying]"

any "voting qualification or prerequisite to voting or standard, practice, or

procedure . . . which *results in* a denial or abridgement of the right of any citizen of

the United States to vote on account of race or color[.]"  52 U.S.C. § 10301(a)

(emphasis added).  A qualification or prerequisite will be deemed to "result in such

a denial or abridgment of the right . . . to vote on account of race or color" if:

> [B]ased on the totality of circumstances, it is shown that **the political processes** leading to nomination or election in the State or political subdivision **are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice**.

52 U.S.C. § 10301(b) (emphasis added).

Section 2(b) recognizes two types of claims:  1) vote-dilution which alleges

a districting practice that denied minorities an equal opportunity to elect

representatives of their choice and, 2) vote-denial or denial of an opportunity to

participate in the electoral process.  *Ohio Democratic Party (ODP) v. Husted*, 834

F.3d 620, 636 (6th Cir. 2016) (citing 52 U.S.C. § 10301(a)-(b)).

This framework was clarified by the Sixth Circuit which emphasized that

while Section 2 of the VRA requires a showing that a voting standard or practice

43

has a discriminatory result, "*this formulation cannot be construed as suggesting that the existence of a disparate impact, in and of itself, is sufficient to establish the sort of injury that is cognizable and remediable under Section 2.*" *Id.* (emphasis added).

If this first element is met, the second step comes into play triggering consideration of the totality of circumstances, potentially informed by the Senate Factors discussed in *Gingles*. *Id*. at 638. The second step focuses on "whether the challenged *voting standard or practice* causes the discriminatory impact as *it* interacts with social and historical conditions." *Id*. *citing* 52 U.S.C. § 10301(a)-(b) (emphasis in original).

Plaintiffs have failed to show that P.A. 268 adversely affects African-American voters. Moreover, the Sixth Circuit explicitly rejected the notion that the showing of a burden on voting rights under the *Anderson-Burdick* analysis is equivalent to the sort of disparate impact recognized under § 2. *Id.* at 639. Stated differently, even a "modest" burden under the *Anderson-Burdick* framework does not automatically satisfy the first prong of a § 2 claim. A *causal linkage* between the challenged act, the elimination of SPV—to the social and historical conditions must be shown.

Here, the record is devoid of any factual or legal bases for finding that eliminating SPV causes racial inequality. There is no evidence African-Americans

44

are not able to complete a ballot without SPV, much less that completing the entire ballot denies African-Americans the right to vote. There is no basis for arguing that African-American voters as a whole are somehow less able or willing to vote for preferred candidates because of prior discrimination.

**B.      Plaintiffs have failed to establish disparate impact.**

The *Gingles* factors only apply in vote denial context. *Thornburg v. Gingles*, 478 U.S. 30, 50, n. 17 (1986). In the vote denial context, *Gingles* requires Plaintiffs to show, as a necessary "precondition," that an alleged deprivation is proximately caused by a *state-imposed* voting practice rather than underlying socio-economic factors. The Supreme Court reaffirmed this causation requirement, emphasizing that "a disparate-impact claim relying on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies *causing* that disparity." *Tex. Dep't of Hous. & Cmty. Aff. v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2523 (2015) (emphasis added). Without the "safeguard[]" of a causation requirement "at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and would almost inexorably lead governmental or private entities to use numerical quotas, and serious constitutional questions then could arise." *Id*.

The Sixth Circuit affirmed this in *ODP* recognizing that the touchstone for the *Anderson-Burdick* framework is the *burden on the right to vote*, whereas the

45

touchstone for § 2 causation claim is *participation in the political process*.
Although the two may be related, the Sixth Circuit has made clear that they are not
interchangeable.  This threshold for a § 2 claim is *higher* than that for an Equal
Protection claim under *Anderson-Burdick*.

Here, there is simply no evidence that P.A. 268 gives African-American
voters less opportunity to participate in the political process.  As Thernstrom
explains, "[Y]ou cannot begin to understand what happened in Michigan, first,
without looking at the national pattern.  You have 50 different states.  The
overwhelming trend, in recent years, has been away from straight-ticket voting."
(Thernstrom Dep. Tr., Ex. 20, p. 34:25-35:7.)  This national pattern trends away
from the SPV.

Take Georgia, which has a large population of African-Americans (*Id*. at p.
30:25-31:1) and eliminated SPV in 1994.  (Thernstrom Report, Ex. 17, p. 5.)  The
Clinton Justice Department found that this elimination did not have a
discriminatory intent or effect.  (Thernstrom Dep. Tr., Ex. 20, p. 31:1-6.)
Similarly, Rhode Island eliminated SPV in 2014 and this elimination was
supported by Common Cause, a Plaintiff here.  (Chapman Dep. Tr., Ex. 14, p.
21:22-25.)

