UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN STATE A. PHILIP RANDOLPH
INSTITUTE, MARY LANSDOWN, ERIN
COMARTIN, DION WILLIAMS and
COMMON CAUSE,

    Plaintiffs,

    v.

RUTH JOHNSON, in her official capacity
as Michigan Secretary of State,

    Defendant.

_____/

Case No. 16-cv-11844

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
MONA K. MAJZOUB

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [102]

## I.    Introduction

The Plaintiffs—Mary Lansdown, Erin Comartin, Dion Williams, the Michigan State A. Philip Randolph Institute, and Common Cause—challenge Public Act 268 ("PA 268").  They allege that this state law violates the Equal Protection Clause of the Fourteenth Amendment because it restricts the right to vote (Count I) and reflects intentional discrimination on the part of the Michigan State legislature (Count II).  Plaintiffs also allege that this law contravenes Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 (Count III).  The Defendant is Ruth Johnson, in her official capacity as Michigan Secretary of State ("the Secretary").

Presently before the Court is the Secretary's Motion for Summary Judgment [102], filed on October 16, 2017. The motion is fully briefed. A hearing on this motion was held on Tuesday, January 16, 2018 at 2:00 p.m. For the reasons discussed herein, the Court will DENY the Defendant's Motion for Summary Judgment [102]. All of Plaintiffs' claims will survive the motion.[1] The Court finds that Plaintiff Erin Comartin lacks standing, however.

## II.    Background

PA 268 eliminates straight-party voting in Michigan. *See* 2015 PA 268. Straight-party voting entails filling in one bubble for a particular political party, and thereby voting for that party in each partisan contest on the ballot. Dkt. No. 56, p. 10 (Pg. ID 1101). This option allows voters to forego filling in a bubble for each partisan candidate individually. *Id.* PA 268 only changes the ballot format by removing the straight-party option; it will keep party vignettes at the top left of the ballot. *Id.* at p. 18 (Pg. ID 1109).

Michigan voters have had the option of straight-party voting for 126 consecutive years. *See* 1891 PA 190, § 14. And they have twice repealed via referendum laws that eliminated straight-party voting—in 1964 and again in 2001.

---

[1] The Defendant moved to strike certain affidavits filed in conjunction with the Plaintiffs' response to the summary judgment motion. *See* Dkt. No. 113. Based on the Court's ruling on the Defendant's Motion to Strike, the Court will not consider here the Lisa Brown affidavit, paragraph four of the Allegra Chapman affidavit, and paragraph five of the Anita Dawson affidavit. *See* Dkt. Nos. 108-7, 108-14, 109.

*See* 1964 PA 240; *see also* 2001 PA 269.  PA 268 cannot be repealed by referendum because it provides for an appropriation of $5 million.  *See Mich. United Conservation Clubs v. Sec'y of State*, 464 Mich. 359, 630 N.W.2d 297, 298 (2001).

A.    Procedural History

The Governor of Michigan signed PA 268 into law in January 2016, and the law was to take effect in the November 2016 elections.  *See* Dkt. No. 102-8; *see also* 2015 PA 268.  Yet in May 2016 the Plaintiffs filed a Complaint in this Court claiming that the bill unlawfully restricted the right to vote pursuant to the Equal Protection Clause, and violated Section 2 of the Voting Rights Act and the Americans with Disabilities Act.  *See* Dkt. No. 1.  Three days after filing the Complaint, Plaintiffs moved for a preliminary injunction to prevent the implementation of PA 268.  Dkt. No. 4.  The Court granted Plaintiffs' request for a preliminary injunction, finding that the Plaintiffs were likely to succeed on the merits for their Equal Protection and Voting Rights Act Claims.[2]  *See Mich. State A. Philip Randolph Inst. v. Johnson*, 209 F. Supp. 3d 935 (E.D. Mich. 2016) ("*Johnson I*").

The Defendant then (1) filed a notice of appeal of this Court's Opinion and Order granting Plaintiffs' preliminary injunction; and (2) requested that this Court

---

[2]  Plaintiffs amended the Complaint in January 2017, and pursuant to the Court's holding that they likely lacked standing under the Americans with Disabilities Act, Plaintiffs did not include this claim in the Amended Complaint.  *See* Dkt. Nos. 55, 56.  Plaintiffs added the intentional discrimination claim, Count II, in the Amended Complaint.  *See* Dkt. No. 56.

stay its grant of Plaintiffs' Motion for a Preliminary Injunction pending appeal. *See* Dkt. Nos. 27, 29. On August 1, 2016, the Court issued a revised Order for Preliminary Injunction. *See* Dkt. No. 30. The Secretary responded by filing a second notice of appeal, this time as to the revised Order. *See* Dkt. No. 33. And, on August 15, 2016 this Court denied Plaintiffs' request to stay the Order granting Plaintiffs' Motion for Preliminary Injunction pending appeal. *See* Dkt. No. 39. Two days later the Sixth Circuit denied the Secretary's Motion for a Stay Pending Appeal. *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 659 (6th Cir. 2016) ("*Johnson II*").

B.      Evidence Submitted on Summary Judgment

In litigating this motion, the parties have submitted a wealth of expert evidence, principally about whether PA 268 would cause longer voting lines and disproportionately impact African-Americans. For example, Plaintiffs rely on two reports authored by Kurt Metzger, a former Regional Information Specialist with the United States Census Bureau in Detroit, Michigan. Dkt. No. 108-2, p. 3 (Pg. ID 2396). Metzger's first report accompanied the original Complaint and his second was filed with Plaintiffs' response to the Defendant's summary judgment motion. *See* Dkt. Nos. 1-11, 108-2. In both reports, Metzger explains that he has found a high correlation between the percentage of voting age African-Americans in a given community and the percentage of straight-party voters in that community. *See* Dkt.

Nos. 1-11, 108-2. Metzger used different data in these two reports. He examined in the first report the nine largest counties in Michigan for which straight-party voting data were available, and utilized results from the November 2012 and November 2014 elections for every precinct in these counties. Dkt. No. 1-11, pp. 6–7 (Pg. ID 224–25). On the other hand, Metzger's amended report relied on data expanded to all eighty-three Michigan counties for 2016, sixty-nine counties for 2014, and sixty-one counties for 2012. Dkt. No. 108-2, pp. 5–6 (Pg. ID 2398–99).

