UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN STATE A. PHILIP
RANDOLPH INSTITUTE, COMMON          No. 2:16-cv-11844
CAUSE, MARY LANSDOWN, ERIN
COMARTIN and DION WILLIAMS,          HON. GERSHWIN A. DRAIN

     Plaintiffs,                        MAG. MONA K. MAJZOUB

v
RUTH JOHNSON, in her official capacity        **DEFENDANT'S TRIAL**
as Michigan Secretary of State,                **SUBMISSIONS**

     Defendant.
_____/

Mark C. Brewer (P35661)
Attorney for Plaintiffs
17000 West Ten Mile Road, 2nd Floor
Southfield, Michigan  48075
248.483.5000

Mary Ellen Gurewitz (P25724)
Attorney for Plaintiffs
2211 East Jefferson Avenue
Detroit, Michigan  48207
313.965.3464

Denise C. Barton (P41535)
Rock Wood (P41181)
Adam Fracassi (P79546)
Elizabeth R. Husa Briggs (P73907)
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30736
Lansing, Michigan  48909
517.373.6434

_____/

**DEFENDANT'S TRIAL SUBMISSIONS**

BILL SCHUETTE
Attorney General

Denise C. Barton (P41535)
Rock Wood (P41181)
Adam Fracassi (P79546)
Elizabeth R. Husa Briggs (P73907)
Assistant Attorneys General
Attorneys for Defendant Secretary of
 State Ruth Johnson
P. O. Box 30736
Lansing, Michigan  48909
517.373.6434
Email:  bartond@michigan.gov
(P41535)

Dated:  March 29, 2018

# TABLE OF CONTENTS

Page

Table of Contents ............................................................................... i

Index of Authorities ......................................................................... iii

Concise Statement of Issues Presented ............................................. v

Controlling or Most Appropriate Authority ...................................... vi

Introduction ....................................................................................... 1

      P.A. 268 is a validly enacted regulation to the manner of voting. ............... 3

Argument ........................................................................................... 5

I.     Plaintiffs have failed to establish an Equal Protection claim under the Anderson-Burdick balancing test. ........................................................ 5

     A.    There is no evidence demonstrating a disparate burden on voters by causing longer lines. ...................................................... 6

     B.    Election administration remedies can address longer lines. ............ 10

           1.    Statutory safeguards for a better experience on election day. ........................................................................... 10

           2.    Absentee Voting in Michigan is comparable to other states and approximately 32% of the State is eligible to vote via one qualification. .................................................. 11

           3.    The Bureau of Elections provides training to the trainers ....... 12

           4.    Michigan clerks can resolve longer lines through administrative remedies. ...................................................... 13

     C.    P.A. 268 will not prohibit African-Americans from participating in the political process. ........................................... 13

     D.    Michigan's interests in eliminating straight ticket voting ............... 15

1. Straight Ticket Voting causes voter confusion...................... 15

2. The elimination of STV was intended to create a more
   informed electorate and to encourage voters to become
   more engaged in and educated about the political process. ....17

II. There is no evidence of intentional discrimination. ................. 18

A. P.A. 268 does not bear more heavily on African-American
   voters..................................................................... 19

B. No discriminatory intent is present. The historical background
   of P.A. 268 does not demonstrate an invidious purpose................. 20

C. The sequence of events leading to P.A. 268 does not
   demonstrate an invidious purpose. ............................... 21

D. No invidious purpose is demonstrated by the legislative history.......22

E. Plaintiffs cannot prove that P.A. 268 was passed based on a
   discriminatory purpose and it survives rational basis scrutiny. ........22

III. There is no evidence establishing that P.A. 268 violates § 2 of the
    Voting Rights Act...................................................................22

A. P.A. 268 will not prevent African-Americans from participating
   in the political process. ................................................ 22

B. Any impact caused by P.A. 268 is not a result of the law as it
   interacts with social and historical conditions...............................25

Conclusion and Relief Requested .................................................. 34

Certificate of Service (e-file) ....................................................... 36

# INDEX OF AUTHORITIES

<u>Page</u>

## Cases

*Anthony v. State of Michigan,* 35 F. Supp. 2d 989 (E.D. Mich. 1999)...................28

*Boblo Excursion Co. v. Michigan*, 333 U.S. 28 (1948)...........................................28

*Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012)..................................................23

*Michigan Farm Bureau v. Hare*, 151 N.W.2d 797 (Mich. 1967) ..........................22

*N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016)............15

*NAACP v. Austin*, 857 F. Supp. 560 (E.D. Mich. 994)............................................27

*Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016) ...........................6

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ................................................................27

*Reynolds v. Bureau of State Lottery*, 610 N.W.2d 597 (Mich. App. 2000).............21

*Rhodes v. Snyder*, Case No. 2:17-cv-14186, Pg.ID.466 .........................................34

*Spurlock v. Fox*, 716 F.3d 383 (6th Cir. 2013) .......................................................19

*Thornburg v. Gingles*, 478 U.S. 30 (1986). .............................................................29

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) . 18, 19, 22

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) ...........7

*Wesley v. Collins,* 791 F.2d. 1255 (6th Cir. 1986)...................................................23

## Statutes

Mich. Comp. Laws § 168.661...................................................................................10

Mich. Comp. Laws § 168.758...................................................................................11

**Rules**

Fed. R. Civ. P. 10 ................................................................. *passim*

**Constitutional Provisions**

U.S. Const. Art. I, § 4 ...............................................................1

52 U.S.C. § 10301 ......................................................... 25, 26

**Other**

2015 P.A. 268................................................................. *passim*

## CONCISE STATEMENT OF ISSUES PRESENTED

1.      Whether a voting regulation violates the Fourteenth Amendment is
        determined by weighing the law's hindrance against the provisions'
        regulatory justifications.  Where the elimination of STV is supported
        by important regulatory interests, should Plaintiffs' equal protection
        claims be denied?

2.      Where there is no direct evidence of intentional discrimination, the
        courts look to circumstantial evidence to determine whether the law
        intentionally discriminates against minorities.  Where no evidence of a
        racially discriminatory intent or purpose is presented, should the
        Plaintiffs' intentional discrimination claim be dismissed?

3.      To establish a Voting Rights Act claim, (1) the voting standard or
        practice must result in an adverse disparate impact; and (2) the
        challenged voting standard or practice must cause the discriminatory
        impact as it interacts with social and historical conditions.  Where the
        Plaintiffs have failed to establish that the elimination of STV causes a
        discriminatory impact as it interacts with social and historical
        conditions, should their Voting Rights Act claim be dismissed?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

<u>*Authority*</u>:

<u>Equal Protection</u>:  When a constitutional challenge to an election regulation concerns the regulation of elections and voting, the Court applies the *Anderson-Burdick* framework which balances the injury asserted by the party challenging the law with the interests put forward by the State as justifications for the burden. *Ohio Democratic Party, et al v. Husted, et al.*, 834 F.3d 620 (6th Cir. 2016).