Eliminating the SPV option merely requires that every voter affirmatively
vote for each candidate he or she wishes to support, and does not *prevent* anyone

from participation in the political process.  Internal emails from Swope

demonstrate that the elimination would impact Lansing residents equally.  (Swope

email from Suzanne Courtade to Bill Zaagman dated 11/19/2015, Ex. 21.)  Even if

voters wanted to vote for all of the candidates of one party, they still remain free to

do so.

Plaintiffs have failed to demonstrate how the elimination of SPV results in

such long lines so as to prevent any voters from voting.  Clerks in Michigan have

significant experience with reducing wait times by, among other things, adjusting

the size of precincts, adding more voting booths, or creating multiple check-in

stations.  Even more lacking is any data or scientific proof that African-Americans

are more likely to use SPV, as explained above.

### C.   Plaintiffs have failed to establish that any burden was caused by or linked to social and historical conditions.

The lack of data supporting a finding that eliminating SPV causes

discriminatory impact is fatal to Plaintiffs' claim and should end the analysis.

The Sixth Circuit made clear in *ODP* that failure to establish a vote denial

under § 2 renders the second step inquiry, i.e., questioning the causal interaction

between "social and historical conditions that have produced discrimination" as

immaterial.  *ODP*, 834 F.3d at 640.  However, even if this Court reaches the

second step, the Plaintiffs' claim lacks evidence to establish that the elimination of

the SPV causes discrimination as it interacts with social and historical conditions.
*Id*.

### Factor 1:  The extent of any history of official discrimination.

Plaintiffs appear to concede this factor in a previous filing.  (Brf. In Spt. Of
Plaintiffs' Mot. For Prelim. Inj., R. 4, p. 30, Page ID # 363.)  It is likely because
Michigan does not have a history of official, racially-discriminatory policies, but
rather has a historical tradition of equality.  *NAACP v. Austin*, 857 F. Supp. 560,
565 (E.D. Mich. 1994) *citing In re Apportionment of State Legislature*, 486
N.W.2d 639, 651-52 (Mich. 1992).  "Michigan was at the forefront of the Free Soil
movement, whose central aim was to halt the expansion of slavery into new
territories." (Thernstrom Report, Ex. 17, p. 29.)  Michigan also was one of the first
states to make advancements in voting rights when an amendment to the
Constitution in 1870 African-Americans the right to vote.  (*Id*. at p. 30.)

This trend of equality for African-Americans continued after the Civil War
when Michigan was the first state to mandate in 1867 that all public schools be
open to students of all races.  (*Id*. at p. 31.)  Then, in 1883, after the U.S. Supreme
Court declared the Civil Rights Act unconstitutional, Michigan was one of eleven
states that enacted similar public accommodation laws.  (*Id*.)  The same year,
Michigan repealed a ban on interracial marriage.  (*Id*.)  These laws were not
repealed in many states until well over one century later.

48

This well-documented history set forth in detail in Thernstrom's report and establishes that Michigan has a progressive history of using the power of government to protect its equality for its minority citizens. (Thernstrom Report, Ex. 17, p. 28-34.) This factor favors Defendant.

**Factor 2: The extent to which voting in the elections of the State or political subdivision is racially polarized.**

Here, Plaintiffs have failed to present evidence of racially polarized voting. In *Anthony*, a Section 2 voting rights lawsuit was filed challenging the merger of Wayne County Circuit Court and Recorder's Court. Plaintiffs contended that the merger violated the Fourteenth Amendment claim and the allegedly racially-discriminatory purpose behind the merger legislation. The court rejected the voting rights claim on the merits. The court also concluded that although voting in Wayne County was polarized with respect to incumbent candidates, it was not "legally significant" so as to trigger § 2 liability. *Anthony v. State of Michigan*, 35 F. Supp. 2d 989 at 1007. Here, Plaintiffs have failed to present evidence of racially polarized voting. This factor weighs in Defendant's favor.

**Factor 3: The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.**

This factor also favors Defendant and Plaintiffs concede as much. (R. 4, p. 46, n. 2, Page ID # 363.) It would not prevent anyone from "casting a ballot" for

the candidates of the party they preferred, but require a person voting this way to select individual candidates rather than a party block, eliminating a "shortcut." (Thernstrom Report, Ex. 17, p. 35.)

> **Factor 4: If there is a candidate slating process where the members of the minority group have been denied access to that process.**

This factor also favors Defendant as Michigan does not have such a process. There is no evidence in the record demonstrating that Michigan does (Thernstrom Report, Ex. 17, p. 35), and Plaintiffs have conceded this point. (R. 4 at 46 n.2; Page ID # 363.)

> **Factor 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.**

Plaintiffs essentially argue that this factor supports them but they fail to provide a systemic analysis to support a finding in their favor. (Thernstrom Report, Ex. 17, p. 36.)

Bearing all of this in mind in addition to the myriad of federal and state agencies in place to combat discrimination, Plaintiffs cannot establish that the elimination of SPV would hinder African-Americans' ability to participate effectively in the political process in Michigan. This factor favors Defendant.