Second, Plaintiffs lean on an expert report by Theodore Allen, an Associate Professor of Industrial & Systems Engineering at Ohio State University. Dkt. No. 108-4. Allen submits in his report that the elimination of straight-party voting would add to voter wait times—perhaps as much as 25%. *Id.* at p. 10 (Pg. ID 2497). He also concluded that longer wait times would deter people from voting, and estimated that the number of deterred voters would increase by 3% for each additional sixty minutes of waiting time. *Id.* at pp. 13–14 (Pg. ID 2500–01).

Lastly, Plaintiffs' expert Daphne Ntiri is a Professor of African-American Studies at Wayne State University. Dkt. No. 108-5, p. 2 (Pg. ID 2511). Ntiri has over thirty-years of experience researching adult education and adult literacy. *Id.* at pp. 2–3 (Pg. ID 2511–12). In her report, she observed lower literacy rates in the African-African community as compared to other demographics, because of historical discrimination and the achievement gap. *Id.* at pp. 14–15 (Pg. ID 2523–

23).  Ntiri posits that there would be greater confusion among African-Americans about the ballot introduced by PA 268.  *Id.* at pp. 17–19 (Pg. ID 2526–28).  Specifically, she argues that this confusion would result from the combination of lower literacy rates and a ballot that removes straight-party voting, but keeps party vignettes in their same location.  *Id.*

The Secretary counters with reports from her experts.  Laurence Rosen, a professional demographer, observes that straight-party voting rates are high in communities that do not have many African-American residents of voting age.  Dkt. No. 102-3, pp. 16, 21 (Pg. ID 1845, 1850).  Relatedly, Rosen concludes that there is not a strong correlation between a community's African-American population and straight-ticket voters.  *Id.* at pp. 17, 36 (Pg. ID 1846, 1865).

Stephen Graves, a Professor of Management at the Massachusetts Institute of Technology, also offers an expert report on behalf of the Secretary.  Dkt. No. 102-5.  He has found that voting lines are longer with straight-party voting than without because voters take time to contemplate which party to support before proceeding with a straight-party ballot.  *Id.* at pp. 4, 16–17 (Pg. ID 1935, 1947–48).

Similarly, Plaintiffs' expert Paul Herrnson, a Professor of Political Science at the University of Connecticut (and an expert on election systems and voting ballots), has found that voting will be faster without the straight-party option.  He has determined that the ballot instituted by PA 268 is less confusing than the straight-

party ballot, and thus, the new ballot will save voters' time.  Dkt. No. 102-6, pp. 2–3 (Pg. ID 1983–84).  Herrnson also theorizes that, setting aside whether PA 268 will increase voting times, voters will not be deterred by longer lines because voting is driven by sociological factors, and not rational interests.  *Id.* at p. 10 (Pg. ID 1991).  Put another way, he believes people will endure lines no matter how long because voting is a social good.  *Id.*

## III.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), "[a] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A court must view the facts, and draw reasonable inferences from the facts, in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52.

## IV.   Discussion

Plaintiffs assert three claims.  The first two claims arise under the Equal Protection Clause of the Fourteenth Amendment, restricting the right to vote (Count I) and intentional discrimination (Count II).  The third and final claim alleges a violation of Section 2 of the Voting Rights Act (Count III).  The Secretary requests that the Court grant the Motion for Summary Judgment on all three counts.  The Court will find that the Secretary is not entitled to summary judgment on any of Plaintiffs' claims.

Before turning to the merits of Plaintiffs' claims, the Court will first address the Secretary's argument that the Plaintiffs lack standing.

### A.     Standing

The Secretary argues that the Plaintiffs lack standing for the same reasons discussed in the Response to the Plaintiffs' Motion for a Preliminary Injunction.  *See* Dkt. No. 15, pp. 9–12 (Pg. ID 441–44); *see also* Dkt. No. 102, pp. 19–27 (Pg. ID 1776–84).  Yet in granting the Plaintiffs' Motion for a Preliminary Injunction, the Court held that the Plaintiffs have standing.  *Johnson I*, 209 F. Supp. 3d at 943–45.  Accordingly, the law of the case doctrine measures that the Secretary's standing argument must also fail here.

Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the

same case." *Arizona v. California*, 460 U.S. 605, 618 (1983) (citation omitted). " 'The doctrine precludes a court from reconsideration of issues decided at an early stage of litigation, either explicitly or by necessary inference from the disposition.' " *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1071 (6th Cir. 2014) (quoting *Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006)). Three exceptions apply to this doctrine and they arise: " '(1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice.' " *Id.* (quoting *Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997)).

None of these exceptions apply here. Indeed, the Defendant's arguments largely reiterate those made in the preliminary injunction briefings.

The Court will clarify that, as for the individual Plaintiffs, its holding in *Johnson I* was that the African-American plaintiffs have standing; the Court did not address whether Plaintiff Erin Comartin has standing. *See Johnson I*, 209 F. Supp. 3d. at 944. After reviewing the offered evidence, the Court will hold that Comartin lacks standing because she has not shown injury in-fact. *See United States v. Hall*, 877 F.3d 676, 681 (6th Cir. 2017) ("Article III standing requires a party invoking federal jurisdiction to demonstrate that it has suffered an injury in fact . . . which is (a) concrete and particularized . . . (b) actual or imminent, not conjectural or

hypothetical") (internal quotations and citations omitted). Because she is white, Plaintiffs' arguments regarding the impact of PA 268 on African-Americans do not apply to Comartin. *See* Dkt. No. 56, p. 5 (Pg. ID 1096). Instead, she alleges that PA 268 will deprive her of the "benefits of democracy." Dkt. No. 102-13, p. 8 (Pg. ID 2111). Plaintiffs do not even defend this argument in their summary judgment pleadings. *See* Dkt. No. 108, pp. 11–13 (Pg. ID 2341–43).

Therefore, as to all the other Plaintiffs, the Court finds that they have standing.

B.      Restrictions on the Right to Vote under the Equal Protection Clause

Plaintiffs raise a facial challenge to PA 268. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 200 (2008) (noting that parties "bear a heavy burden of persuasion" where they "seek[] relief that would invalidate [a] statute in all its applications."). Plaintiffs argue, and the Court agrees, that reasonable minds may disagree about whether Plaintiffs can prove an equal protection claim based on the impact of PA 268 on African-Americans' right to vote.

Because all election laws burden voters, even if slightly, "courts weigh that hindrance against the provision's regulatory justification." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016). This balance recognizes that " 'voting is of the most fundamental significance under our constitutional structure.' " *Id.* (quoting *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). But it also acknowledges that " '[c]ommon sense, as well as

10

constitutional law, compels the conclusion that government must play an active role in structuring elections.' " *Id.* (alteration in original) (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). Courts must accordingly apply a "flexible standard" when assessing the constitutionality of state election laws. This flexible standard provides that:

> A court . . . must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'

*Id.* (quoting *Burdick*, 504 U.S. at 434).