<u>Intentional Discrimination</u>:  Where there is no direct evidence of discrimination, the must Court look to circumstantial evidence to determine if a racially discriminatory intent or purpose is a "motivating factor" before Plaintiffs can prove "a violation of the Equal Protection Clause."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-66 (1977).

<u>Voting Rights Act</u>:  A § 2 challenge has two prongs: (1) the law must result in an adverse disparate impact on protected class members' opportunity to participate in the political process; and (2) whether the challenged voting standard or practice causes the discriminatory impact as it interacts with social and historical conditions.  *Ohio Democratic Party, et al v. Husted, et al.*, 834 F.3d 620 (6th Cir. 2016).

## INTRODUCTION

The foundation of this case is one key issue: Plaintiffs' attempt to undermine the Constitution's mandate to the Legislature to regulate the time, place and manner of holding elections.  U.S. Const. Art. I, § 4.  P.A. 268, the facially-neutral statute at issue, has the same effect on every voter, regardless of race, party affiliation, or any other characterization.  It does not affect which citizens may vote, run for office or access a polling place.  Nor does it impose any pre-requisite test or qualification on voting or direct a voter how to vote.  Rather, P.A. 268 reflects the Legislature's initiative to encourage voters to vote the candidate and not the party.

P.A. 268 promotes three worthy goals: A) encouraging voters to consider the qualifications of each candidate, B) encouraging voters to consider the non-partisan portion of the ballot, which contains some of the most important offices on the ballot, including State court judges for every judicial office, and C) makes voting more understandable.  P.A. 268 made Michigan's voting procedure consistent with that of nearly every other state, as more than 40 states do not provide for a single-mark straight ticket vote (STV) option, and no state has been found to have deprived voters of a constitutional right.

Plaintiffs' challenge is motivated by a single goal: partisan advantage, overturning a validly enacted law through the courts rather than through the elected

1

representatives.  Their lack of credibility is illustrated by the inconsistent manner in which at least one Plaintiff (Common Cause) addressed STV in other States – actually *supporting* its elimination when this benefitted its partisan connections.

Eliminating STV voting is a widespread policy with no correlation to race. STV has been eliminated in states with smaller African-American populations than Michigan (Rhode Island, Indiana), in states with similar African-American populations as Michigan (North Carolina and Texas) and the elimination has been found by the Justice Department to be free of discriminatory purpose and effect in states with a history of racial animus far worse than Michigan's and with larger African-American populations (Georgia).

As demonstrated below, STV can have adverse consequences including voters overlooking the non-partisan portion of the ballot, confusion, and delay. Importantly, Plaintiffs and their experts demonstrated this.

Plaintiffs believe that in Michigan their preferred candidates will realize a numerical advantage by allowing their political party to herd voters to STV, without regard to which candidates are actually elected through STV.  This is reminiscent of the political machines of old.  Plaintiffs present a false facade in support of this effort, alleging discrimination based on manufactured and manipulated data and purported expert opinions that regurgitate arguments of Plaintiffs' own counsel.  In fact, Plaintiffs' experts cite to and relied upon counsel

2

for various aspects of their reports and conclusions.  The proffered reports and

opinions submitted by Plaintiffs to persuade this Court are not based on technical

or specialized knowledge, facts, data, or reliable scientific principles and methods,

but are instead a fiction.[1] This is displayed in the sworn admissions of the proffered

experts and shows this case for what it is: an effort to undermine constitutional

rights and manipulate the system for political gain.

## BACKGROUND AND FACTS

**P.A. 268 is a validly enacted regulation to the manner of voting.**

Under the broad constitutional authority of the time, place and manner of

elections, Michigan enacted 2015 P.A. 268, thereby changing ballot design

throughout the State by removing the voter's ability to use one-punch STV.  It is a

facially neutral, non-discriminatory statute.  (See Zaagman email, R.102-22

Pg.ID.2255-56.)  S.B.13 was presented to both the House of Representatives and

the Senate.  Bill Analyses were prepared and circulated by November 2015 and

public hearings were held at which all interested persons from the public were

given the opportunity to testify.  (R.1-13, Pg.ID.269; R.1-14, Pg.ID.273.)

The Senate Fiscal Analysis sets forth rationale for this legislative initiative,

including promoting voting for individual candidates and encouraging Michigan

---

[1] Defendant sought to exclude two of Plaintiffs' experts but her motions were
denied.  Defendant continues to rely upon those filings and maintains that Dr. Ntiri
and Allen's testimony and reports should be stricken.  See Fed. R. Civ. P. 10(c).

3

voters to participate fully in the political process.  (R.102-7, Pg.ID.2079-2080.)

Supporters also identified ballot roll off as motivating this change, i.e., that voters

vote using STV but fail to vote the nonpartisan section of the ballot, including

judges.  (*Id.*)  A $5 million appropriation was added to the underlying bill to

address concerns in implementation.[2]  S.B. 13 was passed by both bodies,

presented to the Governor, and signed into law on January 5, 2016.  (Signing

Statement, R.102-8, Pg.ID.2083.)

In eliminating STV, Michigan modernized its election practice together with

40 other states.  (Thernstrom Report, R.102-18, Pg.ID.2183.)[3]  P.A. 268 does not

impose additional restrictions for voters to access a ballot or alter the qualifications

of or identification needed for Michigan voters to cast a ballot.  P.A. 268 merely

addressed how voters *complete* their ballot – the manner of voting.

"You have 50 different states.  The overwhelming trend, in recent years, has

been away from [STV]."  (Ex. A, Thernstrom Dep. Excerpts[4].)  In 2014, Rhode

Island eliminated STV, and Plaintiff Common Cause supported the elimination.

---

[2] On July 22, 2016, this Court issued a preliminary injunction that blocked the
implementation of the $5 million appropriation.

[3] Defendant incorporates by reference the expert reports and attachments contained
in her motion for summary judgment.  R.102, Fed. R. Civ. P. 10(c).

[4] The Court requested counsel for the parties to organize their trial submissions in a
manner that was efficient for the court to review, and Defendant has done so. Exs.
A-C, E-J, P-S, U-Y, organize testimony of various witnesses by topic/issue, should
the Court find that to be more efficient for review.