50

**Factor 6:  Whether political campaigns have been characterized by overt or subtle racial appeals.**

Plaintiffs' expert reports fail altogether to establish that the 2016 election were characterized with overt or subtle racial appeals in Michigan.  (*Id*. at p. 36.) Their motion for a preliminary injunction cited two newspaper articles—one from 2004 and one from 2012.  "When you have to reach back over a thirteen-year period to find just two examples of what you claim is a pattern common in a whole state, the critical reader will begin to doubt that there is any such pattern at all." (*Id*. at p. 36.)  This factor favors Defendant.

**Factor 7:  The extent to which members of the minority group have been elected to public office in the jurisdiction.**

Plaintiffs attempt to characterize this factor in their favor by stating that Michigan has only elected one minority African-American, Secretary of State Richard Austin, to a major partisan office in Michigan.  Factor 7 does not ask this question.  In Michigan, elected officials also include judges, university trustees, and members of the Board of Education.  Reliance on Richard Austin alone overlooks several African-Americans who have been elected throughout the State. President Obama carried Michigan both in 2008 and 2012.  The previous Chief Justice of the Michigan Supreme Court, Robert P. Young, Jr., is African-American and was elected and re-elected twice.  African-Americans also have been elected to various positions on the state-wide partisan ballot including the Michigan Supreme

Court, university trustees, and members of the Board of Education.  By district,

African-Americans have been elected to the Michigan Court of Appeals, circuit

courts, the State and Federal House of Representatives, the State Senate, and

several other local elected positions.  (See Aff. Christopher Thomas, Ex. 22;

*NAACP v. Austin*, Docket No. 92-cv-72696, Defs.' Trial Brief, listing African-

American elected officials until 1992; Testimony of George H. Herstek, Jr., Ex.

22.)  In short, Michigan has a history of electing African-Americans to several

state-wide and local positions.  This factor favors Defendant.

> **Factor 8:   Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.**

This factor also favors Defendant because elected officials in Michigan have

a consistent track record of responding to the particularized needs of members of

minority groups.

The best example is Detroit – the largest majority-minority municipality in

Michigan.  As this Court recognized, the State took great strides in Detroit during

the financial crisis to successfully lead the city through bankruptcy.  (R. 25, Page

ID # 738.)  Now, Detroit's population is expected to grow over the next two

decades for the first time since the 1950's.  Louis Aquilar, <u>Study: Detroit will add 60,000 new residents by 2040</u>, Det. News, July 27, 2017.[7]

> **Factor 9:   Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.**

This factor also favors Defendant because the practice of eliminating SPV is far from tenuous.  (Thernstrom Report, Ex. 17, p. 37.)  Michigan joined a vast majority of other states in an effort to streamline its elections.  (*Id*.)

Further, the SPV option with split ticket is problematic.  Where a voter uses the SPV to select a party that has not nominated candidates in the individual office, that voter undervotes for each office.  (Baxter Dep. Tr., Ex. 16, p. 42:5-8.)  Similarly, take the voter who votes straight ticket democrat, then, in a vote for two races, chooses one republican.  The voter has again undervoted and rather than voting for one democrat and one republican, the voter's SPV in that race is cancelled out, and the republican gets the vote.  (Thomas Dep. Tr., Ex. 19, p. 59:18-60:2.)

Plaintiffs also testified to confusion about how the SPV even applies.  In his deposition, Williams indicated that he believed the SPV option would record a vote for Justice of the Supreme Court, a non-partisan office.  (Williams Dep. Tr., Ex.

---

[7] http://www.detroitnews.com/story/news/local/detroit-city/2017/07/27/detroit-population-growth/104031902 (accessed October 10, 2017.)

13, p. 42:15-20.)  Similarly, Comartin thought if she overrode her SPV, it would spoil her ballot.  (Comartin Dep. Tr., Ex. 12, p. 24:11-20.)

Given these actual examples that SPV confused Plaintiffs, together with the problems identified in Herrnson's report and published study, the elimination of SPV cannot be considered "tenuous."  Therefore, this factor favors Defendant.

## CONCLUSION AND RELIEF REQUESTED

For the forgoing reasons, Defendant respectfully requests that this Court dismiss the instant case.

Respectfully submitted,

BILL SCHUETTE
Attorney General

*s/Denise C. Barton*
Denise C. Barton (P41535)
Rock Wood (P41181)
Adam Fracassi (P79546)
Elizabeth R. Husa Briggs (P73907)
Kendell Asbenson (P81747)
Assistant Attorneys General
Attorneys for Defendant Secretary of
  State Ruth Johnson
P. O. Box 30736
Lansing, Michigan  48909
517.373.6434
Email:  bartond@michigan.gov

Dated:  October 16, 2017                    (P41535)

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2017, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

Respectfully submitted,

BILL SCHUETTE
Attorney General

*s/Denise C. Barton*
Denise C. Barton (P41535)
Assistant Attorney General
P. O. Box 30736
Lansing, Michigan  48909
517.373.6434
Email:  bartond@michigan.gov
(P41535)