"[T]he 'rigorousness of [a court's] inquiry into the propriety of a state election law,' " the Sixth Circuit wrote, " 'depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.' " *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (quoting *Burdick*, 504 U.S. at 434). For example, "[i]f a state imposes 'severe restrictions' on a plaintiff's constitutional rights (here, the right to vote), its regulations survive only if 'narrowly drawn to advance a state interest of compelling importance.' " *Id.* (quoting *Burdick*, 504 U.S. at 434). Conversely, " 'minimally burdensome and nondiscriminatory' regulations are subject to a 'less-searching examination closer to rational basis' and 'the State's important regulatory interests are generally sufficient to justify the restrictions.' " *Id.* (quoting *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d

329, 335 (6th Cir. 2016)). For state laws that touch neither end of the spectrum, "i.e., regulations that impose a more-than-minimal but less-than-severe burden," courts are to " 'weigh[] the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it.' " *Id.* (quoting *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 546 (6th Cir. 2014)).

As detailed below, the Court finds that PA 268 imposes more than a minimal, but not severe, burden on African-Americans. *See also Johnson I*, 209 F. Supp. 3d at 947–48. According to the Secretary, the elimination of straight-ticket voting impacts the manner of voting, but not access to the ballot. Dkt. No. 102, pp. 29–30 (Pg. ID 1786–87). "It is clear, however, that how a state chooses to regulate the *manner* that a person must cast a ballot undoubtedly impacts the individual right." *Johnson II*, 833 F.3d at 663. Indeed, "[a] state election law, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends.' " *Burdick*, 504 U.S. at 433 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)).

1.    Burden on Voting

Plaintiffs argue there is a genuine dispute about the constitutionality of PA 268 because it imposes several burdens on voters, namely longer voting lines and

increased congestion at voting precincts, and greater confusion in completing the ballot. Dkt. No. 56, p. 2 (Pg. ID 1093). And Plaintiffs assert that African-Americans will disproportionately bear this burden. *Id.* at p. 20 (Pg. ID 1111). The Court will first assess the burden that PA 268 imposes on Michigan voters in general before addressing Plaintiffs' arguments that PA 268 disproportionately burdens African-Americans specifically.

PA 268 will not cause longer wait times as a matter of law, according to the Secretary. The argument goes that the alleged collateral consequences of removing the option for straight-party voting—persons deterred from voting because of longer wait times and voter confusion leading to rejected ballots—are speculative injuries. Dkt. No. 102, p. 32 (Pg. ID 1789). The Secretary first maintains that the record does not reflect that voting in a state without straight-ticket voting takes longer than voting in a state with straight-ticket voting. *Id.* at p. 33 (Pg. ID 1790). As the Sixth Circuit noted, this is a false comparison: "Importantly, however, comparing the isolated voting practice of one state with the isolated voting practice of another state is not always an apples-to-apples comparison." *Johnson II*, 833 F.3d at 665.

Outside of straight-ticket voting, states have instituted voting practices which reduce voting times and are distinct from practices in Michigan. For instance, no-excuse absentee voting and early voting are available in Ohio, a state that does not have straight-ticket voting. *See* OHIO REV. CODE § 3509.02(A); *see also Ohio*

*Democratic Party*, 834 F.3d at 625–26.  On the other hand, Michigan does not allow

no-excuse absentee voting or early voting.[3]  Indeed, Michigan residents can only

vote absentee (and thereby avoid the polls) if they satisfy one of the following

narrow criteria:

> (a) On account of physical disability, cannot without another's assistance attend the polls on the day of an election.
>
> (b) On account of the tenets of his or her religion, cannot attend the polls on the day of election.
>
> (c) Cannot attend the polls on the day of an election in the precinct in which he or she resides because of being an election precinct inspector in another precinct.
>
> (d) Is 60 years of age or older.
>
> (e) Is absent or expects to be absent from the township or city in which he or she resides during the entire period the polls are open for voting on the day of an election.
>
> (f) Cannot attend the polls on election day because of being confined in jail awaiting arraignment or trial.

MICH. COMP. LAWS § 168.758(1)(a)–(f).  These differences show that the

Defendant's reliance on other states' elimination of straight-party voting is

misplaced.

---

[3] *See* Michigan Dep't of State, *Elections & Voting: Early Voting*, *available at* http://www.michigan.gov/sos/0,4670,7-127-29836-202483--F,00.html (last accessed January 18, 2018).

The Secretary next leans on an expert report from Stephen Graves to show it will take longer to vote with a straight-party ballot than without because voters ponder which party to support before voting. Dkt. No. 102-5, pp. 4, 16–17 (Pg. ID 1935, 1947–48). And she cites Paul Herrnson's findings to demonstrate that the straight-party voting option is confusing, causing voters to request assistance, and this assistance extends voting times. Dkt. No. 102-6, pp. 18, 41–42 (Pg. ID 1999, 2022–23). Regarding requests for assistance, the Secretary asserts that current wait times are exacerbated by requests from African-Americans with low literacy, as they need greater assistance. *Id.* at pp. 41–42 (Pg. ID 2022–23).

This evidence, viewed in the light most favorable to the Plaintiffs, does not prove as a matter of law that all of these collateral consequences are unlikely to occur. Voters of course may ponder which party to support when straight-ticket voting, but PA 268 is intended to encourage voters to consider not just party affiliation, but each election contest individually. Contemplating whom to vote for in every partisan contest on a ballot must take longer than deciding whether to vote a straight-ticket for, say, either Republicans or Democrats.

And, Plaintiffs present evidence indicating that PA 268 will increase wait times, including testimony from Christopher Thomas, a former Director of the Bureau of Elections in Michigan who served in that capacity for thirty-six years. *See* Dkt. No. 102-25, p. 3 (Pg. ID 2316). Thomas testified that he had estimated—in

conjunction with the elections staff and based in part on discussions with county clerks and other election officials—that PA 268 could cause "up to a 3-minute increase" in voting time for individuals who typically voted a straight-party ticket. Dkt. No. 108-9, at p. 3 (Pg. ID 2550). Similarly, in its analysis of PA 268, the Michigan Senate Fiscal Agency said that the Michigan Department of State acknowledged that the bill "could cause an increase in the time it takes to vote due to voters' reading the new instructions as well as having to mark their vote for each candidate." Dkt. No. 1-13, p. 5 (Pg. ID 272).