(Ex. B, Chapman Dep. Excerpts.)  Similarly, Georgia passed preclearance approval by the Clinton Justice Department in 1995 to eliminate STV.  The DOJ found the elimination had no discriminatory intent or effect and authorized its elimination. (Ex. A, Thernstrom Excerpts.) [5]  And, in North Carolina, African-American voter turnout *increased* after eliminating STV.  (Thernstrom Report, R.102-18, Pg.ID.2200.)  But, in making his conclusions, Jason Roberts ignored this.  (Ex. C, Roberts Dep. Excerpts.)  In Pennsylvania, Common Cause was influenced to advocate keeping STV as it made it easier for "die-hard voters."  (Chapman Email, Ex. D.)  In Georgia and Texas (two pre-clearance states due to a history of racial discrimination), Common Cause did not oppose elimination of STV.  (Ex. B, Chapman Excerpts.)  Nor did Common Cause oppose STV in Indiana.  (*Id.*)

## ARGUMENT

I.     **Plaintiffs have failed to establish an Equal Protection claim under the *Anderson-Burdick* balancing test.[6]**

       Elections cases rest between two competing interests:  the general right to vote that is implicit in our democracy and the constitutional requirement that the

---

[5] Importantly, Georgia in 1994 had an African-American population totaling approximately 33.8% of the State's population.  Comparatively, Michigan's African-American population currently equals about 14% of the population. (Thernstrom Report, R.102-18, Pg.ID.2186.)  See DOJ letter at: https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2540.pdf
[6] Defendant adopts and incorporates by reference her legal standard in her motion for summary judgment.  (R. 102, Pg.ID.1784); Fed. R. Civ. P. 10.

State have "substantial regulation of elections" so they are fair and honest "rather than chaos." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 626 (6th Cir. 2016) (ODP). When a party challenges an elections regulation, the Court applies the *Anderson-Burdick* framework which balances the injury with the interests put forth by the state. *Id.*

### A.   There is no evidence demonstrating a disparate burden on voters by causing longer lines.

The first step requires the Court to identify the "character and magnitude" of the burden as a result of P.A. 268. *ODP*, 834 F.3d at 627. Plaintiffs fail to show that the elimination of STV has any burdensome effect on any voter. At the threshold, the ban on STV voting itself obviously does not "burden" voting. It is not a burden on voting to actually vote for one's candidate of choice. Filling out a non-STV ballot is obviously not burdensome, which is presumably why it has been upheld or not challenged in the over 40 states that use this ballot. Rather, the purported burden is the alleged *collateral effect* of the no STV voting practice – longer wait times caused by a longer time to fill out the ballot.

This effect can only occur if P.A. 268 transforms the current wait times into a time that is so unacceptably long it deters African-Americans from voting. Yet, Plaintiffs do not identify what this time would be, and in fact, one Plaintiff testified she would wait in line no matter what. (Lansdown, R.102-12, Pg.ID.2099.) Plaintiffs' entire case rests upon the fact that minorities may use STV more than

6

non-minorities and this somehow establishes a cognizable vote-denial claim.  Yet, it does not.  To have a cognizable vote denial claim, Plaintiffs must show that African-Americans have less opportunity to vote than Caucasians because of longer lines.

There is no evidence beyond speculation or hypotheticals that P.A. 268 will cause long lines prohibiting African-Americans from voting which is insufficient to establish a claim.  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50 (2008) (finding that courts are not allowed to "go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases.").  Further, any hypothetical lines would impact every voter equally.

Lines can form at any one of three distinct areas of voting: (1) check-in (2) voting booth; and (3) tabulator.  (Graves Report, R.102-5, Pg.ID.1937.)  Utilizing queuing theory, Dr. Graves' testimony shows one scenario in which no increase in wait time occurs even if STV results in taking longer to complete a ballot.  Specifically, not every voter will take longer to vote, and increases can be absorbed because the longest wait times are at check-in.  (*Id*., Pg.ID.1948.)  Allen's assumption that backups occur at the voting booth is not supported by the data gathered for purposes of his report from the 2016 general election; rather, it shows the backup is at check-in.  (Ex. E, Graves Dep.)

In complete disregard of this, Allen hypothesizes that voting booths are the only source of delay, despite industry literature and Plaintiffs' admissions to the contrary.  (Ex. G, Allen Dep. Excerpts.)  In creating the data collection sheets, Allen chose not to include a column for the volunteers to record time actually taken in the voting booths, including information on when an open booth existed.  (*Id.*)  He testified that "this issue of whether booths are free or not is rarely relevant to things that my clients are asking me about" and therefore, did not need direct/actual data on it.  (*Id.*)  Allen also did not ask volunteers to record the number of booths added when the need arose, although some volunteers recorded this information.  (*Id.*)[7]

He also testified he relied upon Plaintiffs' counsel to determine the wait occurred at the voting booths because counsel informed him no voter was released from check-in unless a booth opened and that lines are not allowed to form after check-in.  (*Id.*) This does not comport with the actual observations of Plaintiffs' volunteers at the polls and is not accurate.  Allen offered that delays could be addressed by: a) having a line form after check-in, adding voting stations, or for check-in delays, adding poll books or training workers.  (*Id.*)

---

[7] Despite attributing all waiting to the booths, Allen admitted that this may be factually inaccurate.  (Ex. G, Allen Dep. Excerpts.)

Despite having evidence of local polling places doing this, Allen manipulated data presented to him, altering the number of booths for his simulation, and relying on such alteration to determine the outcome. (*Id.*) He arbitrarily altered the number of booths to what he assumed matched data, and attributed delays to this stage. (*Id.*) He acknowledged that even a single modification could greatly alter his simulation outcome, including at Flint, where he reduced the number of voting booths from 28 (observed) to 5. (*Id.*)

He decreased the number of booths present at predominantly African-American precincts while increasing the number at Caucasian precincts. (Allen Report, Pg.ID.3151.) The differences are significant: Flint: 28 down to 5; Detroit: 1-271 reduced by 2; Saginaw: from 25 to 11. Simultaneously, he increased booths in predominately Caucasian precincts: Augusta from 10 to 13; Fruitland increased by 1; Grand Blanc from 6 to 12; and Peninsula increased by 1. (R.131-8, Pg.ID.3100.) He acknowledged he only reduced the number of booths for precincts with predominantly African-American voters. (Ex. G, Allen Excerpts.)

Only after these manipulations was Allen able to assert a 25% increase in the time to vote without STV. This was based solely upon numbers he and Plaintiffs' counsel manufactured. (*Id.*) If there was a 25% increase, one would assume there would be evidence – other than Plaintiffs' counsel – to support Allen's conclusions. (Ex. E, Graves Dep. Excerpts.)

9

Similarly, there is no evidence that the elimination of STV will lead to longer lines – in fact, the opposite.  Herrnson testified that the elimination could actually *reduce* lines by eliminating voter confusion. (Ex. H, Herrnson Excerpts; Herrnson Report, R. 102-6.)  Roberts even agrees that STV may not save time at the polls, and that his approach could not establish causation[8] or actual proof of longer lines.  (Ex. C, Roberts Excerpts.)