Plaintiffs also present contrasting evidence in an expert report by Theodore Allen. *See* Dkt. No. 108-4. Allen "estimate[d] that eliminating the option of straight ticket voting would increase the service time of a voter who had previously used straight ticket voting 25% or more." *Id.* at p. 10 (Pg. ID 2497).

Additionally, as Plaintiffs note, common sense dictates that filling in several ovals will take longer than filling in one. A report from the Michigan House Fiscal Agency supports this common sense observation—it noted that the appropriation of $5 million "would be allocated for new voting equipment purchased for local governments that may be needed as a result of longer lines due to longer lines [sic] with the elimination of the straight-ticket option." Dkt. No. 108-13, p. 2 (Pg. ID 2617).

Plaintiffs further suggest that the additional time it will take to vote has an important consequence: discouraging people from voting. The Secretary disagrees and instead argues that people will vote no matter the obstacles. Dkt. No. 102, pp. 45–46 (Pg. ID 1803–04). The Secretary contends that because one vote will not ordinarily determine an election, "the costs associated with voting almost always outweigh the benefits." *Id.* In other words, the Defendant argues that people vote solely to obtain an intangible benefit, and because this benefit is intangible, voters will visit polls despite it not being in their rational interest (i.e. worth voters' time, money, etc.). *Id.* The Secretary continues that "[e]ven if [a] voter took longer to complete the ballot, Michigan does not limit the amount of time any voter has to complete the ballot." *Id.* at p. 33 (Pg. ID 1790).

These arguments are unpersuasive. A report by Charles Stewart III, a Political Science Professor at the Massachusetts Institute of Technology, is offered by the Plaintiffs as contrasting evidence. *See* Dkt. No. 1-3. In this report, Stewart concludes that longer voting lines discourage voting. *Id.* at p. 18 (Pg. ID 52). Specifically, Stewart observed that 0.8% of respondents to a congressional study did not vote in 2012 primarily because of long lines; and extrapolating this percentage to the number of eligible voters that did not vote in the 2012 federal election, Stewart determined that 730,000 people would have refrained from voting in that election because of long lines. *Id.*

Likewise, Allen determined that the number of people discouraged from voting could be gleaned through a 3% percent rule. Dkt. No. 108-4, p. 13 (Pg. ID 2500). He observed that "every additional 60 minutes of waiting time results in a decline in turnout of approximately 3% of the remaining eligible voters (those who are registered and who have not voted absentee)." *Id.* This theory is based on voter conduct in Ohio and Florida, and not from Michigan. *Id.* at p. 13–14 (Pg. ID 2500–01). Allen reasons that this theory would apply to Michigan voters, and so viewing this evidence in the light most favorable to Plaintiffs, this evidence supports Plaintiffs' claims. Accordingly, a question of fact exists about whether PA 268 would impose a burden of longer wait times on voters.

a)      Disproportionate Impact on African-Americans

There is also sufficient support in the record for Plaintiffs to survive summary judgment on the issue of whether PA 268 disproportionately affects African-Americans, including through the longer wait times PA 268 may cause. Plaintiffs argue that African-Americans in Michigan both vote a straight-ticket at a higher rate than non-black voters and face longer wait times to vote.

Turning first to Plaintiffs' argument that African-Americans vote a straight-ticket at higher rates than other demographics, Plaintiffs offer evidence that 49.2% of Michigan voters used straight-party voting in the 2016 general election. Dkt. No. 108-2, p. 9 (Pg. ID 2402). Yet in the 2016 general election, Plaintiffs assert that

68.9% of people in the seven communities in which African-Americans comprised 40-49.9% of the voting age population used straight-ticket voting. *Id.* What is more, evidence indicates that 77.7% of individuals in the twelve communities where African-Americans constitute a majority of the voting age population used straight-party voting in the 2016 general election. *Id.* And in the November of 2012 and 2014 elections, at least 75% of African-American voters, and possibly up to 80%, used straight-ticket voting, according to the Plaintiffs. *See* Dkt. No. 1-11, pp. 10–13 (Pg. ID 228–31); *see also* Dkt. No. 56, p. 14 (Pg. ID 1105).

The Defendant counters unconvincingly. First, the Secretary's argument—that PA 268 impacts all Michigan voters, not just African-American voters—does not address whether PA 268 disproportionately affects African-Americans. The Defendant next contends that Metzger's 2016 report is unreliable because it does not include several counties with a high percentage of voters who use straight-party voting, including Ottawa County, Washtenaw County, and Livingston County. Dkt. No. 102, p. 42 (Pg. ID 1799); *see also* Dkt. No. 102-3, p. 21 (Pg. ID 1850). Relying on the expert report of Laurence Rosen, a professional demographer, the Secretary claims that straight-ticket voting is popular in communities where African-Americans comprise a small (or no) percentage of the electorate. Dkt. No. 102-3, pp. 16, 21 (Pg. ID 1845, 1850).

This of course may be true, given that reports suggest that African-Americans comprise less than 1.0% of the voting age population in 74.5% of Michigan communities. *See* Dkt. No. 108-2, p. 10 (Pg. ID 2403). But, Plaintiffs' evidence—that all communities in which African-Americans constitute a high portion of the electorate demonstrate a strong preference for straight-ticket voting—is sufficient to raise a question of fact about whether African-Americans would be disproportionately impacted by PA 268. Dkt. No. 108, p. 20 (Pg. ID 2350); *see also* Dkt. No. 108-8, p. 5 (Pg. ID 2542). In light of the above analysis, reasonable minds may disagree about whether African-Americans will be disproportionately affected by PA 268, including through facing longer wait times.

Plaintiffs also argue that PA 268 disproportionately burdens African-Americans because it introduces a confusing ballot, which will lead to both more rejected ballots and requests for assistance. Dkt. No. 56, p. 18 (Pg. ID 1109). According to the Plaintiffs, the ballot authorized by PA 268 would be confusing as it removes the straight-party option, but keeps the party vignettes at the top of the ballot. *Id.* Plaintiffs submit that voters familiar with the party vignettes "will circle the party they want or otherwise mark it, as they will see no other reason for displaying the vignettes on the ballot." *Id.* These votes, then, will be rejected and more voters will request help, causing delay. *Id.* Plaintiffs' expert Daphne Ntiri found that African-Americans will be disproportionately affected by this confusion

20

because African-Americans in Michigan have lower literacy rates than other demographics. *See* Dkt. No. 108-5, pp. 17–19 (Pg. ID 2526–28).