**B.    Election administration remedies can address longer lines.**

Nearly all of Plaintiffs' experts and witnesses admit that election administration remedies can resolve long lines.  (Ex. G, Allen Excerpts; Ex. F, Rozell Excerpts; Ex. I, Baxter Excerpts; Ex. J, Swope Excerpts; Ex. K, Norlander Affidavit; Ex. L, Meltzer Affidavit.)

**1.    Statutory safeguards for a better experience on election day.**

Michigan law limits precincts to 2,999 voters per precinct.  Mich. Comp. Laws § 168.661.  Most jurisdictions keep the total number of registered voters lower to ensure efficiency.  For example, Detroit, as managed by Baxter, has 490 precincts ranging from 3 active voters to 2,000.  (Ex. I, Baxter Excerpts; Ex. M, Detroit Precinct Data.)  Each precinct must have one tabulator and at least one check in station.

---

[8] Plaintiffs' counsel admitted that correlation does not equal causation.  (Ex. S, Rosen Excerpts.)

Voters who need additional assistance have additional available resources. A voter can use the ICX voting system[9].  (Ex. F, Rozell Excerpts.)  Voters can bring a relative or a friend to the polling place to read the ballot or two elections inspectors – one from each major political party – will complete the ballot consistent with the voter's wishes.  (Ex. I, Baxter Excerpts.)

> ### 2.      Absentee Voting in Michigan is comparable to other states and approximately 32% of the State is eligible to vote via one qualification.

A registered voter may also obtain an absentee ballot if the voter is: (1) 60 or older; (2) unable to vote without assistance at the polls; (3) expecting to be out of town on election day; (4) in jail awaiting arraignment; (5) unable to attend the polls due to religious reasons; or (6) appointed to work as an election inspector outside of the precinct of residence.  Mich. Comp. Laws § 168.758.  Alternatively, if an emergency such as a sudden illness or family death prevents a voter from voting at the polls, the voter may request an emergency absent voter ballot until 4 p.m. on election day.[10]  As of this date, 32% of Michigan's registered voters are 60 or older and automatically able to vote absentee.[11]

---

[9] This machine was previously known as the AUTOMark.  (Ex. I, Baxter Excerpt.)
[10] http://www.michigan.gov/sos/0,4670,7-127-1633_8716_8728-21037--,00.html
[11] Data taken from Michigan's Qualified Voter File.

Importantly, Michigan is similarly situated to 12 other states that do not have early voting and require an excuse to absentee vote.  (Ex. N, Absentee Voting chart.)  The absentee voting statutes are similar or nearly identical to Michigan.

### 3.    The Bureau of Elections provides training to the trainers.

In addition to the procedural safeguards set forth by statute, the Bureau of Elections (BOE) provides numerous resources to election administration officials and to voters in preparation for election day.  This includes a procedure manual for election inspectors providing instructions on best practices in election administration including, for example, how to lay out a polling place.  (Ex. O, Polling Place Procedural Manual.)

The BOE also provides a "train-the-trainer" session that demonstrates the training each clerk must provide to poll workers.  (Ex. P, Thomas Excerpts; Ex. Q, Williams Excerpts.)  It provides local trainers materials, videos and an interactive website and other resources for the county or township officials who coordinate training for the individual precincts.  (*Id*.)

This is illustrated through training established by Mr. Rozell.  He testified to providing a two- to three-hour training including giving written materials to poll workers covering every stage of the voting process with the most time spent discussing check-in.  (Ex. F, Rozell Excerpts.)  Elections inspectors are trained as a group allowing for an increase at no burden.  (*Id*.)

12

### 4.    Michigan clerks can resolve longer lines through administrative remedies.

As discussed above, lines occur for a variety of reasons.  Even if Plaintiffs'

speculative assertion that eliminating STV will increase lines, the remedy is

administration.[12]  Clerks have significant authority to control lines to manage their

precinct and can do any of the following: (1) increase voter education; (2) add

voting booths; (3) add laptops; (4) split pollbooks; (5) employ a "pre-check"

process; (6) provides sufficient/additional training; (7) reduce the number of voters

per precinct; (8) move precincts; (9) split precincts; (10) move polling places; (11)

draw attention to the sample ballots online.  (Ex. F, Ex. I, Ex. J, Ex. K, Ex. L.)

Any of these can reduce lines and can be employed when eliminating STV. (*Id*.)

### C.    P.A. 268 will not prohibit African-Americans from participating in the political process.

P.A. 268 is a facially neutral statute that applies equally across the State.

There is no evidence demonstrating that its enactment prohibits African-Americans

from participating in the political process.  Metzger's analysis to the contrary relies

on an ecological fallacy – examining select communities and reporting the usage of

---

[12] Chris Thomas testified that voting stations are available that allow four voting stations in the same space as one.  The implication is that if – for the sake of argument – STV increased the time to complete a ballot by 10%, a clerk concerned about potential lines could replace four voting stations with the four place stations. That would increase the number of voters able to vote at the same time from four to 16, more than making up for any delay that the alleged increase in time to complete the ballot created.  (Ex. P, Thomas Excerpts.)

13

STV, while ignoring high-rates of STV-usage across the State. (Ex. R, Metzger Excerpts, Ex. S, Rosen Excerpts.)  For example, communities with at least a 50% straight-ticket voting rate in the 2016 general election included several with a low percentage of African-American residents: Fillmore Township, Allegan County (0% African-American)--66.92% STV; Tyrone Township, Kent County (2.79% African-American)—56.63% STV; Day Township, Montcalm County (0% African-American)—57.17% STV; Millbrook Township, Mecosta Township (0.53% African-American)—58.85% STV; Blendon Township, Ottawa County (1.23% African-American)—64.24% STV; City of Oak Park, Oakland County (3.04% African-American)—68.28% STV.  (Rosen Report, R.102-3, Pg.ID.1869.) A telling comparison would be to take two areas with nearly identical STV percentages and compare the racial makeup of the community.  Benton Harbor had 69% STV with an African-American population of 46.79%.  Noble Township voted STV by 68.5% with a 0%African-American population.  Likewise, Southfield voted 70.53% STV with 0% African-American population. (*Id.*)  For purposes of illustration, these communities are shaded green in a statewide map. (STV Map, Ex. T.)

Plaintiffs' comparison to North Carolina is a non-sequitur.  The legislation challenged in North Carolina included an array of changes reducing access to the ballot and reducing hours to vote. *N.C. State Conf. of the NAACP v. McCrory*, 831

14

F.3d 204, 218 (4th Cir. 2016).  P.A. 268 does not affect *either*.  P.A. 268 does not reduce hours or the number of days to vote.  Every Michigan voter has the same access to the ballot with P.A. 268 as without P.A. 268.  The only change is an alteration in ballot design, affecting those voters who desire to vote for all candidates of a single party in one punch.  Data shows voters of every jurisdiction use STV – regardless of the racial makeup of the county.  (Ex. T, STV Map.)