The Secretary responds that the straight-party ballot is confusing. But even if true, the Court finds it cannot conclude as a matter of law that PA 268 would eliminate confusion about the ballot: The PA 268 ballot includes the same party vignettes as the current ballot, but would not allow straight-ticket voting. Indeed, the Sixth Circuit acknowledged "the new confusion that PA 268 will likely cause." *Johnson II*, 833 F.3d at 666.

Consequently, the Plaintiffs' contention that PA 268 may impose a burden of confusion on African-American voters in Michigan has merit.

### 2. Regulatory Justification

As the Court has assessed the character and magnitude of the alleged burden on voters, the Court will now examine the justifications offered by the Secretary, and whether these justifications warrant the alleged burden as a matter of law. The Secretary explains that PA 268 is intended first to "encourage the electorate to become more educated about the candidates, more fully involved in the democratic process, and more deliberate in their voting choices." Dkt. No. 102, p. 48 (Pg. ID 1805) (internal quotations and citations omitted). A secondary concern is encouraging voters to complete the non-partisan section of the ballot. *Id.*

There is a genuine dispute about whether the first rationale justifies the burden. There is little evidence in the record that straight-party voting is not an informed choice or that straight-party voting demonstrates a lack of involvement in the democratic process. And the record does not contain ample evidence that voters will be more informed or more deliberate in their choices because of PA 268. The PA 268 ballot will still contain party vignettes, and so, Michigan residents can still vote solely based on party affiliation. *See Johnson I*, 209 F. Supp. 3d at 949; *see also* Dkt. No. 56, p. 16 (Pg. ID 1107). Therefore, the Sixth Circuit's observation about this justification applies with equal force here: "[A] voter desiring to vote for all of the candidates of his or her desired political party may still do so without reading any of the candidates' names, without knowing the office for which the candidate is running, and without knowing a single fact about either—the only change, as the state admits, will be that a voter now " 'can't do it through one bubble.' " *Johnson II*, 833 F.3d at 666 (quoting Dkt. No. 26, pp. 31–32 (Pg. ID 773–74)).

Second, the Defendant has also not established as a matter of law that the State's interest in encouraging voters to complete the entire ballot outweighs the risk that PA 268 will cause such long lines that some people will not bother to vote. Indeed, it is not clear that PA 268 will increase ballot completion. Dkt. No. 108-3, p. 24–27 (Pg. ID 2481–84). To the contrary, Plaintiffs contend that voters using the

straight-party option are more likely to complete a ballot than voters not using the option. Specifically, there is evidence that straight-party voters are more likely to complete the non-partisan section of the ballot because they have less "voter fatigue" than voters who do not vote straight-party. *Id.* This voter fatigue theory is bolstered by the large number of candidates on Michigan ballots. *See* Dkt. No. 102, pp. 35–36 (Pg. ID 1792–93). The Secretary concedes that Michigan voters must vote for a "large number" of offices, explaining that Detroit voters had to fill in thirty-seven bubbles on just the non-partisan section of the 2016 ballot. *Id.*

Third, the Secretary unconvincingly argues—as in the Response to Plaintiffs' Motion for a Preliminary Injunction—that because most states do not have straight-ticket voting, PA 268 modernizes Michigan election law. But whether other states have straight-party voting does not determine the constitutionality of PA 268. *See Johnson I*, 209 F. Supp. 3d at 948–49 ("If the Ohio Legislature successfully instituted poll-taxes and literacy tests without challenge, it would not change the fact that poll-taxes and literacy tests are still clearly unconstitutional burdens on the right to vote.").

Even assuming that a comparison of Michigan's voting practices with other states' practices is a "potentially valuable tool" here, this comparison does not assist the Secretary. *See Ohio Democratic Party*, 834 F.3d at 629. The Defendant notes, for example, that Rhode Island eliminated straight-party voting in 2014. *See* Dkt.

No. 102, p. 57 (Pg. ID 1814). Rhode Island in 2014 allowed no-excuse voting by mail, however. *See* 1956 R.I. GEN. LAWS § 17-20-2(4) (providing that a person is eligible to vote by mail if the person "may not be able to vote at his or her polling place in his or her city or town on the day of the election."). Michigan of course does not permit no-excuse absentee voting and authorizes absentee voting in only limited circumstances. *See* MICH. COMP. LAWS § 168.758(1)(a)–(f).

Accordingly, whether PA 268 unlawfully restricts African-Americans' right to vote is an issue for trial.

### 3. Legal Challenges to Straight-Party Voting

Lacking evidence to prove the absence of a factual dispute here, the Secretary cites two cases and maintains that a law removing straight-party voting is always constitutional because no court has struck down a law on the grounds that it eliminated straight-party voting. The Court disagrees and the cases cited in support are inapposite.

The Secretary first cites to *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014), but concedes the removal of straight-party voting went unchallenged in this case. She then relies heavily on *One Wisc. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 946 (W.D. Wisc. 2016), but this case, too, is distinguishable. In *Thomsen*, the court held that the elimination of straight-ticket voting in Wisconsin did not offend the Fourteenth Amendment. *Id.* There, an expert

witness failed to present evidence in support of his claim that the elimination of straight-ticket voting would cause longer lines, and thus, Wisconsin voters "faced only a slight burden on the right to vote." *Id.* at 945–46. Notably, the court concluded that "plaintiffs' evidence is entirely anecdotal and mainly establishes only that African Americans and Latinos would prefer to use straight-ticket voting." *Id.* at 957. Plaintiffs' evidence here, by contrast, is not "entirely anecdotal": They have submitted several expert reports and lay testimony indicating that African-Americans vote a straight-party ticket at significantly higher rates than others, and that voting will take longer without a straight-party option. *See* Dkt. Nos. 108-2, 108-3, 108-9.

In citing *Thomsen*, the Secretary again incorrectly compares the voting schemes of two states with different practices. *See generally Thomsen*, 198 F. Supp. 3d 896. For example, when *Thomsen* was decided, Wisconsin allowed absentee voting "for any reason," which Michigan does not. *See* WIS. STAT. ANN. § 6.85; *see also* Dkt. No. 102-8. Rather, as detailed here above, Michigan narrowly restricts absentee voting. *See* MICH. COMP. LAWS § 168.758(1)(a)–(f).

Third, *Thomsen* was decided after a trial, and not at the summary judgment stage. At the summary judgment stage, this Court must view the facts in the light most favorable to the Plaintiffs.

In light of the foregoing analysis, Plaintiffs' equal protection claim under the *Anderson/Burdick* framework will survive the motion for summary judgment.