Additionally, North Carolina was required to keep data on racial statistics and voting under the VRA, but Roberts ignored this to draw his conclusions, which admittedly, altered his analysis, and he failed to use direct observation data which is a crucial flaw.  (Ex. C, Roberts Excerpts; Ex. H, Herrnson Excerpts.)

### D.     Michigan's interests in eliminating straight ticket voting

The Legislature's expressed reasons for enacting P.A. 268 are valid.  STV is confusing and its elimination encourages a more informed electorate.

#### 1.     Straight Ticket Voting causes voter confusion.

Unrefuted testimony here demonstrates that STV is confusing, not understood by Michigan voters (including Plaintiffs and their expert(s)) – and that this confusion may be most severe with African-Americans with characteristics consistent with traditionally underrepresented groups.  (Ex. H, Herrnson Excerpts.) It is not an intuitive process and raises legitimate questions especially in multi-

member elections.  (Herrnson Report, R.102-6, Pg.ID.2008-10; Ex. H, Herrnson Dep. Excerpts.)

This is exemplified most clearly by Dr. Herrnson, who served as a principal investigator on one of the few large-scale studies of elections practices.  (*Id.*) Herrnson found STV resulted in a higher percentage of voters requesting assistance and making errors, and that this occurred most frequently with "African-Americans with low literacy rates and associated background characterizations."  (*Id.*) Herrnson's testimony demonstrates Michigan's ballot with STV is confusing and poses a "hurdle" for voters because it is unclear what vote(s) are counted in multi-member races.  (*Id.*)  Using STV can cause the voter's vote to be cancelled, or to undervote.  (Ex. P, Thomas Excerpts.)

Unintentional undervoting also results from STV, where a voter selects a party through STV that is not represented in all elections, as Daniel Baxter did during his deposition.  (*Id.*)  His STV for "Natural Law Party" resulted in approximately 10 partisan offices not accounted for.  (Ex. I, Baxter Excerpts.)  It also raises confusion as to which candidates are covered.  Plaintiff Williams testified that he assumed the STV included judicial elections, including State Supreme Court candidates.  (R. 102-14, Pg.ID. 2123.)  Former Plaintiff Comartin[13]

---

[13] Defendant previously filed a motion for summary judgment arguing that Plaintiffs lacked standing.  This Court denied the motion finding it was law of the case that Plaintiffs had standing.  Defendant maintains her objection to this finding.

testified to the mistaken understanding that if she overrode a STV, it would spoil her ballot.  (R. 102-13, Pg.ID2108.)  Eliminating STV actually increases voter participation because it discourages undervoting.  (Ex. I, Baxter Excerpts.)

> **2.    The elimination of STV was intended to create a more informed electorate and to encourage voters to become more engaged in and educated about the political process.**

The Legislature enacted P.A. 268 to encourage voters to become more educated about candidates, "more fully involved in the democratic process," and more deliberate in voting.  (S. Fiscal Analysis, R.102-7, Pg.ID.2079; Signing Statement, R.102-8, Pg.ID.2083.)  There was also a concern that persons would neglect to vote for the nonpartisan portion of the ballot.  (*Id.*)

Former Republican Party Chair Ronna Romney McDaniel provided an additional reason.  She supports eliminating STV to encourage campaigning for offices down the ballot.  (Ex. U, McDaniel Dep. Excerpts.)  In her experience, some candidates declined to campaign or fundraise relying instead on the STV. (*Id*.)  At least one Michigan clerk hypothesizes that a more informed electorate, who are encouraged to read through the ballot, will be less likely to vote ballot drop off or unintentionally ignore non-partisan elections.  (Ex. K, Norlander Affidavit.)

## II.   There is no evidence of intentional discrimination.[14]

Plaintiffs have produced no evidence of discrimination – much less

intentional discrimination.  At best, they assert that partisan consideration led to

the passage of P.A. 268.  (Pls.' Br. R.140, Pg.ID.3387.)  This argument is

reminiscent of an earlier claim this Court rejected.  (R. 55, Pg.ID.1089.)

There is no direct evidence of discriminatory intent, nor is there indirect or

circumstantial evidence suggesting that a racially discriminatory intent or purpose

was a "motivating factor" in the passage of P.A. 268.  *Vill. of Arlington Heights v.*

*Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-66 (1977); *Moore v. Detroit Sch.*

*Reform Bd.*, 293 F.3d 352, 369-70 (6th Cir. 2002) (addressing these factors in a

challenge against Michigan School Reform Act and finding no equal protection

violation).  This is fatal to Plaintiffs' claim.

Several non-exhaustive evidentiary factors are relevant to this analysis: (1)

whether "[t]he impact of the official action" "'bears more heavily on one race than

another'"; (2) "[t]he historical background of the decision[,] . . . particularly if it

reveals a series of official actions taken for invidious purposes"; (3) "[t]he specific

sequence of events leading up the challenged decision"; and, (4) the "legislative or

administrative history" especially "contemporary statements by members of the

---

[14] Defendant adopts and incorporates by reference her legal standard in her motion
for summary judgment.  (R. 102, Pg.ID.1807); Fed. R. Civ. P. 10.

decisionmaking body, minutes of its meetings, or reports." *Id.* at 266-68
(quotation omitted).  When these are applied, Plaintiffs' challenge fails.

### A.    P.A. 268 does not bear more heavily on African-American voters.

P.A. 268 is a facially neutral statute applying statewide.  STV is very
popular in urban and rural communities, cities and suburbs, communities with
high-and-low percentage of African-Americans.  First, even if African-Americans
use STV more often than non-minorities, this would not establish that eliminating
STV has a cognizable adverse impact.  Again, the alleged burden that "bears more
heavily on one race than another" (*A.H.*, 429 U.S. at 266) is *longer wait lines*, not
simply filling out the ballots.  So, Plaintiffs need to establish a disparate impact in
unacceptable wait times.  But Plaintiffs provide no such showing.

Notably, even if P.A. 268 resulted in a disparate impact, such proof alone is
not enough to demonstrate discriminatory intent.  *Spurlock v. Fox*, 716 F.3d 383,
397 (6th Cir. 2013).  To establish a disparate impact, the ultimate determination
looks to the "impact of the official action whether it bears more heavily on one
race than another."  *A.H.*, 429 U.S. at 266 (quotation omitted).  Plaintiffs point to
no reliable data demonstrating that P.A. 268 affects one race any more than any
other.  Even its opponents recognized that STV is a change in the manner of voting
that impacts everyone.  As demonstrated by an email sent by clerk lobbyist Bill
Zaagman prior to the passage of P.A. 268:

Elimination of Straight-party voting is not an urban problem.  SB 13 will cause state-wide problems impacting urban, suburban and rural precincts across the state. Tell them how many of your voters, both Republicans and Democrats, avail themselves of the straight-party option.  You can find your data easily in the EMS data.