C.     Intentional Discrimination under the Equal Protection Clause

Plaintiffs also mount an equal protection challenge alleging that PA 268 was enacted with discriminatory intent. The Court will find that the evidence for this claim is sufficient to proceed to trial.

" 'Facially neutral laws can be motivated by invidious racial discrimination.' " *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 636 (6th Cir. 2016) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). To assess whether a facially neutral law was indeed motivated by racial discrimination, "courts must undertake a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' " *Id.* (quoting *Arlington Heights*, 429 U.S. at 266). This doctrine does not mandate that a plaintiff show racial discrimination was "the law's 'dominant' or 'primary' purpose." *Id.* (quoting *Arlington Heights*, 429 U.S. at 266). Rather, "[c]hallengers need to show only that discriminatory purpose was 'a motivating factor.' " *Id.* (quoting *Arlington Heights*, 429 U.S. at 266).

"[E]vidence of a policy's disparate impact may be probative in determining whether the policymaker harbored a discriminatory intent." *Spurlock v. Fox*, 716 F.3d 383, 400 (6th Cir. 2013) (citing *Arlington Heights.*, 429 U.S. at 266). This

evidence is, of course, not dispositive. *See id.* at 401 (" 'Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution.' " (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976))). In *Arlington Heights*, the Supreme Court instructed courts to consider:

> '[t]he historical background of the decision[,] . . . particularly if it reveals a series of official actions taken for invidious purposes'; '[t]he specific sequence of events leading up the challenged decision'; '[d]epartures from the normal procedural sequence'; '[s]ubstantive departures[,] ... particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached'; and the 'legislative or administrative history[,] . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.'

*Id.* at 398 (alterations in original) (quoting *Arlington Heights*, 429 U.S. at 267–68).[4]

Engaging in this inquiry here, the Court will find that this claim survives the motion for summary judgment. Addressing the first factor, the historical background of the decision, as discussed above, the record reveals evidence signaling that PA 268 will have a discriminatory impact on African-Americans. This consideration, although not controlling, weighs in favor of the Plaintiffs.

Next the Court must analyze the specific sequence of events leading up to enacting the law. The Secretary argues that this factor should weigh in her favor despite conceding that in prior years the elimination of straight-party voting was

---

[4] The third factor—if there were departures, procedurally or substantively, from the ordinary workings of the legislature in enacting this bill—does not offer insight into the dispute.

"somewhat politically unpopular." Dkt. No. 102, p. 52 (Pg. ID 1809). Indeed, Michigan voters twice repealed laws removing the practice, once in 1964 and again in 2001. *See* Dkt. No. 56, pp. 12–13 (Pg. ID 1103–04). A referendum on PA 268 is unavailable to Michigan voters, as it contains an appropriation. *See Mich. United Conservation Clubs v. Sec'y of State*, 464 Mich. 359, 630 N.W.2d 297 (2001). Moreover, almost a majority of Michigan voters still vote a straight-party ticket—49.2% in the 2016 general election, according to the Plaintiffs. Dkt. No. 108-2, p. 9 (Pg. ID 2402). This consideration measures against granting the Defendant summary judgment on Plaintiffs' intentional discrimination claim.

The final factor involves an examination of the legislative and administrative history of PA 268. This consideration is neutral—the parties are engaging in additional discovery as to subpoenas directed at current and former Michigan state legislators. *See* Dkt. No. 119. The record contains evidence helpful to Plaintiffs, but not enough evidence for the Court to conclude that this factor favors them over the Secretary. Specifically, Plaintiffs present persuasive testimony from the chair of the Michigan Republican Party in 2015, Ronna Romney McDaniel. *See* Dkt. No. 108-15. McDaniel said that she thought PA 268 was good policy, but conceded that she knew it would benefit Republican Party candidates to the detriment of Democratic Party candidates. *Id.* at p. 7 (Pg. ID 2632).

Even if this last factor weighed in the Secretary's favor, after balancing all of the considerations, the Court will hold that the Defendant is not entitled to summary judgment on Plaintiffs' intentional discrimination claim.

D.      Section 2 of the Voting Rights Act

The Court is persuaded that a question of fact exists about whether PA 268 violates Section 2 of the Voting Rights Act.

Neutral state action, the Supreme Court held, was not covered under Section 2 of the Voting Rights Act as it was originally enacted. *See City of Mobile v. Bolden*, 446 U.S. 55 (1980). Congress then amended Section 2 and this amendment established that a showing of intentional discrimination was no longer required to prove a Section 2 claim. *Ohio Democratic Party*, 834 F.3d at 636 (citing *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 363 (6th Cir. 2002)). Accordingly, " 'a violation [of Section 2] could be proved by showing discriminatory effect alone.' " *Ne. Ohio Coal.*, 837 F.3d at 626 (alteration in original) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986)). In its current form, Section 2 provides that:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not

equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

This section authorizes claims for either vote dilution or vote denial. *Ne. Ohio Coal.*, 837 F.3d at 626. Plaintiffs here raise a challenge based on vote denial, and the standard for denial claims is not well-developed. *Id.* (explaining that the Supreme Court has established the test for vote dilution claims, but not for vote denial claims).

The Sixth Circuit has seemingly approved the following two-part test for vote denial claims:[5]

---

[5] The Sixth Circuit in *Ne. Ohio Coal.* cites this test, but does not confirm its validity. *See* 837 F.3d at 626–27. The court noted that the decision originally detailing this framework was vacated. *See Ohio State Conference of the NAACP v. Husted*, 768 F.3d 524 (6th Cir. 2014). It was vacated because the injunctive order in that case was stayed by the Supreme Court and the order only applied to the then upcoming election. *See Husted v. Ohio State Conference of N.A.A.C.P.*, ⸺ U.S. ⸺, 135 S. Ct. 42 (2014) (staying preliminary injunction); *see also Ohio State Conference of the NAACP v. Husted*, No. 14–3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014) (vacating opinion). The *Ne. Ohio Coal.* court noted, however, that the Sixth Circuit panel in *Ohio Democratic Party*, 834 F.3d 620, found this test useful (with some clarification) in addressing a Section 2 vote denial claim. *See Ne. Ohio Coal.*, 837 F.3d at 627. Accordingly, this Court will apply the standard described by *Ne. Ohio Coal.* and *Ohio Democratic Party*.

[t]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, and (2) that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

See *Ne. Ohio Coal.*, 837 F.3d at 626–27 (internal quotations and citations omitted).