(Zaagman email, R.102-22, Pg.ID.2255-56.)

## B.    No discriminatory intent is present. The historical background of P.A. 268 does not demonstrate an invidious purpose.

Plaintiffs have no evidence that P.A. 268 has any discriminatory purpose and cannot demonstrate any history of discrimination behind P.A. 268.  This Court afforded Plaintiffs an opportunity to depose certain former and current members of the State Legislature about their reasons for passing P.A. 268.  Their testimony offers no support for intentional discrimination.

First, the legislators testified that eliminating STV is good public policy for all individual voters.  (Ex. W, Robertson Dep. Excerpts; Ex. X, Knollenberg Dep. Excerpts; Ex. Y, Lyons Dep. Excerpts;, Knollenberg Article.)  Second, Plaintiffs predict that election administration problems could result from long lines if STV is in place. But there is no credible evidence to support the notion that even slightly longer lines will have this effect.[15]  If waiting an hour with STV in effect is permissible and not an equal protection violation, then how can waiting an hour

---

[15] Defendant sought to exclude the report of Allen but this Court denied Defendant's motion.  Defendant continues to maintain that this expert witness is not qualified to testify for the reasons set forth in her evidentiary objection which are incorporated herein.  Fed. R. Civ. P. 10.  (R. 131, Pg.ID 2950.)

and additional minutes under the elimination of STV, transform the situation to an

impermissible equal protection violation based on race?  More importantly,

Plaintiffs own expert Allen testifies that the clerks should be able to mitigate any

increase in time.  (Ex. G, Allen Excerpts.)  Rather, STV has been abandoned in a

variety of states with varying racial compositions and has been upheld by the DOJ

as free of any discriminatory purpose (or effect).  (Thernstrom Report, R.102-18,

Pg.ID.2187; Ex. A, Thernstrom Excerpts.)

### C.   The sequence of events leading to P.A. 268 does not demonstrate an invidious purpose.

Discriminatory intent cannot be inferred from the sequence of events leading

up to the passage of P.A. 268.  If anything, the prior referendums overturning past

legislation that also eliminated STV evidence the widespread popularity of this

method of voting, that its enactment was not targeted at a particular group, and that

questions as to the wisdom of this law should be left to the political processes.

(Second Amend. Compl., R. 56, ¶¶ 26-31, Pg.ID.1101-1104.)  In Michigan, there

is no constitutional prohibition barring the Legislature from reenacting a law

identical or similar to one disapproved by referendum.  *Reynolds v. Bureau of State*

*Lottery*, 610 N.W.2d 597 (Mich. App. 2000); *Michigan Farm Bureau v. Hare*, 151

N.W.2d 797, 802 (Mich. 1967).  Nor does the break of the tie-bar with S.B. 13 and

a bill providing no-reason absentee voting demonstrate anything other than

politics, appropriately, at work.

**D.**    **No invidious purpose is demonstrated by the legislative history.**

Lastly, courts examine legislative or administrative history to discern

discriminatory intent, including records made "contemporary by members of the

decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429

U.S. at 268.  As set forth above, nothing in the legislative analysis or even their

testimony supports this.  Plaintiffs have not shown a racially discriminatory

purpose.  Their claim fails as a matter of law.

**E.**    **Plaintiffs cannot prove that P.A. 268 was passed based on a discriminatory purpose and it survives rational basis scrutiny.**

In addition to the dearth of any evidence of discriminatory purpose, there is

significant evidence that P.A. 268 is "rationally related" to not only "legitimate,"

but also a "significant" government interest.  These government interests are

described above and aim to create a more informed electorate and reduce voter

confusion.  Accordingly, Plaintiffs' intentional discrimination claim must fail.

**III.**    **There is no evidence establishing that P.A. 268 violates § 2 of the Voting Rights Act.[16]**

**A.**    **P.A. 268 will not prevent African-Americans from participating in the political process.**

The first element of a § 2 violation is a necessary precursor to a challenge

that Plaintiffs conveniently ignore.  To establish a § 2 violation of the Voting

---

[16] Defendant adopts and incorporates by reference her legal standard in her motion for summary judgment.  (R. 102, Pg.ID.1811); Fed. R. Civ. P. 10.

Rights Act (VRA), Plaintiffs must first establish that the elimination of STV results in an adverse disparate impact on African-American voters in Michigan.  *Ohio Democratic Party v. Husted*, 834 F.3d 62, 637 (6th Cir. 2016).  However, this is not enough.  "It is well-settled . . . that a showing of disproportionate racial impact alone does not establish a *per se* violation."  *Wesley v. Collins,* 791 F.2d. 1255, 1260-61 (6th Cir. 1986); *see also ODP*, 834 F.3d at 637 *citing Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (en banc) ("[A] § 2 challenge based purely on a showing of some relevant statistical disparity between minorities and whites, without any evidence that the challenged voting qualification causes that disparity, will be rejected." (internal quotation marks and citation omitted)).  Further, "[P]roof of a disparate impact – amounting to a denial or abridgement of protected class members' right to vote – that *results from the challenged standard or practice* is necessary to satisfy the first element but is not sufficient to establish a § 2 claim."  *Id.*  (emphasis in original).  This element "requires *proof* that the challenged standard or practice causally contributes to the alleged discriminatory impact by affording protected group members *less opportunity* to participate in the political process."  *Id.* at 638.  (emphases added).  In other words, to meet the first element, Plaintiffs must provide evidence that the elimination of STV causes African-Americans voters less opportunities to vote.  There is no evidence of this.

The elimination of STV does not deny any voter the opportunity to vote. In fact, the law merely requires the voter to vote for the candidate and not the party. Importantly, P.A. 268 does not reduce African-American's opportunity to participate more than white voters as the law applies equally to all Michigan voters. It requires the same opportunities across the board: that the voter fill out the ballot. The only way Plaintiffs can prove their § 2 claim is to show that because of the elimination of STV, lines will become so long in minority districts as compared to non-minority districts that it will prevent African-Americans from voting. Yet, as Plaintiffs indicate, and noted above, lines already occur in some precincts and are a result of numerous factors. Management is a function of the local clerks' administration of their elections, and tools exist to avoid disruptions to a smooth election process. Those processes already exist and can and will be applied. For example, as indicated above, Plaintiffs themselves are confused as to what the STV option even includes and P.A. 268 removes the opportunity for such confusion.[17] P.A. 268 simplifies the ballot and will not prohibit African-Americans from participating in the political process.

To the extent Plaintiffs point this Court to North Carolina where the elimination of STV was not even challenged, their reliance is misplaced since after

---

[17] Plaintiffs and this Court have previously indicated that the party vignettes on the ballot would lead to voter confusion. Those vignettes have since been removed from the ballot.

its elimination, minority participation and turnout actually *increased*.  (Thernstrom

Report, R.102-18, Pg.ID.2200.).