"[T]he first element of the Section 2 claim," the Sixth Circuit emphasized, "requires proof that the challenged standard or practice causally contributes to the alleged discriminatory impact by affording protected group members less opportunity to participate in the political process." *Ohio Democratic Party*, 834 F.3d at 637–38. Only if a plaintiff has satisfied this first step, can a district court proceed to the second step. *See id.* at 638.

Step two of this framework "trigger[s] consideration of the 'totality of circumstances,' potentially informed by the 'Senate Factors' discussed in *Gingles*." *Id.* (referencing *Thornburg v. Gingles*, 478 U.S. 30, 47–52 (1986)). Under the second step, a court evaluating a facially neutral law must determine whether "a disparate impact in the opportunity to vote is shown to result not only from operation of the law, but from the interaction of the law *and* social and historical conditions that have produced discrimination." *Id.*

The Sixth Circuit summarized the two-part test as instructing that "[PA 268] is actionable as a Section 2 violation only if it is shown to causally contribute, as it

31

interacts with social and historical conditions that have produced discrimination, to a disparate impact on African Americans' opportunity to participate in the political process." *Id.* at 639 (citing 52 U.S.C. § 10301(a)–(b)).

Applying this standard here, the Court finds that a reasonable person could conclude that PA 268 violates Section 2 of the Voting Rights Act.

1.   PA 268 and African-Americans' Opportunity to Participate in the Political Process

Invoking the first step, Plaintiffs argue African-Americans utilize straight-party voting at a higher rate than other demographics and, as PA 268 will increase the time it takes to vote, PA 268 will make it increasingly difficult for African-Americans to participate in the political process through voting. Dkt. No. 108, pp. 50–51 (Pg. ID 2380–81). In his amended report, Metzger concluded that there is a "high correlation between the racial composition of the voting-age population (percent African American) and the use of the straight party voting option," even after controlling for certain other considerations that may impact the use of straight-party voting. Dkt. No. 108-2, pp. 8–9 (Pg. ID 2401–02). Metzger further posited "that communities where African Americans of voting age were in the majority are significantly more likely to cast a straight party ballot than those where African Americans represent less than 50 percent of the voting-age population." *Id.* at p. 10 (Pg. ID 2403). Plaintiffs supplement Metzger's findings with Allen's expert report. Dkt. No. 108-4. Allen determined that the longer wait lines caused by PA 268 would

disproportionately impact African-American voters, depriving thousands of African-Americans of an equal opportunity to participate in the political process. *Id.* at p. 18 (Pg. ID 2505).

In *Ne. Ohio Coal.*, for example, the Sixth Circuit determined that plaintiffs failed to prove disparate impact at trial, in part, because their expert "found that the evidence to support the conclusion that high-minority counties use absentee ballots more heavily was 'not very strong.' " 837 F.3d at 627. On the other hand, the expert evidence relied on by Plaintiffs uniformly suggests (1) that a strong correlation exists between the percentage of African-Americans of voting age in a community and the percentage of straight-party voters in that community; and (2) that longer voting lines will result from PA 268.

The Secretary responds unconvincingly, reasoning that PA 268 "merely requires that every voter affirmatively vote for each candidate he or she wishes to support, and does not *prevent* anyone from participation in the political process." Dkt. No. 102, pp. 57–58 (Pg. ID 1814–15). The issue here, however, is not whether PA 268 bars African-Americans from voting. Of course, if PA 268 precluded all African-Americans from voting, its constitutionality would be an easy question. Rather, the Court must examine whether PA 268 disproportionately affects African-Americans' ability to participate in the political process. Plaintiffs, as above detailed, have presented a question of fact on that question.

The Court will accordingly proceed to step two of the Section 2 framework.

2. *Gingles* Factors and the Totality of the Circumstances

The second part of this framework entails evaluating the totality of the circumstances and determining if reasonable minds may disagree about "whether the challenged *voting standard or practice* causes the discriminatory impact as *it* interacts with social and historical conditions." *Ohio Democratic Party*, 834 F.3d at 639 (citing 52 U.S.C. § 10301(a)–(b)). The Court finds that the record reveals a genuine dispute on this issue.

Informing this analysis are the *Gingles* factors:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

. . .

[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36–37.

The Court assessed the *Gingles* factors in *Johnson I*, and the results are nearly the same after scrutinizing each factor again here. But, given the evidence submitted to the Court since *Johnson I*, the Court must explain its reasoning.

To start, several of these factors—factors one, three and four—are not relevant, as the Court determined in *Johnson I*.[6] *See* 209 F. Supp. 3d at 951. The Court will address the relevant factors in turn.

---

[6] The Defendant incorrectly argues that because these factors do not weigh in favor of the Plaintiffs, they must weigh in favor of the Defendants. These factors, however, are not either-or propositions. For example, all agree that Michigan does not have a candidate slating process (factor four), and thus, the Court cannot credit the Defendant for the absence of discrimination in a process that does not exist.

a) Factor Two: The extent to which voting in the elections of the state or political subdivision is racially polarized.

Plaintiffs have presented evidence that voting in Michigan is racially polarized. According to a Pew Research Center poll cited by the Plaintiffs, "87% of black voters identify with the Democratic Party or lean Democratic, compared with just 7% who identify as Republican or lean Republican." PEW RESEARCH CENTER, *The Parties on the Eve of the 2016 Election: Two Coalitions, Moving Further Apart*, (Sept. 13, 2016), http://www.people-press.org/2016/09/13/2-party-affiliation-among-voters-1992-2016/ [hereinafter TWO COALITIONS, MOVING FURTHER APART]; *see also* Dkt. No. 108-2, p. 25 (Pg. ID 2418). Conversely, "54% of white registered voters identify as Republican or lean toward the GOP, while just 39% affiliate with the Democratic Party or lean Democratic." TWO COALITIONS, MOVING FURTHER APART. Even if there is less disparity between these percentages in Michigan specifically, these country-wide figures suggest that there is racially polarized voting in Michigan.

b) Factor Five: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.

The record, and in particular Metzger's amended report, indicates the impact of discrimination in each of these areas. *See* Dkt. No. 108-2, pp. 13–24 (Pg. ID 2406–17). In addition, Ntiri found that African-Americans had experienced

discrimination in education, and one result of this discrimination is lower literacy rates for African-Americans as compared to whites. Dkt. No. 108-5, pp. 2, 14–15 (Pg. ID 2511, 2523–24). Ntiri also concluded that discrimination in education is connected to "substandard schooling, economic and social hardships, and the longstanding racial achievement gap." *Id.*

In the face of this evidence, the Secretary attacks Ntiri's credibility, but does not offer evidence to the contrary. *See* Dkt. No. 114, p. 6 (Pg. ID 2695). As a result, this factor weighs in Plaintiffs' favor.

         c)     Factor Six: Whether political campaigns have been characterized by overt or subtle racial appeals.