### B.   Any impact caused by P.A. 268 is not a result of the law as it interacts with social and historical conditions.

The analysis above, demonstrating Plaintiffs' failure to establish factor one

should end the analysis.  However, in the event this Court inquires beyond,

Plaintiffs' claims still fail.

As established by ODP, "the second step asks not just whether social and

historical conditions "result in" a disparate impact, but whether the

challenged *voting standard or practice* causes the discriminatory impact

as *it* interacts with social and historical conditions."  *ODP,* 834 F.3d at 638 *citing*

52 U.S.C. § 10301(a)-(b).  Thus, under the second step, social and historical

conditions are relevant only insofar as they interact with the challenged practice to

have a disparate adverse effect on minorities.  Thus, these conditions cannot be

analyzed in the abstract pursuant to a check list.  They are relevant only to the

extent they cause or contribute to the challenged practice's denial of equal

opportunity.  For example, since racially polarized voting for different candidates

does not contribute to longer wait times to vote, it is an irrelevant factor.  Since

Plaintiffs discuss these factors in the abstract, with no attempt to show how they

cause the facially neutral Act to disproportionately exclude African-Americans,

these factors cannot provide a cause for invalidating the Act under Section 2.  In any event, the socio-economic factors favor Defendant.

Evidence shows that the elimination of STV did not result "in any cognizable, racially disparate impact such that African-Americans were afforded 'less opportunity than other members of the electorate to participate in the political process.'"  *ODP* at 639 quoting 52 U.S.C. § 10301(b).

Since Plaintiffs fail to meet the first step and establish a vote denial claim under § 2, the second step inquiry questioning the causal interaction between "social and historical conditions that have produced discrimination is immaterial." *ODP*, 834 F.3d at 640.  Accordingly, this Court need not address the second step. Even if this Court reaches the second step, the Plaintiffs' claim lacks evidence to establish that the elimination of straight ticket option causes discrimination as it interacts with social and historical conditions.  *Id*.

> **Factor 1: The extent of any history of official discrimination the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.**

Even Plaintiffs concede that this factor weighs in Defendant's favor, and contrary to this Court's prior findings, it is relevant.  (R.124, Pg.ID.2815.) Whether a state has engaged in historical racial discrimination matters in voting rights issues.  See *Oregon v. Mitchell*, 400 U.S. 112, 118 (1970), *superseded by* U.S. Cost. Amend. XXVI; *ODP*, 834 F.3d at 640 (second prong is based on causal

interaction between "social and historical conditions that have produced discrimination is immaterial.")

Michigan does not have a history of racially-discriminatory policies but has a historical tradition of equality. *NAACP v. Austin*, 857 F. Supp. 560, 565 (E.D. Mich. 1994) *citing In re Apportionment of State Legislature*, 486 N.W.2d 639, 651-52 (Mich. 1992). "Michigan was at the forefront of the Free Soil movement, whose central aim was to halt the expansion of slavery into new territories." (Thernstrom report, R.102-18, Pg.ID.2210.) It was one of the first states to amend its constitution to give African-Americans the right to vote. (*Id.* at Pg.ID.2211.)

This trend of legislating equality in Michigan continued after the Civil War when Michigan was the first state to mandate all public schools be open to students of all races. (*Id.* at Pg.ID.2212.) Then, in 1883, after the U.S. Supreme Court declared the Civil Rights Act unconstitutional, Michigan was one of 11 states that enacted similar public accommodation laws and repealed a ban on interracial marriage. (*Id.*) Many states did not carry out similar laws until well-over a century later.

The U.S. Supreme Court recognized Michigan's "long-settled policy against racial and creedal discrimination." (*Id., quoting Boblo Excursion Co. v. Michigan*, 333 U.S. 28 (1948)). Post-war, Michigan moved to aggressively protect African-

Americans in the employment context by becoming the eighth state to create

strong state agencies to protect minority citizens.  (*Id.*)

This well-documented history establishes Michigan's progressive history of

equality for minority citizens.  This factor favors the Defendant.

**Factor 2: The extent to which voting in the elections of the state or political subdivision is racially polarized.**

Michigan does not have a history of racially polarized voting.  In *Anthony v.*

*State of Michigan*, a § 2 voting rights lawsuit was filed challenging the merger of

Wayne County Circuit Court and Recorder's Court.  35 F. Supp. 2d 989 (E.D.

Mich. 1999).  This lawsuit also contended the merger violated the Fourteenth

Amendment due to the alleged racially-discriminatory purpose behind the law.

The court rejected the VRA claim on the merits, and the constitutional claim on

lack of standing.  It concluded although voting in Wayne County was polarized

with respect to incumbent candidates, it was not "legally significant" so as to

trigger § 2 liability.  *Id.* at 1007.[18]  Here, Plaintiffs have not proffered any evidence

to establish this factor weighs in their favor or how it triggers § 2 liability.

**Factor 3:  The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.**

---

[18] "Racial bloc" or "racially polarized" voting "exists where there is 'a consistent relationship between [the] race of the voter and the way in which the voter votes,' or to put it differently, where 'black voters and white voters vote differently.' " *Thornburg v. Gingles*, 478 U.S. 30, n.21 (1986).

Plaintiffs concede this factor does not apply.  (R.108, N.16 Pg.ID.2382.)

**Factor 4:  If there is a candidate slating process where the members of the minority group have been denied access to that process.**

Plaintiffs concede this factor does not apply.  (R.108, N.16 Pg.ID.2382.)

**Factor 5:  The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.**

Plaintiffs essentially argue that this factor supports them since African-Americans suffer from low literacy rates as supposedly demonstrated by Dr. Ntiri.[19]  However, they ignore numerous options available to individuals having difficulty reading the ballot, and Dr. Ntiri's report is entirely premised upon outdated data generalized from the entire country.

As Plaintiffs' own witness testified:

"If a voter can't read they have several options.  The first option is is [sic] that they can use the ADA voter assistive device whereby they might be able to use the headphones and the headphones can articulate and express the names of the candidates, the offices, the parties . . . and they might be able to cast their vote from that point by following the instructions as prescribed by the AVA voting machine."  (Ex. I, Baxter Excerpts.)

---

[19] Defendant sought to exclude the report of Dr. Ntiri but this Court denied Defendant's motion.  Defendant continues to maintain that this expert witness is not qualified to testify for the reasons set forth in her evidentiary objection which are incorporated herein.  Fed. R. Civ. P. 10.  (R. 130, Pg.ID 2856.)

*Anyone* can use the AutoMARK machine and voters do not typically wait for the machine to be available. (Ex. I, Baxter Excerpts.) Voters who have difficulty reading or understanding the ballot also can bring in a friend or family member to assist them in voting. "If they have a family or friend that they are comfortable with that person can assist them." (*Id*.) Additionally, voters can ask poll workers for assistance where two workers – one from each major party – will assist the voter. (*Id*.)