Plaintiffs' assertions regarding the occurrence of overt or subtle racial appeals fail, according to the Secretary, because they are based on outdated articles, specifically articles from 2004 and 2012. Dkt. No. 102, p. 62 (Pg. ID 1819); *see* Dkt. No. 4, pp. 49–50 (Pg. ID 366–67). Instead, the Secretary contends that Plaintiffs are required to show such evidence in the 2016 election. Dkt. No. 102, p. 62 (Pg. ID 1819). The Court finds that this argument lacks merit, and Plaintiffs' citation of these articles is not problematic because of the dates of these articles. *See* Dkt. No. 4, pp. 49–50 (Pg. ID 366–67). Moreover, this Court has previously acknowledged racial appeals in 2016 political campaigns. *See Johnson I*, 209 F. Supp. 3d at 952–53.

        d)     Factor Seven: The extent to which members of the minority group have been elected to public office in the jurisdiction.

For this consideration, the parties rehash the same arguments offered in the pleadings on the preliminary injunction. Namely, that this factor should weigh in favor of the Defendant first because Michigan has elected African-Americans to various judicial positions, and most notably, to Chief Justice of the Michigan Supreme Court. The weight of this fact is diminished because designations on ballots signaling incumbent candidates for judicial positions make it easier for these candidates to win reelection. *See* MICH. CONST. art. 6, § 24 (West, Westlaw through Nov. 2016 amendments). The Secretary notes second that former President Barack Obama twice carried Michigan. Plaintiffs, on other the hand, argue that this factor should be resolved in their favor as Michigan has elected only one African-American to a statewide partisan office.

Balancing these arguments, the Court again finds that this factor is neutral. *See Johnson I*, 209 F. Supp. 3d at 953.

        e)     Factor Eight: Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

As with factor seven, the parties do not present new evidence on this point. Yet the Court acknowledges that recent developments measure in favor of Plaintiffs: The 13th Congressional District, a majority African-American and heavily-leaning

Democratic district,[7] will not have a representative in Congress for nearly one year. This illustrates a substantial lack of responsiveness on the part of elected officials to the specific needs of the minority community in this district.

Thus, the Court concludes that, unlike in *Johnson I*, this factor weighs in Plaintiffs' favor. *See id.* at 953–54 (noting that Plaintiffs' reference to the Flint water crisis, standing alone, was insufficient to show this factor weighed in their favor, because of the state government's substantial support to Detroit during its bankruptcy).

> f)      Factor Nine:  Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

The Court agrees with the Plaintiffs that this consideration should be resolved in their favor because Michigan is attempting to remove straight-ticket voting after authorizing its use for over 126 years, and voters twice repealed by referendum the elimination of straight-party voting.  *See* Dkt. No. 108, p. 57 (Pg. ID 2387).

---

[7] *See* Michigan Dep't of State, *Office of Governor Rick Snyder: Gov. Rick Snyder announces special election dates for 13th Congressional District*, *available at* http://www.michigan.gov/snyder/0,4668,7-277-80388_80397-454755--,00.html (last accessed January 18, 2018); *see also* United States Census Bureau, *My Congressional District*, *available at* https://www.census.gov/mycd/?st=26&cd=13 (last accessed January 18, 2018); *see also* Paul Egan, *Snyder sets Aug. 7, Nov. 6 election dates to replace John Conyers in Congress*, DETROIT FREE PRESS, *available at* https://www.freep.com/story/news/local/michigan/detroit/2017/12/08/john-conyers-special-election-congress/934206001/ (last accessed January 18, 2018).

The *Gingles* factors are just one component of the analysis; the Court must also examine the totality of the circumstances. In doing so, the Court will hold that the evidence warrants a trial about "whether [PA 268] causes the discriminatory impact as *it* interacts with social and historical conditions." *Ohio Democratic Party*, 834 F.3d at 639.

First, evidence in the record indicates that African-Americans will be disparately impacted by the longer voting lines caused by PA 268. This impact is linked to historical discrimination in education, which has led to lower literacy rates among African-Americans as compared to whites. And, these lower literacy rates interact with PA 268 by making it more challenging for African-Americans to complete the ballot. This challenge could lead to confusion that causes longer waiting lines and more spoiled ballots.

Second, historical discrimination in housing is reflected in Michigan through segregated communities, according to evidence submitted by the Plaintiffs. *See* Dkt. No. 108-2, pp. 10–11 (Pg. ID 2403–04). If African-Americans are largely voting in the same precincts, then they will be disproportionately affected by the longer wait times PA 268 will introduce.

Finally, racial appeals in campaigns—whether direct or subtle—have led to increasing political polarization based on race. *Id.* at p. 25 (Pg. ID 2418). Plaintiffs, for example, cite to a report which explains that "[i]n urban local elections, race is a

more decisive factor than income, education, religion, sexual orientation, age, gender, and political ideology." Khalilah Brown-Dean et al., *50 Years of the Voting Rights Act the State of Race in Politics*, JOINT CENTER FOR POLITICAL AND ECONOMIC STUDIES, March 3, 2015, http://jointcenter.org/sites/default/files/VRA%20report%2C%203.5.15%20%2811 30%20am%29%28updated%29.pdf. Moreover, evidence in the record indicates that African-Americans overwhelming support the Democratic Party, and this support is partly motivated by opposition to racial appeals allegedly carried out by the Republican Party. *See generally* TWO COALITIONS, MOVING FURTHER APART; *see also Johnson I*, 209 F. Supp. 3d at 954.

Because Plaintiffs have presented evidence that PA 268 will causally contribute, through linkage to social and historical discrimination, to a disparate impact on African-Americans' opportunity to vote, the Defendant is not entitled to summary judgment on Plaintiffs' Section 2 claim.

## V.     Conclusion

The Court will DENY the Defendant's Motion for Summary Judgment [102]. The Court will deny the Defendant's motion on Plaintiffs' claims for restricting the right to vote under the Equal Protection Clause of the Fourteenth Amendment (Count I), intentional discrimination under the Equal Protection Clause of the Fourteenth

Amendment (Count II), and violations of Section 2 of the Voting Rights Act (Count III).

IT IS SO ORDERED.

Dated:  January 19, 2018                 /s/Gershwin A. Drain
                                            GERSHWIN A. DRAIN
                                            United States District Judge

## CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
January 19, 2018, by electronic and/or ordinary mail.
/s/ Tanya Bankston
Deputy Clerk