Yet, Dr. Ntiri does not consider any of these options – in fact, she was not aware any voter could use the AutoMARK nor does she know how it works. (Ex. V, Ntiri Dep. Excerpts.) Her report fails altogether to even mention the AutoMARK. She admits she does not "know much about the voting process" and thought poll workers assisting low literacy voters as allowed under law "would be interference." (*Id*.)

Additionally, Ntiri makes broad generalizations about the literacy levels in Michigan based upon outdated data and her report ignores the history of African-Americans altogether. (Thernstrom Report, R.102-18, Pg.ID.2194.) She has no direct evidence about racial disparities in literacy skills in Michigan because no such data is available. (*Id*. at Pg.ID.2195.) For example, the numbers provided in Table 2 on page 12 "are not derived from actual literacy tests administered" in each of the arbitrarily selected communities. (*Id*.) "They are not even from tests

30

given across the state of Michigan." (*Id*.)  Furthermore, as Plaintiffs themselves

state: "It is insulting to suggest that some voters or groups of voters will not be

able to negotiate a full partisan ballot or will consider voting too much trouble as a

result." (R.1-14, Pg.ID.277.)

Finally, over the last 50 years, the federal government and the State of

Michigan have developed a myriad of agencies and programs to combat

discrimination.  The Equal Employment Opportunity Commission, the U.S.

Commission on Civil Rights, the Civil Rights Division of the U.S. Department of

Justice and the U.S. Department of Education, and the Michigan Department of

Civil Rights are a few examples.  (Thernstrom Report, R.102-18, Pg.ID.2217.)

Bearing all of this in mind, Plaintiffs cannot establish the elimination of STV

would hinder African-Americans' ability to participate effectively in the political

process.  There are numerous resources available to those who would need

assistance at the voting booth; thus, this factor favors the Defendant.

### Factor 6:  Whether political campaigns have been characterized by overt or subtle racial appeals.

Plaintiffs' experts fail to establish Michigan's elections are plagued by overt

or subtle racial appeals in Michigan.  (Thernstrom Report, R.102-18, Pg.ID 2217.)

They previously cited two newspaper articles – one from 2004 and the other from

2012.  "When you have to reach back over a thirteen-year period to find just two

examples of what you claim is a pattern common in a whole state, the critical

reader will begin to doubt that there is any such pattern at all." (*Id*.) This factor favors Defendant.

**Factor 7: The extent to which members of the minority group have been elected to public office in the jurisdiction.**

Plaintiffs claim that this weighs in their favor because Michigan has only elected one minority state-wide official, Secretary of State Richard Austin. This argument is meritless. Michigan's elected minority officials include judges, university trustees, and members of the Board of Education. Several African-Americans have been elected throughout the State. President Obama carried Michigan both in 2008 and 2012. The previous Chief Justice of Michigan's Supreme Court is African-American and was elected and re-elected numerous times. By district, African-Americans have been elected to the Michigan Court of Appeals, circuit courts, the State and Federal House of Representatives, the State Senate, statewide university boards, as well as local elected positions throughout the state. (Thomas Affidavit, R.102-25, Pg.ID.2315; Herstek Report, R.102-23, Pg.ID.2259.) Michigan has a history of electing African-Americans. This factor favors Defendant.

**Factor 8: Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.**

This factor favors Defendant because elected officials in Michigan have a consistent track record of responding to the particularized needs of members

32

minority groups.  As noted above, Michigan was one of the first states to provide minority citizens the right to vote, the right to public education, and the right to marry.  A recent example is Detroit – the largest majority-minority municipality in Michigan.  As this Court recognized, the State took great strides in Detroit during the financial crisis to successfully lead the city through bankruptcy.  (R. 25, Pg.ID.738.)  Now its population is expected to grow over the next two decades for the first time since the 1950s.[20]

Plaintiffs also attempt to argue that the schedule established for a special election to fill John Conyers Jr.'s term shows a lack of responsiveness on the part of the Detroit population.  But as Judge Goldsmith indicated, Gov. Snyder acted within his discretion when he considered "the financial burden standalone elections place on municipalities, and the time it takes for candidates to collect signatures and educate voters . . . and determined that holding the special primary and special general election in conjunction with the regularly scheduled elections was the best course of action."  *Rhodes v. Snyder*, Case No. 2:17-cv-14186, Pg.ID.466.

Plaintiffs attempt to demonstrate the alternative uses non-state actors but Michigan's history, Michigan case law, and the actions of the Michigan state government clearly establish Michigan is responsive to the needs of African-

---

[20] (http://www.detroitnews.com/story/news/local/ detroit-city/2017/07/27/detroit-population-growth/104031902, accessed October 10, 2017.)

Americans.  The fact that these communities receive a majority of the funding of the state budget, demonstrates the responsiveness of elected officials to majority-minority communities.  Therefore, this factor favors Defendant.

> **Factor 9:  Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.**

This factor also favors Defendant because the practice of eliminating STV is far from tenuous, in fact.  (Thernstrom Report, R.102-18, Pg.ID.2218.)  Through the elimination, Michigan joined a majority of other states in an effort to streamline its elections.  (*See Id.*)  Further, there are a number of problems with STV causing the practice itself to be tenuous and lead to undervotes as indicated above.  Given these confusions, together with the confusions established in Dr. Herrnson's report, the elimination of STV cannot be considered "tenuous." Therefore, this factor favors the Defendant.

## CONCLUSION AND RELIEF REQUESTED

For these reasons, Defendant requests this Court find that the elimination of STV does not violate the Fourteenth Amendment or the Voting Rights Act and therefore dismiss this case, with prejudice, costs and any additional relief deemed fair and just.

BILL SCHUETTE
Attorney General

*s/Denise C. Barton*
Denise C. Barton (P41535)
Rock Wood (P41181)
Adam Fracassi (P79546)
Elizabeth R. Husa Briggs (P73907)
Assistant Attorneys General
Attorneys for Defendant Secretary of
   State Ruth Johnson
P. O. Box 30736
Lansing, Michigan  48909
517.373.6434
Email:  bartond@michigan.gov
(P41535)

Dated:  March 29, 2018

## CERTIFICATE OF SERVICE (E-FILE)

I hereby certify that on March 29, 2018, I electronically filed the above

document(s) with the Clerk of the Court using the ECF System, which will provide

electronic copies to counsel of record.

> _s/Denise C. Barton_
> Denise C. Barton (P41535)
> Assistant Attorney General
> Attorneys for Defendant Secretary of
>   State Ruth Johnson
> P. O. Box 30736
> Lansing, Michigan  48909
> 517.373.6434
> Email:  bartond@michigan.gov
> (P41535)