UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN STATE A. PHILIP RANDOLPH
INSTITUTE, MARY LANSDOWN, DION
WILLIAMS and COMMON CAUSE,

          Plaintiffs,

          v.

RUTH JOHNSON, in her official capacity
as Michigan Secretary of State,

          Defendant.
_____/

Case No. 16-cv-11844

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
MONA K. MAJZOUB

## OPINION AND ORDER GRANTING PLAINTIFFS' REQUEST FOR PERMANENT INJUNCTIVE RELIEF

## I.    Introduction

In early 2016, Michigan passed Senate Bill ("SB") 13, which eliminated straight-ticket voting. 2015 Mich. Pub. Acts 268 ("PA 268"). Plaintiffs Michigan State A. Philip Randolph Institute, Common Cause, Mary Lansdown, Dion Williams, and Erin Comartin then sued Ruth Johnson, Michigan Secretary of State ("the Secretary") in May 2016. *See* Dkt. No. 1. The Plaintiffs raised both constitutional and statutory claims. *See id.*

This case proceeded to trial, where the Court heard opening statements and then examined the parties' briefs, along with the voluminous record.

For the reasons detailed below, the Court will GRANT Plaintiffs' request for a permanent injunction on PA 268.

The Court cautions that its holdings are specific to this litigation. The Court's only charge here is to assess the constitutionality and legality of PA 268 based on the election laws and the voting patterns of demographics, in Michigan, as they exist today. The Court appreciates the "vigilant respect" due to the separation of powers embodied in the Constitution. *Ohio Democratic Party v. Husted*, 834 F.3d 620, 623 (6th Cir. 2016). But "[f]ederal judicial remedies, of course, are necessary where a state law impermissibly infringes the fundamental right to vote." *Id.* Such remedies are necessary in this case, as the Court will explain herein.

### A.    History of Straight-Ticket Voting in Michigan

By voting a straight-ticket (or straight-party) ballot, Michigan residents can vote for all the candidates of a given political party through shading in one oval, as opposed to voting for each candidate by shading in, say, eighteen ovals. Dkt. No. 146, p. 2 (Pg. ID 4380); *see also* Dkt. No. 1-15, p. 9 (Pg. ID 288). Michigan residents must also vote for nonpartisan offices and proposals, sometimes as many as thirty-

2

seven nonpartisan offices and eighteen proposals.  Dkt. No. 1-15, p. 9 (Pg. ID 288).
The straight-party option only streamlines voting for partisan offices; Michigan
residents must vote for each nonpartisan office and proposal individually.

Since 1891, Michigan residents have had the option of straight-ticket voting.
1891 Mich. Pub. Acts. 190 § 14.  In this 127-year span, Michigan legislators have
tried to abolish the practice three times.

Twice, Michigan voters defeated by referendum laws that would have
eliminated straight-party voting:  first in 1964 and second in 2001.  *See* 1964 Mich.
Pub. Acts. 240; 2001 Mich. Pub. Acts. 269.  On both occasions, voters demonstrated
an overwhelming preference for keeping straight-ticket voting.  Michigan voters
repealed 1964 PA 240 by a vote of approximately 66% (1,515,875) to 34%
(795,546).  Dkt. No. 146, p. 2 (Pg. ID 4380).  And they repealed 2001 PA 269 by a
vote of roughly 60% (1,775,043) to 40% (1,199,236).  *Id.* at p. 3 (Pg. ID 4381).

The third attempt at eliminating straight-ticket voting occurred in December
2015, when the Michigan Legislature passed SB 13.  *Id.*  Governor Rick Snyder
signed the bill into law on January 5, 2016 and it became effective immediately.
Dkt. No. 102-8, pp. 2 (Pg. ID 2083).  SB 13 was enrolled as PA 268.  *Id.*; *see also*
Dkt. No. 146, p. 3 (Pg. ID 4381).  PA 268 includes a $5 million appropriation for
"purchas[ing] voting equipment to implement the elimination of straight party ticket

3

voting."[1]  PA 268, Sec. 795c.(2).  This appropriation is for the purchase of voting booths, which can cost just $15.  Dkt. No. 147, pp. 34–35 (Pg. ID 4449–50).  The appropriation has additional significance:  it prevents a referendum on PA 268—and referenda had undone previous laws eradicating straight-party voting.  *See Mich. United Conservation Clubs v. Sec'y of State*, 630 N.W.2d 297, 298 (Mich. 2001).

### B.    Procedural History

Because of this litigation, PA 268 has yet to cover an election.  On May 27, 2016, five months after PA 268 had become law, the Plaintiffs requested a preliminary injunction prohibiting the Secretary from implementing PA 268.  Dkt. No. 4.  In requesting the preliminary injunction, the Plaintiffs alleged that PA 268 violates the Equal Protection Clause and Section 2 of the Voting Rights Act ("VRA").[2]  And on July 22, 2016, the Court granted Plaintiffs' request, finding that

---

[1]  PA 268 only changed the ballot to remove the straight-party option and so party vignettes were still to appear at the top of ballots.  *See* 2017 Mich. Pub. Acts 113.  The Michigan Legislature later removed the party vignettes from the ballot, however.  *See id.*

[2]  In the initial Complaint, the Plaintiffs also asserted an Americans with Disabilities Act ("ADA") claim, 42 U.S.C. § 12131 *et seq*.  *See* Dkt. No. 1, pp. 21–22 (Pg. ID 21–22).  After the Court found that they probably lacked standing to assert a claim under the ADA, the Plaintiffs abandoned this claim.  *See Mich. State A. Philip Randolph Inst. v. Johnson*, 209 F. Supp. 3d 935, 945–46 (E.D. Mich. 2016) ("*Johnson I*").  The Plaintiffs later amended the Complaint by adding an intentional discrimination claim under the Equal Protection Clause (Count II).

4

PA 268 likely violated the Equal Protection Clause and Section 2 of the VRA.  *See Johnson I*, 209 F. Supp. 3d 935; *see also* Dkt. No. 30.

Then, on August 15, 2016, this Court denied the Secretary's motion to stay the preliminary injunction pending appeal.  *See Mich. State A. Philip Randolph Inst. v. Johnson*, Case No. 16-cv-11844, 2016 WL 4267828 (E.D. Mich. Aug. 15, 2016). Two days later, the Sixth Circuit denied the Secretary's motion for a stay pending appeal of this Court's orders granting the Plaintiffs' motion for a preliminary injunction.  *See Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656 (6th Cir. 2016) ("*Johnson II*").

On October 16, 2017, the Secretary moved for summary judgment.  Dkt. No. 102.  As the Court denied the Secretary's motion, this case proceeded to trial.[3]  *See Mich. State A. Philip Randolph Inst. v. Johnson*, Case No. 16-cv-11844, 2018 WL 493184, at *1 (E.D. Mich. Jan. 19, 2018) ("*Johnson III*").

### C.    Passage of SB 13

Michigan State Senator Marty Knollenberg, a Republican, introduced SB 13 in January 2015.  Dkt. No. 146, p. 5 (Pg. ID 4383).  When Knollenberg introduced

---

[3]  In deciding that motion, the Court concluded that Plaintiff Erin Comartin lacked standing to assert any of the claims raised herein.  *Johnson III*, 2018 WL 493184, at *4.

the bill, he did not have sufficient votes for its passage.  Dkt. No. 137-4, pp. 6–7 (Pg. ID 3270–71).   In seeking votes, he relied on others, including Ronna Romney McDaniel and Ronald Weiser.  *Id.*  McDaniel became chairperson of the Michigan Republican Party in February 2015, one month after Knollenberg introduced the bill. Dkt. No. 146, p. 5 (Pg. ID 4383).  Weiser, on the other hand, held no public office or official role in the Republican Party during this period.  *Id.* at p. 6 (Pg. ID 4384). But he was chairperson of the Michigan Republican Party from 2009 to 2011 and holds that position today.  *Id.*

Knollenberg explained his reliance on McDaniel, saying "I needed some help getting some votes and [McDaniel] knows people, so you know, she, I assume, went out and talked to folks. I don't know who, but I needed more votes. . . . And so, she was helping me get votes."  Dkt. No. 137-4, p. 6 (Pg. ID 3270).  McDaniel helped Knollenberg obtain votes by, for example, connecting Knollenberg with Weiser. *See id.* at pp. 19–20 (Pg. ID 3283–84).

And Knollenberg kept McDaniel informed as to his communications with Weiser, as indicated by a March 2015 text message which Knollenberg sent to McDaniel.  *Id.*  According to Knollenberg, Weiser had confirmed that he was working to secure the Governor's support for SB 13, and that the Chair of the Michigan Senate Elections Committee, David Robertson, would support SB 13 if the Governor confirmed that he would sign the bill.  *Id.* at p. 19 (Pg. ID 3283).

6

Knollenberg continued to coordinate with Weiser in the following months.  In May 2015, Weiser emailed Knollenberg asking for "a whip count," or in layman's terms, the number of Michigan Senators who would support SB 13.  *Id.* at p. 21 (Pg. ID 3285).  Knollenberg replied "I will work on it ASAP."  *Id.*

Beyond connecting Knollenberg with political operatives, McDaniel worked to pass SB 13 by seeking Republican lawmakers' support for the bill.  For instance, she urged Robertson and Lisa Posthumus Lyons, then-Chair of the House Elections Committee, to support SB 13.  *Id.* at p. 20 (Pg. ID 3284).  McDaniel also told Knollenberg that she would speak with the Governor to secure his approval.  *Id.* at pp. 19–20 (Pg. ID 3283–84).

McDaniel vigorously supported SB 13 for two reasons:  (1) she thought it would help the Republican Party win elections; and (2) she believed it was good policy.  In her words:  "I was party chair of Michigan, I wanted to win elections. I'm not going to say that I didn't think that this would help Republicans win elections, but I also think at the same time it's very good policy."  Dkt. No. 108-15, p. 7 (Pg. ID 2632).  McDaniel found SB 13 beneficial for the Republican Party, as "if one party is using [straight-party voting] more than the other and they're just voting straight party, then it's hard for that candidate to break out."  *Id.* at p. 5 (Pg. ID 2630).  Specifically, she felt that the abolition of straight-ticket voting would help "down-the-ticket" Republican candidates, e.g. candidates for school board elections.  *Id.* at

7

4–6 (Pg. ID 2629–31).    It would allow these candidates to "break out" by encouraging them to spend money and resources campaigning instead of depending on top-of-the-ticket candidates for their election, according to McDaniel.  *Id.*

She claimed her father was a "perfect example" of a Republican down-the-ticket candidate who would have benefited from SB 13.  *Id.* at p. 6 (Pg. ID 2631). McDaniel said her father was "the top Republican vote getter" in 2008 for a seat on the Michigan State University Board of Trustees.  *Id.*  But, McDaniel lamented, "he lost statewide because every Republican lost statewide because Obama was a juggernaut." *Id.*  That is, McDaniel believed that many people voted a straight-ticket for the Democratic Party because of former President Barack Obama and "[that] impacted the ballot all the way down." *Id.*  From her perspective, SB 13 would prevent strong straight-ticket support of a Democratic Party presidential candidate from ruining down-the-ticket Republican candidates' chances for election.  And in that way, McDaniel considered that the law would assist the Republican Party at the expense of the Democratic Party.

Additionally, McDaniel considered SB 13 good policy.  She said it would aid the public by encouraging voters to assess each candidate individually.  *Id.*  As summarized by the Michigan Senate Fiscal Agency, McDaniel's theory supposes that, "[w]ithout the option of straight-ticket voting, people might be encouraged to

8

educate themselves about the prospective office-holders, their qualifications, and what they stand for."  Dkt. No. 102-7, pp. 3–4 (Pg. ID 2079–80).

McDaniel understood SB 13 as good policy despite her knowledge of concerns that it would increase wait times at voting precincts.  Dkt. No. 108-15, p. 5 (Pg. ID 2630).  In response to these concerns, "[she] assume[d] the legislature addressed those issues."  *Id.*  Regardless, she said, "[any increase in wait times] was not, from a [Republican] [P]arty perspective, something in our jurisdiction."  *Id.*

### 1.    SB 13 in the Michigan Legislature and Governor's Office

The Michigan Legislature resumed the official legislative process for SB 13 on November 10, 2015.  Dkt. No. 146, p. 7 (Pg. ID 4385).  Immediately, elections officials conveyed an unequivocal fear that PA 268 would make wait times not only much longer, but also unmanageable.

On November 10, 2015, the Gaines Township Clerk, Crystal Osterink, emailed Lyons regarding SB 13.[4]  Dkt. No. 137-3, pp. 29–30 (Pg. ID 3253–54).

---

[4]  In Michigan, county clerks provide high-level supervision over election processes. Dkt. No. 1-15, p. 2 (Pg. ID 281).  Their responsibilities include (1) training election inspectors, who are hired by cities and townships; (2) printing ballots; (3) developing and maintaining voting records and canvassing the election; (4) programming voter equipment; and (5) advising city and township clerks.  *Id.*  City and township clerks, on the other hand, handle the election processes specific to a given city or township,

Osterink expressed a "grave concern" about the longer lines and wait times that SB 13 would cause. *Id.* at p. 29 (Pg. ID 3253). She complained that lines were already too long, predicting that even if straight-party voting were available in the then-forthcoming 2016 general election, wait times would be at least thirty minutes. *Id.* According to Osterink, "it would take a voter much, much longer to vote a ballot where each individual candidate (even within their party choice) had to be selected[.]" *Id.* She declared "I cannot imagine the lines, the complaints, the media attention (remember Grand Rapids several years ago) if people would have to wait in a longer line than they have been." *Id.*

Likewise, the Kent County Clerk, Mary Hollinrake, emailed Lyons on November 12, 2015 claiming that "[Michigan Senators] have NO idea what impact [SB 13] will have on election night." *Id.* at p. 31 (Pg. ID 3255). Because of the high number of proposed ballot measures, Hollinrake explained, voters would have to complete two ballots (each 18-22" long and 8-9¾" wide, allowing for three columns of positions and ballot proposals on both sides). *Id.*; *see also* Dkt. No. 56, p. 10 (Pg. ID 1101). The incredibly long ballots, combined with the elimination of straight-ticket voting, would result in "disaster" in certain areas, she proclaimed. Dkt. No. 137-3, p. 31 (Pg. ID 3255).

---

including administering precincts and managing the financial aspects of election administration. *Id.*

Lyons shared Hollinrake's concern, as demonstrated by a text message she sent to Bill Zaagman on November 20, 2015. *See id.* at p. 36 (Pg. ID 3260). Zaagman was a spokesperson and lobbyist for the Michigan Association of County Clerks and the Michigan Association of Municipal Clerks. *Id.* In that November 2015 text, Lyons wrote "are you making sure all your clerks are telling house members that straight ticket elimination is a nightmare without secure [sic] no reason absentee voting?" *Id.*

Zaagman himself was troubled by the anticipated impact of SB 13 on Michigan voters. In a draft distribution dated November 19, 2015, he encouraged clerks to pressure their state representatives to reject the bill, saying that "SB 13 will cripple [clerks'] precincts[.]" Dkt. No. 102-22, p. 2 (Pg. ID 2255). In addition, in proceedings in the House, both the Michigan Association of Municipal Clerks and Michigan Association of County Clerks testified in opposition to SB 13. Dkt. No. 108-13, p. 6 (Pg. ID 2621).

In contrast, only two clerks have backed the elimination of straight-party voting. *See id.*; Dkt. No. 141-14. The Elections Clerk of Calhoun County, Michigan, Anne Norlander, is the only clerk to have submitted an affidavit in this case supporting PA 268. Dkt. No. 141-14. She agrees with McDaniel that PA 268 will encourage voters to be "more informed" about candidates. *Id.* at p. 4 (Pg. ID 3983). She also asserts that the elimination of straight-party voting will motivate voters to

prioritize candidates rather than political parties. *Id.* The only other clerk to have supported PA 268 is the clerk of Clinton Township in Macomb County. Dkt. No. 108-13, p. 6 (Pg. ID 2621). That clerk submitted a letter advocating for PA 268 during the House hearings. *Id.*

### 2.    Legislative Hearings

On November 10, 2015, a Senate committee held an hour-long hearing on SB 13 and voted it out of the committee. Dkt. No. 146, p. 7 (Pg. ID 4385); *see also* Dkt. No. 108-12, p. 13 (Pg. ID 2613). The full Senate held a hearing on the bill that same day. Dkt. No. 146, p. 7 (Pg. ID 4385); *see also* Dkt. No. 108-12, p. 13 (Pg. ID 2613). In that hearing, several Senators criticized the appropriation for additional equipment, which at that time was set at $1 million. *See* Dkt. No. 108-12, p. 14 (Pg. ID 2614). Senator Curtis Hertel Jr. said "[t]his appropriation is a $1 million insurance policy against the will of the people. The only reason to add the appropriation to this bill is to go around the voters and make it referendum-proof." *Id.* Then-Senator Steve Bieda likewise stated that "I find it really appalling that we have a provision in there for an appropriation to make it referendum-proof. We know why that is being done. You know why that is being done." *Id.* "[T]he only reason to [enact SB 13] is a perceived partisan advantage," former Senator Bieda said. *Id.*

12

Despite these statements, the full Senate passed SB 13 on November 10, 2015, and next sent it to the House. *See id.* at p. 13 (Pg. ID 2613); Dkt. No. 146, p. 7 (Pg. ID 4385). The House Elections Committee evaluated the bill over two days, December 3rd and 8th of 2015. Dkt. No. 146, p. 10 (Pg. ID 4388). The first day included testimony from Senator Knollenberg, the bill's sponsor. Knollenberg explained his motivation for the bill, testifying that:

> [t]o those in countries who don't have the right to vote, I assume how long it takes to vote isn't on their list of concerns. . . . It is time that Michigan's elections process becomes more about people, less about political parties, and even less about how long it takes to exercise one of our most fundamental rights.

*Elections Hearings*, MICHIGAN HOUSE OF REPRESENTATIVES VIDEO ARCHIVE 20:39–20:46, 20:55–21:05, (December 3, 2015), *available at* http://house.mi.gov/MHRPublic/videoarchive.aspx.

Knollenberg responded to clerks' anxiety about increased wait times and longer lines, first by testifying that the appropriation for voting equipment was intended to address those worries. *Id.* at 20:21 to 20:24. Second, he again dismissed concerns that PA 268 would generate impossibly long lines. He said "to those individuals [in third world countries] that can't vote, they just want to be able to vote, regardless of how long it takes to vote. In those countries where they've been able to vote for the first time, they'll wait all day." *Id.* at 21:49 to 22:11.

On the second day of testimony, the House Elections Committee voted SB 13 out to the full House.  Dkt. No. 146, p. 10 (Pg. ID 4388); *see also* Dkt. No. 108-13, p. 2 (Pg. ID 2617).  The full House passed the bill on the following day, December 9, 2015, and did so largely along party lines.  Dkt. No. 146, p. 12 (Pg. ID 4390).  All the House Democrats opposed SB 13, as did four Republicans.  *Id.*

Notably, in passing SB 13, the House tied it to a bill authorizing no-reason absentee voting, House Bill ("HB") 4724.  *Id.*  The House imposed the tie-bar to alleviate congestion on Election Day.  *Id.*; *see also* Dkt. No. 108-13, p. 5 (Pg. ID 2620).  Lyons testified that many legislators in the House, including herself, had backed HB 4724 because it would have lessened the impact of longer lines and wait times caused by SB 13.  Dkt. No. 137-3, p. 36 (Pg. ID 3260).

McDaniel opposed no-reason absentee voting because the Republican Party was not prepared "to train and put people in the clerk's offices for the extended time period" for the purpose of "ensur[ing] the Integrity [sic] of the election."  Dkt. No. 140-2, p. 2 (Pg. ID 3414).  Ensuring the integrity of the election, McDaniel explained, included poll challenges.  *Id.*

On December 16, 2015, the Senate received SB 13, now tied to HB 4724. Dkt. No. 146, p. 14 (Pg. ID 4392).  The Senate severed the tie-bar, passed SB 13 standing alone, and sent it to the House for approval.  *Id.*  The House passed SB 13 on December 16, 2015, this time without HB 4724.

The Governor signed SB 13 on January 5, 2016.  *See* Dkt. No. 102-8.  In signing the bill, he observed that, "[u]nder SB 13, Michigan joins 40 other states that require voters to select an individual for each elective office, rather than simply selecting a political party."  *Id.* at p. 2 (Pg. ID 2083).  And he implored the Senate to pass HB 4724.  *Id.*  Citing evidence from the National Conference of State Legislatures, the Governor wrote that "Michigan is one of only 13 states that does not allow for some form of early or no-reason absentee voting."  *Id.*  He stressed that "[u]pdating Michigan's archaic absentee voting law, and bringing Michigan in line with other states regarding early, or easier, access to the polls is critical[.]"  *Id.*

### D.    Election Laws in Michigan

As suggested by Governor Snyder, Michigan has a unique voting regime.  To begin, Michigan ballots include races for many positions beyond those for the federal or state legislature, including judicial seats and trustee positions on the boards of public universities.  *See* MICH. CONST. art. VI; *id.* art. VIII, § 5.  Indeed, in the 2012 general election, Detroit voters assessed a total of seventy-nine offices and proposals on the ballot:  eighteen partisan offices, forty-three nonpartisan offices, and eighteen proposals.  Dkt. No. 1-15, p. 9 (Pg. ID 288).  The November 2016 general election ballot was not quite as long.  There, Detroit residents voted

for at least fifty-five positions.  *See id.*; *see also* Dkt. No. 102-17, p. 13 (Pg. ID 2172).

That year's ballot included eighteen or nineteen partisan offices, thirty-seven judicial

offices, and seven school board seats for selection out of sixty-two candidates.  *See*

Dkt. No. 1-15, p. 9 (Pg. ID 288); *see also* Dkt. No. 102-17, p. 13 (Pg. ID 2172); *see*

*also* Dkt. No. 146, p. 16 (Pg. ID 4394).

And except for a limited number of qualified residents, all Michigan voters

must visit the polls on Election Day.  Michigan does not permit early voting or no-

reason absentee voting.  *See* MICH. COMP. LAWS § 168.758.  A person can only vote

absentee in Michigan if they meet one of the following narrow criteria:

> (a) On account of physical disability, cannot without another's
> assistance attend the polls on the day of an election.
> (b) On account of the tenets of his or her religion, cannot attend the
> polls on the day of election.
> (c) Cannot attend the polls on the day of an election in the precinct in
> which he or she resides because of being an election precinct inspector
> in another precinct.
> (d) Is 60 years of age or older.
> (e) Is absent or expects to be absent from the township or city in which
> he or she resides during the entire period the polls are open for voting
> on the day of an election.
> (f) Cannot attend the polls on election day because of being confined in
> jail awaiting arraignment or trial.

*Id.*

Between its prohibition on early voting and restriction on absentee voting,

Michigan has one of the most restrictive voting regimes in the country.  Indeed,

thirty-seven states allow early voting.  *Absentee and Early Voting*, NAT'L

CONFERENCE    OF    STATE    LEGISLATURES    (Aug.    17,    2017),

http://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-

voting.aspx.  Thus, only thirteen states do not allow voters to cast a ballot in-person

prior to Election Day.  And twenty-seven states permit no-reason absentee voting,

whereas twenty states (including Michigan) require a justification.  *Id.*

Additionally, fourteen states recently eliminated straight-ticket voting.[5]  Yet

eleven of these fourteen states permit early voting.  *Id.*  Of these fourteen states, only

Michigan, New Hampshire, and Missouri do not allow early voting.  *Id.*

Likewise, nine of these fourteen states have authorized no-reason absentee

voting; only Michigan, Missouri, New Hampshire, Texas, and West Virginia do not

allow no-reason absentee voting.  In sum, of the fourteen states that have recently

eliminated straight-ticket voting, Michigan is one of only three states—along with

Missouri and New Hampshire—to not have authorized both early voting and no-

reason absentee voting.  Michigan, on the other hand, is one of nine states to allow

straight-ticket voting.  *Id.*

Although  most  Michigan  voters  must  attend  the  polls  on  Election  Day,

Michigan law includes measures intended to alleviate congestion at the polls.  For

---

[5]    These  states  are  Georgia,  Illinois,  Indiana,  Iowa,  Michigan,  Missouri,  New
Hampshire, New Mexico, North Carolina, Rhode Island, South Dakota, Texas, West
Virginia,  and  Wisconsin.  *Straight-ticket  Voting  States*, NAT'L CONFERENCE OF
STATE LEGISLATURES (May 31, 2017), http://www.ncsl.org/research/elections-and-
campaigns/straight-ticket-voting.aspx#2.

example, voting precincts can include no more than 2,999 voters.  *See* MICH. COMP. LAWS § 168.661.  Any precinct with more than 1,000 voters must have at least one voting machine for every 600 active registered voters, and polls are open from 7:00 a.m. to 8:00 p.m.  *See id.*; *see also* Dkt. No. 147, p. 42 (Pg. ID 4457).

These administrative measures have not stemmed long lines and wait times in Michigan, however.  A 2012 national study concluded that Michigan voters had the sixth longest average wait time, which was almost twenty minutes.  Dkt. No. 146, p. 18 (Pg. ID 4396); *see also* Dkt. No. 1-3, p. 44 (Pg. ID 78).  A former chair of the House Elections Committee offered anecdotal support for that study, testifying that "sometimes you would hear of long line issues, even with straight-party voting." Dkt. No. 137-3, p. 14 (Pg. ID 3238).

Because of its narrow exception for qualified absentee voters, its decision not to authorize early voting, and its extremely long ballots, Michigan has a restrictive voting scheme.

## II.   Findings of Fact

### A.   Impact of PA 268 on Michigan Voters

In the context of Michigan's particular election laws, the Court finds that PA 268 will increase wait times for all Michigan voters.  It is self-evident that shading in eighteen ovals will take much longer than shading in one oval.  But through election officials' testimony and affidavits, and expert reports, Plaintiffs have proven that PA 268 will introduce significantly greater wait times and dramatically longer lines.

Indeed, as detailed above, almost every elections clerk who has commented on PA 268 has concluded that the law will have these effects.  And other elections officials share elections clerks' concerns. For instance, Christopher Thomas held those views, and he was the Director of the Michigan Bureau of Elections for thirty-six years.  Thomas, in conjunction with Bureau of Elections staff, estimated that it takes three minutes longer to shade in an oval for each individual partisan candidate than to shade in one oval.  Dkt. No. 141-19, p. 2 (Pg. ID 4049).  An additional three minutes for each straight-ticket voter would drastically increase voting times:  1.5 to 2.5 million Michigan residents voted a straight-ticket in the 2016 general election. Dkt. No. 108-13, p. 7 (Pg. ID 2622).

Like Thomas, Joseph Rozell, the Director of Elections in Oakland County, noted that voting with a straight-ticket is "easier and faster" than voting for each candidate individually. Dkt. No. 1-15, pp. 2–3 (Pg. ID 281–82). Daniel Baxter, the Director of Elections in Detroit, and Chris Swope, the Lansing City Clerk, agreed with Rozell's assessment. *Id.* at p. 8, 16 (Pg. ID 287, 295). The lay evidence here, then, strongly indicates that PA 268 will generate significantly longer lines and wait times.

In addition, particularly convincing are the conclusions and testimony offered by Plaintiffs' expert Theodore Allen, an associate professor of Industrial Engineering at Ohio State University. Dkt. No. 108-4, p. 3 (Pg. ID 2490). Allen analyzed voting patterns during the 2016 presidential election at thirty-one precincts in Michigan, precincts which Plaintiffs' demography expert, Kurt Metzger, identified as representative of Michigan as a whole.[6] *Id.*; Dkt. No. 141-8, p. 36 (Pg. ID 3712). Allen examined data compiled by volunteers who observed the polls at these thirty-one precincts. Dkt. No. 141-8, pp. 34–38 (Pg. ID 3710–14). Of the thirty-one precincts, African-Americans outnumbered other demographics in only five precincts, but were not a majority in any of these precincts. Dkt. No. 108-4, pp.

---

[6] These precincts, according to Metzger, were representative of those throughout Michigan during the 2016 election with respect to the amount of time voters spent at the polls, including time spent waiting, registering, and voting. Dkt. No. 108-4, p. 6 (Pg. ID 2493).

6, 8 (Pg. ID 2493, 2495). These five precincts were in either Detroit, Flint, or Saginaw. *Id.*

Allen simulated the amount of time it would take for people to vote with or without a straight-party option. *Id.* at p. 8 (Pg. ID 2495). To create this simulation, he altered the data in two important ways. *Id.* at p. 11 (Pg. ID 2498). First, in seven precincts he added voting booths to account for additional resources, like desks, which enabled voting but were not voting booths. *Id.* at p. 6 (Pg. ID 2493); *see also* Dkt. No. 141-8, pp. 41–42 (Pg. ID 3717–18). Second, he subtracted the number of voting booths observed at certain polling places to identify only those booths used in a particular precinct. Dkt. No. 108-4, p. 6 (Pg. ID 2493); *see also* Dkt. No. 141-8, pp. 41–42 (Pg. ID 3717–18). Allen made this adjustment because some polling places encompassed several precincts, and the data reflected the number of voting booths at only the location level. No. 108-4, p. 6 (Pg. ID 2493); *see also* Dkt. No. 141-8, pp. 41–42 (Pg. ID 3717–18).

Finally, according to Allen, there are three components to voting: registration, voting booths, and tabulators, where voters scan ballots. Dkt. No. 108-4, p. 9 (Pg. ID 2496). And one of the three stages of voting often serves as the principal cause of wait times, or "bottleneck." *Id.* He contends that the voting booth is most frequently the bottleneck. *Id.* Consequently, Allen omitted the other voting stages from the simulation and stated that this change did not affect the results. *Id.*

Based on this data, Allen reached several important conclusions.  He found that the eradication of straight-ticket voting would increase wait times by 25% or more for every voter who previously voted a straight-ticket.  *Id.* at p. 10 (Pg. ID 2497).  As an example of the time saved with straight-party voting, he noted that Flint residents waited an average of fifty-two minutes to vote and had a ballot comprised of fifteen partisan races, twelve nonpartisan races, and nine proposals.  *Id.*  Allen then determined that PA 268 might increase wait times by more than 33%, as illustrated by this Flint example.  *Id.*

Because Allen was able to both evaluate a representative sample of Michigan voting precincts and create a simulation based on that representative sample, the Court finds that his conclusions are persuasive.  Indeed, Allen's findings likely reflect the impact of PA 268, given the high number of partisan elections on Michigan ballots, which Michigan voters would have to shade in individually with the implementation of PA 268.

The Secretary contends that PA 268 will not increase waiting times and, in making this argument, she largely relies upon expert reports authored by Stephen Graves and Paul Herrnson.  The Court will give these expert reports some weight, but will ultimately conclude that the balance of the evidence weighs in favor of the Plaintiffs.  First, the Secretary's expert Stephen Graves is a Professor of Management at the Massachusetts Institute of Technology and he specializes in the

disciplines of operations management, supply chain management, and manufacturing systems. Dkt. No. 102-5, p. 2 (Pg. ID 1933). Graves's analysis is credible, although not particularly persuasive.

Graves agrees with Allen that there are three processes relevant to voting. *Id.* at p. 6 (Pg. ID 1937). Unlike Allen, Graves determined that waiting times in Michigan were almost solely caused by bottlenecks at registration. *Id.* at p. 5 (Pg. ID 1936). In other words, he believes that Allen's data shows that voting booths were generally available when voters were ready to use them. Therefore, in Graves's estimation, any increase in time spent in voting booths because of PA 268 would not increase voting wait times overall.

Graves also attacked Allen's methods. He supposed that Allen arbitrarily reduced the number of voting booths at the three most congested precincts (Saginaw, Flint, and one in Detroit), which were precincts where African-American voters outnumbered other demographics. *Id.* at pp. 15–16 (Pg. ID 1946–47); *see also* Dkt. No. 108-4, pp. 6–7 (Pg. ID 2493–94).

Graves's first finding warrants some weight, as Allen concedes that bottlenecks occur at voting registration, not just at voting booths. Yet it is unlikely that backups at registration are the sole cause of all the delay at voting precincts throughout Michigan—delay which amounts to the sixth longest wait time in the country. *See* Dkt. No. 1-3, p. 44 (Pg. ID 78).

Even assuming that Graves is correct that voters only wait at registration, this will change under PA 268. Allen concludes that the eradication of straight-ticket voting will cause straight-ticket voters—1.5 to 2.5 million Michigan residents—to use 25% more time in voting booths. PA 268, then, will significantly impact the amount of time it takes for a large number of residents to vote. Accordingly, voting booths will not be as readily available with PA 268 as Graves contends that they are today.

Finally, Graves convincingly undermines Allen's data by highlighting that Allen may have eliminated booths in certain precincts in an imprecise manner. The Court finds Graves's contention persuasive given that the volunteers Allen relied on misunderstood whether a location consisted of multiple precincts or just one precinct. This misunderstanding forced Allen to reconstruct precincts from the available data. Allen may have successfully reconstructed these precincts, of course. The Court concludes, however, that this adjustment reduces the likelihood that Allen has evaluated precisely accurate data. Consequently, Graves's report and testimony undercut some of the Plaintiffs' evidence.

In contrast, the findings and methods of Paul Herrnson, a professor of Political Science at the University of Connecticut, are unsound and lack credibility. Dkt. No. 102-6, p. 3 (Pg. ID 1984). Herrnson determined that the elimination of straight-party voting will not increase voter wait times because "the straight-party option has been

24

shown to lead to greater confusion, increased voter errors, and more individuals feeling the need for assistance during the voting process." *Id.* He attests that these issues are particularly pronounced for African-American voters "with low literacy levels and other characteristics associated with traditionally underrepresented groups." *Id.*

Herrnson concedes that shading in one oval takes less time than shading in eighteen ovals, but he argues that voting consists of more than simply shading in ovals. *Id.* at p. 12–13 (Pg. ID 1993–94). According to Herrnson, straight-ticket voting in Michigan is confusing because ballots do not include instructions about how to override a straight-ticket vote. *Id.* at p. 14 (Pg. ID 1995). He determined that a study of voters from Maryland, Michigan, and New York revealed that voters reported higher satisfaction with a ballot where they voted for each candidate individually, as contrasted with a ballot having the straight-party option. *Id.* at p. 28–29 (Pg. ID 2009–2010). Herrnson claims that these participants, when completing a straight-ticket ballot, asked for help more frequently than when they were completing a ballot which allowed them to vote for each candidate individually. *Id.* at p. 29 (Pg. ID 2010). And, according to Herrnson, this confusion leads to more voters asking for assistance than would be the case without straight-ticket voting. *Id.* at p. 18 (Pg. ID 1999).

Herrnson's determinations include several analytical gaps which the Court is unwilling to overlook. The first, and most alarming, is that straight-ticket voting is confusing to so many Michigan voters that its elimination will expedite the voting process. For 127 years, Michigan ballots have included a straight-party option. And in the 2016 election, almost half (49.2%) of Michigan voters used the straight-party option. Dkt. No. 108-2, p. 9 (Pg. ID 2402). Thus, the Court strains to comprehend how the mechanics of straight-party voting might confuse Michigan voters generally.

What is more, Herrnson reached this conclusion in reliance on a study of voters from Maryland, New York, and Michigan. Maryland and New York do not have straight-party voting. Herrnson, then, bases his findings on a study which includes voters who probably have no prior experience with a straight-party ballot.

Third, Herrnson's analysis requires that the Court agree that straight-party voting not only confuses Michigan voters, but also that this confusion compels so many voters to ask for assistance as to negate the three minute increase in voting time that PA 268 would introduce for 1.5 to 2.5 million voters. This is inconceivable. The Court doubts that PA 268 is confusing to Michigan voters generally, and there is no evidence regarding how many Michigan voters request assistance or how much time this assistance ordinarily entails. The Court, therefore, will not place any weight on Herrnson's examination of the impact of PA 268 on voter wait times.

Additionally, the Court recognizes that PA 268 includes an appropriation for voting equipment.  But aside from asserting that voting booths are inexpensive, the Secretary offers no evidence regarding how this appropriation will specifically reduce wait times.  Evidence, for example, describing how many voting booths or other equipment might be purchased and used in certain areas.  In any event, that evidence would not have saved the Secretary's argument.  The Plaintiffs rightly contend that voting precincts can accommodate only so many additional booths.  *See* Dkt. No. 1-15, p. 6 (Pg. ID 285).  Consequently, additional voting booths, standing alone, will not quell the congestion that PA 268 would create in voting precincts.

The parties vigorously debate whether PA 268 causes longer lines and wait times.  Given the overwhelming number of elections officials who determined that PA 268 will cause drastically longer wait times and the relative strength of Plaintiffs' expert evidence, the Court finds that the Plaintiffs have shown that PA 268 will cause significantly longer lines and wait times.

## B.     Effect of PA 268 on African-American Voters

The Court further concludes that African-Americans will disproportionally suffer increased wait times.  African-Americans vote a straight-party at vastly higher rates than whites.  The Plaintiffs demonstrate this fact through research by Kurt

Metzger, Regional Information Specialist with the United States Census Bureau for thirty-seven years. Dkt. No. 108-2, at p. 3 (Pg. ID 2396). Metzger studied 2012 to 2016 election data from Michigan. *Id.* at p. 2 (Pg. ID 2395). For 2016, he studied all eighty-three Michigan counties; for 2014, sixty-nine counties; and for 2012, sixty-one counties.[7] *Id.* at pp. 6–7 (Pg. ID 2399–2400). To identify the racial composition of a given area, he relied on 2010 census data. *Id.* at p. 6 (Pg. ID 2399). Because precinct boundaries changed frequently between 2010 and 2016, Metzger analyzed the prevalence of straight-ticket voting among communities, which is a larger collection of voters than precincts. *Id.* at p. 7 (Pg. ID 2400). Based on his analysis, there were 1,522 communities in Michigan in 2016. *Id.* at p. 10 (Pg. ID 2403).

After aggregating and examining this data, Metzger found that "it is quite clear that African Americans are more likely to use the straight party voting option and will be disproportionately affected by its elimination." *Id.* at p. 2 (Pg. ID 2395). He observed that 49.2% of all Michigan voters used the straight-party option in the 2016 general election. *Id.* at pp. 9–10 (Pg. ID 2402–03). But in communities where African-Americans constituted less than 40% of the voting age population, only 46.5% of voters used the straight-ticket option. *Id.* at p. 9 (Pg. ID 2402).

---

[7] For 2012 and 2014, Metzger captured approximately 90% of Michigan's voting age population and about 96% of the African-American voting age population in Michigan. *Id.* at p. 6 (Pg. ID 2399).

Yet straight-ticket voting rates were much higher in communities where African-Americans constituted a substantial percentage of the voting age population. For example, in the twelve communities where African-Americans were the majority demographic, 77.7% of voters used the straight-party option. *Id.* 68.9% of voters used the straight-ticket option in the seven communities where African-Americans were 40 to 49.9% of the voting age population. *Id.* This evidence shows that if a Michigan community has a high percentage of voting age African-Americans, that community's voters use the straight-ticket option at a high rate.

In addition, the evidence shows that African-Americans are using straight-ticket voting in high rates for the Democratic Party. In communities where African-Americans constituted at least 40% of the voting age population, 94.8% of straight-ticket votes were submitted for the Democratic Party. *Id.* at p. 25 (Pg. ID 2418). The Republican Party, however, garnered 53.3% of straight-ticket votes in communities where African-Americans were less than 40% of the voting age population. *Id.*

The analysis of the Secretary's expert Laurence S. Rosen Ph.D., does not shed doubt on Metzger's findings. Rosen has been a demographer and research professional for over forty years and, in 1980, was selected as Michigan's first state demographer. Dkt. No. 102-3, pp. 4–6 (Pg. ID 1833–35). Based on his review of Metzger's data and conclusions, Rosen found a "weak level of association between

29

race and straight-ticket voting across the state." *Id.* at p. 15 (Pg. ID 1844). He claims that straight-ticket voting is popular in both communities that have many African-Americans and communities with few or no African-Americans. *Id.* at p. 16 (Pg. ID 1845).

He notes, for instance, that in several communities in Ottawa County, African-Americans make up no more than 1% of the population. *Id.* at pp. 19–20 (Pg. ID 1848–49). Yet 56% to 64% of voters in those communities utilized the straight-party option. *Id.* He also highlights that Ottawa County had a 54.7% straight-ticket voting rate, and only 1.4% of its voting age population was African-American. *Id.* at p. 22 (Pg. 1851).

Likewise, Rosen observes that Allegan County, Livingston County, and Washtenaw County have few African-American residents, but these counties' residents voted a straight-party at rates between 45.8% and 50.9%. *Id.* Thus, according to Rosen, race is not driving the high straight-ticket voting rates demonstrated by Metzger. *Id.* at p. 16 (Pg. ID 1845). Rather, Rosen believes that other factors better explain the variation in straight-ticket voting rates. *Id.*

Rosen's findings, however, are unconvincing when contrasted with Plaintiffs' evidence that every community with a high percentage of African-Americans of voting age has an exceptionally high straight-ticket voting rate. Dkt. No. 108-2, p. 9 (Pg. ID 2402). Indeed, the voting rates in communities with high percentages of

30

African-Americans of voting age dwarf those of the small number of communities identified by the Secretary as having high straight-party voting rates and low African-American populations. In addition, the straight-party voting rate of communities with a high percentage of African-Americans of voting age far exceeds the statewide rate of straight-party voting. Therefore, it is of no moment that a few, discrete communities have high rates of straight-party voting, despite having a low or non-existent African-American voting age population.

### 1. Lower Levels of Literacy and PA 268

Plaintiffs have also offered forceful evidence that African-Americans in Michigan have lower levels of literacy than whites. Plaintiffs have also shown that, as a result of these lower levels of literacy, PA 268 will disproportionately cause African-Americans to (1) take more time than whites in completing ballots; and to (2) abandon their ballots at higher rates than whites out of frustration or lack of ability. In support of these contentions, Plaintiffs present an expert report by Daphne Ntiri, an African-American studies Professor at Wayne State University. Dkt. No. 108-5, p. 2 (Pg. ID 2511). She specializes in adult education and literacy. *Id.*

Ntiri has determined that African-Americans have, on average, lower levels of literacy than whites. *Id.* at pp. 4–5 (Pg. ID 2513–14). She has reached this finding

partly based on evidence that "there is clearly a direct correlation between the rate of illiteracy in Michigan cities and the size of the African American population [in Michigan cities]." *Id.* at p. 14 (Pg. ID 2523). Ntiri additionally relies on a United States Census Bureau study regarding educational attainment in Michigan. *Id.* at p. 13 (Pg. ID 2522). The Census Bureau study covers 2011 to 2015, and reflects that in Michigan African-Americans were less likely to have completed high school than whites. *Id.* Specifically, 84.1% of African-Americans had completed high school, whereas 91.4% of whites had a high school education. *Id.*

Ntiri then explains that African-Americans' lower levels of literacy affects their ability to vote. She contends that with the PA 268 ballot African-Americans would be more likely than whites to encounter confusion and to experience difficulty casting votes. *Id.* at pp. 4–5 (Pg. ID 2513–14). This confusion and difficulty, Ntiri asserts, would lead to African-Americans spending relatively more time in the voting booth and suffering from higher rates of ballot roll-off. *Id.* at p. 5 (Pg. ID 2514).

The Secretary responds by arguing that Ntiri has little knowledge of voting procedures and is therefore unqualified to discuss the impact of literacy on voting. Dkt. No. 147, p. 24 (Pg. ID 4439). The Secretary also offers evidence from Stephan Thernstrom, a former History Professor at Harvard University who has researched issues involving race, ethnicity, and immigration. *See* Dkt. No. 102-18, pp. 3, 41 (Pg. ID 2182, 2220).

32

Thernstrom maintains that Ntiri's report is absent of conclusions and evidence regarding Michigan. *Id.* at p. 15 (Pg. ID 2194). Instead, he argues, her analysis solely involves nationwide research. *Id.* Thernstrom continues that Ntiri fails to explain the method for selecting the fifteen cities which she says demonstrate a correlation between African-American populations and literacy levels. *Id.* at p. 16 (Pg. ID 2195). Relatedly, he maintains that Ntiri's conclusions are unfounded because she did not conduct a methodological study. *Id.* at pp. 16–17 (Pg. ID 2195–96). Rather, Thernstrom asserts, her findings connect certain variables in the National Adult Literacy Survey ("NALS") sample of estimating literacy levels. *Id.* at p. 17 (Pg. ID 2196).

Thernstrom also contests Ntiri's finding that individuals with low literacy will have difficulty voting. He admits that people with low literacy might have problems locating an intersection on a street map, but he argues that they can vote without trouble because they can identify the expiration date on a license. *Id.* at pp. 17–18 (Pg. ID 2196–97). Finally, Thernstrom attempts to discredit Ntiri by asserting that she provides no evidence for her conclusion that persons with low literacy will be hesitant to seek assistance when in the voting booth or will become frustrated while attempting to read a ballot, and thus, will not complete a ballot. *Id.* at p. 18 (Pg. ID 2197).

The Court finds that, through Ntiri, the Plaintiffs have shown that relatively lower levels of literacy in the African-American community will contribute to longer wait times for African-American voters because these voters are more likely to experience confusion in completing a ballot.  The Secretary is right, of course, that Ntiri is not an expert on voting.  But she is an expert on adult literacy and has noted that individuals with low literacy have difficulty identifying intersections on a street map.  The Court finds that this evidence convincingly suggests that voters with low literacy would struggle with a ballot having potentially seventy-nine individual selections.

Contrary to Thernstrom's contentions, Ntiri need not have conducted a study specifically targeted to the issues in this litigation.  Instead, her explanation of the interplay of variables in the NALS, combined with her considerable expertise in adult literacy, is a sufficient basis for her to make findings regarding people with low literacy.

Accordingly, the Court determines that African-Americans will disproportionately experience longer lines and wait times as a result of PA 268.

### C.    PA 268 and Voter Deterrence

PA 268 will disproportionately deter African-Americans from voting.  But the Court must first explain its finding that PA 268 will deter voters generally.  As evidence that longer lines and wait times will deter voters from attending the polls, Plaintiffs cite to a report by Charles Stewart III, a Professor of Political Science at the Massachusetts Institute of Technology.  Dkt. No. 1-3.  This report warrants considerable weight.

Stewart III concluded "that long lines discourage voting, lower voter confidence, and impose economic costs."  *Id.* at p. 17 (Pg. ID 51).  In particular, based on the results of a 2012 survey, Stewart III determined that long lines deterred 730,000 people from voting in the 2012 presidential election.  *Id.* at p. 18 (Pg. ID 52).

Likewise, numerous elections officials have said that longer lines and wait times will deter voters.  Baxter, the Director of Elections in Detroit, said "[l]onger lines will deter voters from voting either by not joining the line or leaving the line and the polling place."  Dkt. No. 1-15, pp. 10–11 (Pg. ID 289–90).  Swope, the Lansing City Clerk, concurred with Baxter's assessment.  *Id.* at p. 18 (Pg. ID 297).

Plaintiffs also present expert evidence in support of their assertions. Plaintiffs' expert Allen deduced that every additional sixty minutes of waiting time

would deter 3% of registered voters from attending the polls.  Dkt. No. 108-4, pp.

12–13 (Pg. ID 2499–2500).  This finding resulted from a study of Ohio and Florida

voters in the 2002 and 2014 elections, respectively.  *Id.* at pp. 13–14 (Pg. ID 2500–

01).  Allen concluded, however, that Michigan voters would behave similarly in

these circumstances.  *Id.* at p. 15 (Pg. ID 2502).  Applying the 3% theory to this case,

Allen gathers that longer lines and wait times stemming from PA 268 would deter

between 13,000 and 22,000 African-Americans from voting in a given election.  *Id.*

at p. 18 (Pg. ID 2505).

### D.    PA 268 and Deterred African-American Voters

The Court finds that PA 268 will disproportionately deter African-Americans

from voting.  The parties use North Carolina as a proxy for the impact of PA 268 on

African-Americans in Michigan.  This comparison is not perfect, but the Court will

not simply "wear[] blinders."  *Ohio Democratic Party v. Husted*, 834 F.3d 620, 629

(6th Cir. 2016).  And the Court finds that this examination supports Plaintiffs' claim

that PA 268 will disproportionately deter African-Americans in Michigan from

voting.

The parties' reliance on North Carolina here is not controlling because North

Carolina and Michigan have quite different voting regulations.   North Carolina

36

permits both early voting and no-reason absentee voting, and these measures ease access to the polls.  *See* N.C. GEN. STAT. ANN. §§ 163A-1295, -1300–04; *see also N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204, 216–17 (4th Cir. 2016).  Michigan, of course, allows neither voting method.

Yet North Carolina is a useful comparison because it eliminated straight-ticket voting in 2013.  Thus, there is data available from elections in North Carolina with straight-party voting (pre-2013) and without straight-party voting (post-2013).

Plaintiffs and the Secretary vigorously dispute how the elimination of straight-party voting impacted African-American voter turnout in North Carolina.  And their disagreement extends to what that impact suggests about the effect of PA 268 on African-American voter turnout in Michigan.

On this issue, Plaintiffs offer expert analysis from Jason Roberts, a Professor of Political Science at the University of North Carolina at Chapel Hill.  Roberts determined that in areas in North Carolina where voters used the straight-party option at a high rate in 2012, voter turnout was "down considerably" in 2016.[8]  Dkt. No. 108-3, p. 16 (Pg. ID 2473).  "Given that straight ticket voting is currently utilized at higher rates in counties with large African American populations," Roberts concludes that "this reduction in voter turnout would disproportionately affect

---

[8]   All agree that comparing voter turnout across presidential elections is more appropriate than contrasting turnout in presidential elections with that in midterm elections.

African American voters." *Id.* at p. 27 (Pg. ID 2484).  Specifically, he contends that the absence of the straight-party option in 2016 deterred from voting 8% of African-Americans who both voted in 2012 and resided in high straight-ticket voting counties.  *Id.* at pp. 17–18 (Pg. ID 2474–75).  Roberts asserts that this finding holds after controlling for several factors, including county poverty levels and county regulations for early voting.  *Id.* at p. 17 (Pg. ID 2474).

Roberts steadfastly claims that wait times and longer lines generated by the elimination of straight-party voting caused some of the downturn in turnout.  But he admits that the removal of straight-ticket voting was not the sole cause of the entire decline in turnout.  *See id.* at pp. 15–16 (Pg. ID 2472–73).  He submits, for example, that former President Barack Obama's absence from the 2016 election caused some of the downturn, as African-Americans turned out to vote in record numbers for Obama in 2012.  Roberts also concedes that he did not identify—and did not attempt to identify—the amount of downturn in African-American voter turnout in North Carolina attributable to Obama's absence from the 2016 ballot.  Dkt. No. 141-4, pp. 19–20 (Pg. ID 3558–59).

Roberts's views warrant some weight, even considering the absence of findings attributing a specific amount of decline in voter turnout to a relevant consideration.  He convincingly reports that certain counties with high straight-party voting rates had high voting-age populations of African-Americans, and that these

38

counties experienced a substantial decrease in voter turnout from 2012 to 2016. And the substantial size of the decline in voter turnout suggests that this drop had several causes. Accordingly, he has presented credible evidence that PA 268 will likely deter African-Americans from voting.

Through expert evidence from Herrnson and Thernstrom, the Secretary offers a different view of African-American voter turnout in North Carolina. First, Herrnson's findings are of no value to the Court. He argues that longer wait times will not deter any Michigan residents from attending the polls. In Herrnson's view, people will vote no matter how long it takes to do so and no matter the obstacles. This is true, Herrnson supposes, because individuals only vote for reasons not linked to the outcome of an election. Dkt. No. 102-6, pp. 9–10 (Pg. ID 1990–91). These reasons supposedly include for personal satisfaction and for personal or civic obligation. *Id.*

This assertion not only conflicts with common sense, but also the weight of the evidence. Therefore, the Court will not give any weight to Herrnson's attacks on Roberts's theory about how PA 268 will deter African-Americans in Michigan from voting.

Thernstrom's analysis, on the other hand, is credible. Citing voter turnout in mid-term elections in North Carolina in 2010 and 2014, Thernstrom maintains that African-American turnout actually increased by 1.84% from 2010 to 2014, despite

39

the abolition of straight-ticket voting.  Thernstrom concedes, however, that African-American voter turnout in North Carolina decreased by 5.89% in the presidential elections during this period, in 2012 and 2016.  Dkt. No. 102-18, p. 21 (Pg. ID 2200).  But Thernstrom asserts that this decrease was largely a result of African-Americans turning out to vote in high numbers for Barack Obama in 2012 and not turning out in the 2016 election, as Obama was not on the ballot.

Thernstrom continues that Roberts failed to control for Obama's popularity with African-American voters in North Carolina.  *Id.* at pp. 23–24 (Pg. ID 2202–03).  Comparing African-American voter turnout nationally with that in North Carolina in 2012 and 2016, Thernstrom finds that the drop in African-American voter turnout nationwide was 1.9% greater than the decline in African-American turnout in North Carolina.  *Id.* at p. 24 (Pg. ID 2203).  Thus, according to Thernstrom, the elimination of straight-ticket voting did not disproportionately impact African-American voters in North Carolina.  *Id.*

The Court determines that this evidence undermines some of Roberts's conclusions.  But Thernstrom's findings do not warrant rejection of Roberts's analysis.  Indeed, Thernstrom contends that African-Americans in North Carolina were more likely to vote in the 2016 election than African-Americans throughout the country, but he offers no evidence as to why.  *Id.*  Innumerable variables may be

40

relevant to African-Americans' voting rates throughout the country. Thus, the Court will not adopt Thernstrom's findings.

Second, Roberts's evidence shows that 8% of African-American voters in high straight-ticket voting counties did not vote in 2016, although these voters went to the polls in 2012. This figure is so high that it accommodates multiple, meaningful causes for the decline in African-American turnout, including both the elimination of straight-ticket voting and the absence of Obama from the 2016 ballot. Thernstrom admits that it is especially difficult to identify the percentage of African-Americans who declined to vote in 2016 either (1) because Obama was not on the ballot, or (2) because of longer lines and wait times generated by the elimination of straight-ticket voting. *See id.* at p. 22 (Pg. ID 2201) (noting that "[p]erhaps Dr. Roberts barely mentioned President Obama in his report because political scientists who work with mathematical models of voting behavior necessarily focus their attention on variables that can be measured precisely."). Therefore, the Court will credit Roberts's testimony and findings regarding PA 268 and its deterrence of African-American voters in Michigan.

In addition to the comparison with North Carolina, conditions specific to Michigan further suggest that PA 268 will disproportionately deter African-Americans from voting. Indeed, African-Americans' high rate of straight-ticket voting and housing patterns in Michigan indicate that PA 268 will disproportionately

deter African-Americans from voting.  Evidence reveals that African-Americans in Michigan overwhelmingly tend to live in areas where they constitute a high percentage of the population, and thus, they tend to vote in the same precincts.  A 24/7 Wall Street article published just last year noted that the Detroit, Warren, and Dearborn, Michigan area was the most segregated metropolitan area in the United States.  Dkt. No. 137-8, pp. 19–21 (Pg. ID 3344–46).  "55.3% of Detroit's African American population lives in neighborhoods where at least 4 in 5 residents are black, the largest share of any U.S. metro area," according to 24/7 Wall Street.  *Id.* at p. 20 (Pg. ID 3345).  Because African-Americans use the straight-party option at such a high rate, the additional time that PA 268 would impose on African-American voters would be especially pronounced in areas in Michigan with substantial populations of African-Americans of voting age.

For instance, in the 2016 election 77.7% of voters used the straight-party option in the twelve communities where African-Americans were the majority demographic.  Dkt. No. 108-2, p. 9 (Pg. ID 2402).  The elimination of straight-ticket voting would force 77.7% of voters in those communities to take significantly more time completing a ballot, and this increase in time is substantial.  Thomas, the former elections official, supposed that it would take each person who previously voted a straight-ticket an additional three minutes to vote without that option.  Likewise,

42

Assistant Professor Allen determined that it would take voters at least 25% longer to shade in eighteen ovals than to shade in one.

Plaintiffs also note that longer lines in Michigan for African-Americans as compared to whites is consistent with the national trend. Dkt. No. 1-3, p. 14 (Pg. ID 48). Professor Stewart III, for example, observed that across the country "wait times . . . are unevenly distributed demographically," as in 2012, white voters waited an average of twelve minutes to vote. *Id.* By contrast, African-Americans waited an average of twenty-four minutes to vote. *Id.*

In countering this evidence, the Secretary again relies on Thernstrom. Thernstrom observes that these statistics are irrelevant because they are national and not Michigan-specific. Dkt. No. 102-18, p. 27 (Pg. ID 2206). That contention is unconvincing, however. The national trend simply corroborates Plaintiffs' evidence specific to Michigan—evidence demonstrating that PA 268 will disproportionately deter African-Americans from exercising their right to vote, given that they will face significantly greater wait times and longer lines. Based on the above, the Court determines that PA 268 will disproportionately deter African-Americans from voting.

## III.   Burden of Proof

In a civil bench trial, plaintiffs must prove their claims by a preponderance of the evidence.  *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993).  That is, a court must "believe that the existence of a fact is more probable than its nonexistence before [the court] may find in favor of the [plaintiffs] who ha[ve] the burden to persuade the [court] of the fact's existence."  *Id.* (internal quotation marks omitted) (quoting *In re Winship*, 397 U.S. 358, 371–372 (1970) (Harlan, J., concurring)).

Where, as here, plaintiffs request a permanent injunction, a court must evaluate the following:  (1) whether the plaintiffs have succeeded on the merits; "(2) whether the [plaintiffs] would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction."  *Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012) (internal quotation marks omitted) (quoting *Chabad of S. Ohio v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004)).

## IV.    Conclusions of Law

The Plaintiffs have demonstrated by a preponderance of the evidence that PA 268 unduly burdens the right to vote, reflects racial discriminatory intent harbored by the Michigan Legislature, and disparately impacts African-Americans' opportunity to vote in concert with social and historical conditions of discrimination. Accordingly, the Court holds that PA 268 violates the Equal Protection Clause under both the *Anderson-Burdick* framework (Count I) and that clause's prohibition on intentional discrimination (Count II).    The Court further holds that PA 268 contravenes Section 2 of the VRA (Count III).

The Court will address each holding in turn.

### A.    Equal Protection Claim (Count I)

The Plaintiffs have shown that PA 268 burdens African-Americans' voting rights, and that the Secretary's stated interests for PA 268 do not warrant the burden imposed on those rights.    PA 268, therefore, violates the Equal Protection Clause.

In this case, the Court must resolve the collision of two interests.    On one hand, states have a "clear prerogative to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives.'"    *Ohio Democratic Party*, 834

45

F.3d at 626 (quoting U.S. CONST. art. I, § 4). And on the other, "the Supreme Court has readily acknowledged the general right to vote as implicit in our constitutional system." *Id.* (internal quotation marks omitted) (quoting *Mixon v. Ohio*, 193 F.3d 389, 402 (6th Cir. 1999)). When a court balances these considerations, it must apply the *Anderson-Burdick* framework. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *see also Burdick v. Takushi*, 504 U.S. 428 (1992). That framework instructs courts as follows:

> [T]he court must first consider the character and magnitude of the asserted injury to the rights protected by the [Constitution] that the plaintiff seeks to vindicate. Second, it must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. Finally, it must determine the legitimacy and strength of each of those interests and consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Ohio Democratic Party*, 834 F.3d at 626–27 (alterations in original) (quoting *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 693 (6th Cir. 2015)).

The *Anderson-Burdick* framework comprises three standards of judicial review. The most stringent standard applies where "a state imposes 'severe restrictions' on a plaintiff's constitutional rights (here, the right to vote)[.]" *Id.* at 627 (quoting *Burdick*, 504 U.S. at 434). In this situation, "regulations survive only if 'narrowly drawn to advance a state interest of compelling importance.' " *Id.* (quoting *Burdick*, 504 U.S. at 434). In contrast, the least demanding standard of review is "closer to rational basis[.]" *Id.* (internal quotation marks omitted) (quoting

46

*Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016)). Regulations are subject to this standard if they are "minimally burdensome and nondiscriminatory[.]" *Id.* (internal quotation marks omitted) (quoting *Ohio Council*, 814 F.3d at 335). And in this scenario "the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (quoting *Ohio Council*, 814 F.3d at 335). The third standard of judicial review is for "[r]egulations falling somewhere in between—i.e., regulations that impose a more-than-minimal but less-than-severe burden[.]" *Id.* (citing *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 546 (6th Cir. 2014)). These regulations "require a 'flexible' analysis, 'weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it.' " *Id.* (quoting *Green Party of Tenn.*, 767 F.3d at 546).

The Court finds that PA 268 imposes a "more-than-minimal but less-than-severe burden" on African-Americans' right to vote. *See also Johnson II*, 833 F.3d 656, 663 (noting that this Court did not err in reaching that same conclusion at the preliminary injunction stage of this litigation). The Court will thus apply the third, flexible standard here.

Plaintiffs' facial challenge to PA 268 means that they seek "to invalidate the law in each of its applications, to take the law off the books completely." *Green Party of Tenn.*, 791 F.3d at 691 (citing *Speet v. Schuette*, 726 F.3d 867, 871 (6th Cir. 2013)). Plaintiffs, therefore, "bear a heavy burden of persuasion." *Crawford v.*

47

*Marion Cty. Election Bd.*, 553 U.S. 181, 200 (2008). They must demonstrate by a preponderance of the evidence "that no set of circumstances exist under which [the statute] would be valid." *Green Party of Tenn.*, 791 F.3d at 691 (alteration in original) (internal quotation marks omitted) (quoting *Speet*, 726 F.3d at 872). In sum, the Plaintiffs must prove—by a preponderance of the evidence—that the burden PA 268 imposes on African-Americans' right to vote outweighs the State's asserted interests, and that there are no circumstances under which PA 268 is constitutional.

The Plaintiffs have made this showing. As the *Anderson-Burdick* framework requires, the Court will (1) address the burden on African-Americans' voting rights, (2) assess the Secretary's justifications for PA 268, and (3) explain why these justifications do not warrant the burden here.

### 1. Burden on African-Americans

The Secretary argues that PA 268 changes only the manner of completing a ballot, and does not impact the right to vote. The record suggests otherwise. PA 268 has a more-than-slight, but not severe effect on African-Americans' right to vote. Although all Michigan voters will wait much longer to vote under PA 268,

African-American voters will face disproportionately longer lines and wait times, and will be deterred from voting.

This is apparent for two reasons.  First, because African-Americans use the straight-party option far more than whites.  Second, in Michigan, African-Americans have lower levels of literacy than whites, which will lead to more time spent completing a ballot or abandonment of a ballot prior to completion, either as a result of frustration or lack of ability.  Both of these facts will work to deter a substantial and disproportionate number of African-Americans from voting.

### a)  Significantly Increased Wait Times and Longer Lines

Plaintiffs' lay evidence persuasively demonstrates that PA 268 will increase voting wait times for all Michigan residents.  Numerous elections officials and clerk associations either testified in opposition to PA 268 during legislative hearings, submitted affidavits here asserting that PA 268 would introduce longer wait times, or did both.  Dkt. No. 108-13, p. 6 (Pg. ID 2621); Dkt. No. 1-15, p. 8, 16 (Pg. ID 287, 295).   And they predicted a doomsday-like situation.  The House Fiscal Analysis described this testimony, noting that "[c]ity and county clerks testified that the average wait time to vote in Michigan is already 22 minutes, and that this measure could double that wait."  Dkt. No. 108-13, p. 7 (Pg. ID 2622).  The then-

Chair of the House Elections Committee said longer lines caused by PA 268 would be a "nightmare," absent the enactment of no-reason absentee voting legislation. Dkt. No. 137-3, p. 36 (Pg. ID 3260).  The State Legislature, of course, did not pass no-reason absentee voting legislation, which was initially tie-barred to SB 13.

An elections clerk forebode that PA 268 would lead to "disaster." *Id.* at p. 31 (Pg. ID 3255).  Another clerk was "grave[ly] concern[ed] over the lines [PA 268] would create on voting day." *Id.* at p. 29 (Pg. ID 3253).  For thirty-six years Christopher Thomas was the Director of the Michigan Bureau of Elections, and he concluded that PA 268 will generate longer wait times.  Dkt. No. 141-19, p. 2 (Pg. ID 4049).  In particular, he thought that it would take at least three more minutes for a voter to complete a ballot without a straight-party option. *Id.*  Additionally, in a hearing before the House, both the Michigan Association of Municipal Clerks and Michigan Association of County Clerks testified in opposition to PA 268.  Dkt. No. 108-13, p. 6 (Pg. ID 2621).

Only two clerks have supported PA 268.  The Clinton Township Clerk submitted a letter to the House supporting the law. *Id.*  And the Calhoun County Clerk authored an affidavit in this case asserting that PA 268 will not cause longer lines or wait times.  Dkt. No. 141-14, p. 4 (Pg. ID 3983).

Election officials' overwhelming opposition to PA 268, based on their belief that PA 268 would create drastically longer lines, is strong evidence that PA 268

will indeed create longer lines and wait times for voters. As clerks oversee and administer election processes, they have intimate knowledge about Michigan elections. Clerks are therefore best positioned to understand the probable impact of PA 268 on voters. The evidence involving clerks, then, greatly contributes to Plaintiffs' proof that PA 268 will burden Michigan voters by introducing longer wait times.

Plaintiffs' expert evidence likewise indicates that PA 268 will produce longer lines and increased wait times at the polls. Associate Professor Allen, after conducting a simulation, found that PA 268 would increase voting times by at least 25% for each person that had previously voted a straight-ticket. Dkt. No. 108-4, p. 10 (Pg. ID 2497). The Secretary's expert Graves attacks Allen's simulation, contending that Allen had failed to account for delays at the registration line and counted imprecisely the number of voting booths at certain precincts. Delays at registration, however, may consist of some—but not all—of the twenty minutes that Michigan residents currently spend at the polls.

Yet even if Graves is correct that Allen has overstated the additional time that PA 268 would cause individuals to spend in the voting booth, Graves cannot credibly argue that PA 268 would not increase the time spent in voting booths. Indeed, Allen's simulation has demonstrated that voting for each candidate individually takes drastically longer than voting a straight-ticket. Allen has also shown that the

increased time for each voter is not de minimis, even if that time is not precisely 25% greater than the time spent voting for each candidate individually.

Plaintiffs' claim that PA 268 inflicts a more-than-slight burden gains significant force when one considers that Allen's predicted time increase of 25% covers almost half of Michigan voters, or 1.5 to 2.5 million voters. Dkt. No. 108-2, p. 9 (Pg. ID 2402); *see also* Dkt. No. 108-13, p. 7 (Pg. ID 2622). PA 268, then, would inject a substantial amount of time into the voting process. As a result, Plaintiffs have illustrated by a preponderance of the evidence that PA 268 will cause significantly longer wait times.

This finding is undisturbed by the analysis of the Secretary's expert Herrnson and the Secretary's contention that administrative remedies will alleviate Election Day congestion. First, Herrnson maintains that PA 268 will not introduce longer wait times because straight-ticket voting is confusing. According to Herrnson, straight-ticket voting confuses Michigan residents, requiring residents to request assistance, which in turn causes delay at the polls. Without straight-party voting, Herrnson argues, ballots will be less confusing, leading to fewer requests for assistance, and ultimately, less delay.

Herrnson's contention is not supported by his report or the record, however. Straight-ticket voting may confuse some Michigan voters, but it has been available in Michigan for 127 years and 49.2% of voters used it in the 2016 election. Dkt. No.

108-2, p. 9 (Pg. ID 2402).  The Court, therefore, finds it implausible that straight-ticket voting is confusing to Michigan residents generally.  Second, PA 268 might increase wait times by as much as three minutes for each person who previously voted a straight-ticket.  Consequently, under PA 268, any time saved from a decline in requests for assistance will not offset the additional time that it will take for previous straight-ticket voters to complete their new ballots.

The Secretary next unpersuasively argues that administrative remedies will ameliorate longer lines.  Dkt. No. 141, p. 18 (Pg. ID 3434).  She emphasizes that a 2,999 voter limit in a given precinct reduces or prevents congestion at the polls.  *See* MICH. COMP. LAWS § 168.661.  And she asserts that elections officials, including clerks, have excellent training and ample discretion to implement administrative remedies.  According to the Secretary, these administrative remedies would include increasing the number of laptops and voting booths at precincts, and improving voter education.  Dkt. No. 141, p. 21 (Pg. ID 3437).  Additionally, the Secretary insists that the current absentee voting law is sufficient to mitigate longer lines, noting that 32% of registered voters in Michigan are eligible to vote absentee because they are at least sixty years old.  *Id.* at p. 19 (Pg. ID 3435).

These arguments are unpersuasive.  Almost all of the elections officials who have commented on PA 268 have predicted desperately long lines and wait times.  Their anxiety about the effect of PA 268 implies that the available administrative

remedies are insufficient.  In the face of this strong evidence from elections officials, the Court cannot accept the Secretary's unfounded assertions.  Indeed, the Secretary offers no evidence regarding how many people actually vote absentee in Michigan.

What is more, Michigan already has some of the longest lines and wait times in the country.  And this fact sheds further doubt on the Secretary's argument that the available administrative remedies would ameliorate lines and wait times potentially twice as long as those facing Michigan voters today.  *See* Dkt. No. 108-13, p. 7 (Pg. ID 2622).  In light of the above, the Court holds that PA 268 will impose increased wait times on all Michigan voters.

### b)  Disproportionately Longer Wait Times and Lines for African-Americans

African-Americans, however, will disproportionately suffer increased wait times and longer lines as a result of PA 268.  Although the Secretary rightly maintains that PA 268 is a facially neutral statute, that fact does not answer the critical question of whether PA 268 disproportionately impacts African-American voters.  Plaintiffs' expert Metzger has directly addressed that issue by finding a positive correlation between the percentage of African-Americans in a given community and the percentage of voters in that community who used the straight-party option in the 2016 election.

Metzger determined, for example, that in the twelve communities in which African-Americans were the majority demographic, 77.7% of voters used the straight-ticket option. Dkt. No. 108-2, p. 9 (Pg. ID 2402). Similarly, the seven communities in which African-Americans constituted 40 to 49.9% of the voting-age population had a straight-ticket voting rate of 68.9%. *Id.* On the other hand, 49.2% of all Michigan voters used the straight-party option in the 2016 election. *Id.* And in communities where African-Americans constituted less than 40% of the voting-age population, the straight-ticket voting rate was 46.5%. *Id.*

In countering this evidence, the Secretary shows that some communities with few or no African-Americans vote a straight-ticket at high rates. Dkt. No. 102-3, p. 16 (Pg. ID 1845). This argument, however, ignores data that straight-ticket voting rates in communities with substantial African-American voting-age populations are much higher than the statewide rates and the rates in communities with lower percentages of African-Americans of voting age as part of their population. These facts require rejection of the Secretary's assertion that there is only a "weak" correlation between the African-American voting-age population in a community and that community's straight-ticket voting rate. *See id.* at p. 15 (Pg. ID 1844). Indeed, the record indicates that this correlation is quite strong.

### c) African-Americans' Disparate Deterrence from Voting

Considerably longer lines and wait times will have a tremendously important consequence: They will deter African-Americans from exercising their right to vote. The Lansing City Clerk and Director of Elections in Detroit both asserted that the effects of PA 268 would discourage people from attending the polls. Dkt. No. 1-15, pp. 10–11, 14, 18 (Pg. ID 289–90, 93, 297). Professor Charles Stewart III reached a similar conclusion when he determined that longer lines deter voting. Dkt. No. 1-3, p. 17 (Pg. ID 51). Analyzing the 2012 election across the country, Stewart III found that 730,000 people did not vote because of long lines. *Id.* at p. 18 (Pg. ID 52). According to Associate Professor Allen, every additional sixty minutes of waiting time will deter 3% of registered voters from going to the polls. Dkt. No. 108-4, pp. 12–13 (Pg. ID 2499–2500). Based on this formula, Allen found that longer lines would discourage 13,000 to 22,000 African-Americans in Michigan from voting. *Id.* at p. 18 (Pg. ID 2505).

PA 268 would not only deter African-Americans from voting, but it would also decrease the likelihood that African-Americans will complete their ballots. Professor Roberts makes this point using data on North Carolina voters, as North Carolina eliminated straight-ticket voting in 2013 and had elections without straight-ticket voting in 2014 and 2016. Dkt. No. 108-3, p. 8 (Pg. ID 2465). First, Roberts

contends that in 2012, in North Carolina, there was a "strong, positive correlation" between the African-American population in a given county and the straight-ticket voting rate in that county.  *Id.* at p. 3 (Pg. ID 2460).

He also found that North Carolina counties with high levels of straight-party voting in 2010—before the elimination of straight-party voting—had the greatest ballot drop-off from 2012 to 2016.  *Id.* at p. 14 (Pg. ID 2471).  With the elimination of straight-ticket voting in North Carolina, "[i]n 2010, the average level of roll off from the U.S. Senate contest to the North Carolina House contest in North Carolina counties was 8.3%, while in 2014 it was 17.79%."  *Id.* at p. 13 (Pg. ID 2470).  The reason for this decline, Roberts believes, is that "[l]ong ballots that do not have a straight ticket option tend to induce voter fatigue as voters struggle to wade through the ballot."  *Id.* at p. 7 (Pg. ID 2464).  He continues that "[f]atigued voters often turn in their ballots before they have marked choices for all races and ballot questions producing an 'undervote' in offices that are placed lower on the ballot."  *Id.*  According to Roberts, ballot roll-off led to 1.5% of North Carolina voters failing to vote for United States House of Representatives contests despite voting in the presidential contest.[9]  *Id.* at pp. 7–8 (Pg. ID 2464–65).

---

[9]  Roberts did not evaluate contests further down the ballot.  Dkt. No. 108-3, p. 7 n.11 (Pg. ID 2464).

Examining this ballot roll-off theory in Michigan, Roberts concludes that across the 2012, 2014, and 2016 elections, straight-party voting rates are positively correlated with ballot completion rates. *Id.* at p. 21 (Pg. ID 2478). Roberts contends that "voter fatigue" is apparent in Michigan Supreme Court elections, which are non-partisan elections. *Id.* at p. 24 (Pg. ID 2481). Voters in counties having high straight-ticket voting rates are more likely to vote in those races, Roberts says. *Id.* Stephan Thernstrom, one of the Secretary's experts, surprisingly lends credibility to Roberts's theory of voter fatigue. He wrote that "[i]f a large fraction of the electorate takes the STV [straight-ticket voting] option, rolloff rates will inevitably be low." Dkt. No. 102-18, p. 25 (Pg. ID 2204).

Yet Thernstrom attacks Roberts's conclusions, alleging that Roberts has not shown a relationship between race and ballot roll-off because Roberts evaluated race at the county level, and not as to each individual. *Id.* at pp. 25–26 (Pg. ID 2204–05). Put another way, Thernstrom argues that because counties are not racially homogenous, Roberts's assessment of county preferences for straight-party voting offers no evidence about whether African-Americans had higher ballot roll-off rates than whites after North Carolina had eliminated straight-party voting. *Id.* at p. 26 (Pg. ID 2205).

Yet the Court finds that examining race at the county level is sufficient to demonstrate a positive correlation between the African-American population in a

particular county and the ballot roll-off rate in that county. Indeed, Roberts's sample notes the change in a county's voting rates based on a change in the composition of that county's demographic. In examining 2012 data, Roberts found that the straight-ticket voting rate in a given county would increase by 0.35% where there was a 1% increase in that county's population consisting of African-Americans. Dkt. No. 108-3, p. 9 (Pg. ID 2466). And Roberts's sample is sufficiently large as it encompasses every county in North Carolina. *See id.*

Beyond straight-ticket voting, ballot roll-off would also be most prevalent among African-Americans because roll-off occurs most among voters with relatively "lower levels of education and less experience voting[.]" *Id.* at p. 7 (Pg. ID 2464). Professor Ntiri determined that ballot roll-off is positively correlated with lower levels of literacy. Dkt. No. 108-5, p. 18 (Pg. ID 2527). She notes that a disproportionate percentage of African-Americans have lower literacy levels. Therefore, according to Ntiri, African-Americans are more likely to experience frustration with a ballot that necessitates voting for each candidate individually and for numerous proposals—sometimes as many as seventy-nine offices and proposals. *Id.*; Dkt. No. 1-15, p. 9 (Pg. ID 288). Ntiri has determined that this frustration would cause African-Americans to abandon their ballot prior to completion. Dkt. No. 108-5, p. 18 (Pg. ID 2527).

She further recognizes that voters may request assistance in voting booths, and that this assistance may lessen voter frustration or diminish ballot roll-off. *Id.* But her experience with adults having low literacy has led her to believe that many of these people would not seek help out of embarrassment. *Id.* Ballot roll-off, then, is another burden that African-Americans would disproportionately bear as a result of PA 268.

In spite of this evidence, the Secretary contends that PA 268 imposes no burden on African-Americans. Instead, the Secretary argues, PA 268 just impacts the manner of voting. *See* Dkt. No. 141, p. 12 (Pg. ID 3428). The Sixth Circuit dismissed this argument in *Johnson II*, reasoning that "how a state chooses to regulate the *manner* that a person must cast a ballot undoubtedly impacts the individual right." 833 F.3d at 663.

Further signaling that the Secretary's argument lacks merit is that the burden asserted here sharply contrasts with the slight burden addressed in *Ohio Democratic Party*. There, "[t]he undisputed factual record show[ed] that it's easy to vote in Ohio. Very easy, actually." 834 F.3d at 628. The *Ohio Democratic Party* court even noted that Ohio's voting system was more generous than Michigan's, as Ohio permits a 29-day early voting period and Michigan does not allow any early voting. *Id.* Additionally, Ohio has authorized no-reason absentee voting, whereas Michigan has not. *See id.* at 630. Thus, Ohio only minimally burdened voters by eliminating

60

six days of early voting and requiring that voting and registration occur on different dates. *See id.*

Michigan voters, by contrast, generally must go to the polls on Election Day. To be sure, "[t]he Constitution does not require *any* opportunities for early voting." *See id.* at 623. But the Constitution does require that voting regulations not unduly burden the right to vote, and the record here shows that PA 268 significantly increases voting times and that these longer times will deter African-Americans from voting. PA 268, then, impacts African-Americans' right to vote and not simply the manner of voting. Accordingly, Plaintiffs have demonstrated that African-Americans will disproportionately suffer numerous burdens from PA 268, including drastically longer wait times and voting lines, greater deterrence from voting, and increased ballot roll-off.

## 2.    State Interests Supporting PA 268

As the Plaintiffs have demonstrated that SB 13 imposes a more-than-minimal, but less-than-severe burden on African-Americans' right to vote, "[t]he State must propose an 'interest sufficiently weighty to justify the limitation.' " *Obama for America v. Husted*, 697 F.3d 423, 433 (6th Cir. 2012) (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)). The Secretary's interests are reasonable. Yet they are

not "sufficiently weighty" to justify the effect that PA 268 has on African-Americans' right to vote.

The Secretary maintains that PA 268 supports the following interests: (1) it encourages voters to examine each candidate individually, without regard for political party; (2) it increases the likelihood that voters will complete the non-partisan section of the ballot; and (3) it reduces confusion about how to complete a ballot. The Secretary's first interest—encouraging voters to learn more about candidates, to participate in elections, and to be "more deliberate in voting"—does not justify the burden that PA 268 imposes on African-American voters. Dkt. No. 141, p. 25 (Pg. ID 3441). The record is absent of evidence indicating that the elimination of straight-ticket voting will elicit more interest in gathering information about candidates. To the extent the Secretary argues that voting a straight-ticket reflects a lack of "deliberateness" or participation in the democratic process, the Secretary is mistaken. There is no evidence here illustrating that straight-ticket voters know less about candidates or participate less in elections. Similarly, the record lacks any indication that straight-ticket voters are less intentional when completing a ballot.

As for the second interest, the record also lacks sufficient evidence that PA 268 will lead to higher voting rates in nonpartisan elections. The only evidence supporting this conclusion is an affidavit from the Calhoun County Clerk. *See* Dkt.

No. 141-14, p. 4 (Pg. ID 3983).  And that clerk lacks credibility; her views on whether PA 268 will cause longer lines contrast with those of virtually every other clerk and elections official whose opinion is reflected in the record.

Conversely, there is strong evidence that PA 268 will drastically decrease voting rates for nonpartisan contests.  Professor Roberts, for example, demonstrated that "voter fatigue" sets in when voters must address numerous contests and proposals, and that this fatigue causes ballot roll-off.  Dkt. No. 108-3, p. 7 (Pg. ID 2464).  Roberts accordingly found that straight-ticket voting rates were positively correlated with ballot completion rates.  *Id.*  Thernstrom, although an expert for the Secretary, admitted that this positive correlation exists.  Dkt. No. 102-18, p. 25 (Pg. ID 2204).  Thernstrom even went so far as to question whether ballot roll-off is a bad thing.  *Id.* at p. 24–25 (Pg. ID 2203–04).  He wrote "it is not obvious to me why [Roberts's] observed increase in rolloff is a problem. It may be a bad thing for political parties, but the interests of parties cannot be equated with the interests of individual voters."[10]  *Id.* at p. 24 (Pg. ID 2204).  His position is hard to reconcile with the Secretary's contention that PA 268 will encourage voting in nonpartisan

---

[10] He then contends that straight-ticket voting is bad because it leads to greater voter error and makes it easier for voters with strong political leanings to vote, while imposing a relative cost on voters without strong leanings. Dkt. No. 102-18, pp. 24–25 (Pg. ID 2203–04).  The Court finds unpersuasive the Secretary's arguments that straight-ticket voting leads to greater voter confusion or error, as detailed below in the discussion of the Secretary's third interest regarding PA 268.

elections and that this interest justifies the impact that PA 268 would have on African-American voters. Therefore, the Secretary's interest in encouraging voters to vote in nonpartisan contests does not warrant the intrusion on voting rights brought by PA 268.

Finally, the Secretary's interest in eliminating confusion caused by straight-ticket voting is not "sufficiently weighty" to sustain PA 268. In support of this interest, the Secretary offers anecdotal evidence that voters may unintentionally undervote because they misunderstand straight-ticket voting.[11] Dkt. No. 141, p. 24 (Pg. ID 3440). The evidence cited for this interest is threadbare. It does not consist of lay testimony from people with knowledge of ballot issues. Rather, it addresses mock ballots that lay persons, including Plaintiff Williams, completed incorrectly in depositions. In contrast, at no point in his thirty-six years as Director of Elections in Michigan did Christopher Thomas receive feedback from county clerks that straight-ticket voting was confusing voters. Dkt. No. 108-9, pp. 6–7 (Pg. ID 2553–54).

Additionally, the expert evidence that the Secretary offers on this issue is unconvincing. She principally relies on a study by Professor Herrnson, where he found that straight-ticket voting spawned more confusion than voting for each

---

[11] Undervoting in this situation happens when people vote a straight-ticket and then do not vote in a nonpartisan contest, thinking that their straight-ticket selection covered the nonpartisan contest. Dkt. No. 141, p. 24 (Pg. ID 3440).

candidate individually.  Dkt. No. 141, p. 24 (Pg. ID 3440); *see also* Dkt. No. 102-6.
Herrnson's study, however, consisted of participants who did not adequately
represent Michigan voters.  The participants hailed from not only Michigan, but also
from New York and Maryland—two states that do not have straight-ticket voting.
Therefore, the Court doubts that this study included a representative sample of
Michigan residents and their familiarity with straight-ticket voting.  That familiarity
is consequential, as straight-ticket voting has been available in Michigan for 127
years and was used by 49.2% of Michigan residents in the most recent election.
Based on the evidence presented, the Court is skeptical that straight-ticket voting
confuses Michigan residents generally.  *See* Dkt. No. 108-2, pp. 9–10 (Pg. ID 2402–
03).

In resisting this evidence, the Secretary argues that the State's interests in PA
268 must be sufficiently weighty here for two reasons.  First, the Secretary highlights
that no court has held that a law eliminating straight-ticket voting violates the Equal
Protection Clause.  Second, the Secretary observes that most states do not allow
straight-party voting.  Yet these contentions do not alter the Court's holding; whether
PA 268 violates African-Americans' right to vote is a "jurisdiction-specific
inquir[y]." *Johnson II*, 833 F.3d at 670 (Gilman, J., concurring).  Indeed, Michigan
has a unique voting administration, given its especially long ballots and its mandate
that only certain qualified voters can avoid the polls on Election Day.

This singularity is illuminated by a comparison of this matter with *One Wis. Inst., Inc. v. Thomsen*, where a court rejected an Equal Protection Clause challenge to Wisconsin's elimination of straight-ticket voting.[12]  198 F. Supp. 3d 896, 945–96 (W.D. Wis. 2016).  There, plaintiffs claimed that a law eradicating straight-ticket voting burdened voters with less education and less time to vote by generating longer wait times and confusing voters.  *Id.* at 945.  But the court concluded that for these voters "straight-ticket voting was mostly a convenience," and that "there was limited evidence about whether the elimination of straight-ticket voting caused these burdens and, if so, to what extent."  *Id.* at 945–46.

The plaintiffs' expert, for example, had no basis for asserting that the eradication of straight-party voting would lead to longer lines, and he presented no evidence on the specific increase in time that would result from the law.  *Id.*  The plaintiffs' lay evidence was likewise insufficient because the only confusion in the record related to voters searching the ballot for the straight-party option, which had been removed.  *Id.* at 946.  Most damaging was that the "plaintiffs did not adduce evidence that the lack of straight-ticket voting deterred anyone from voting."  *Id.*

Because the Wisconsin law imposed only a slight burden on voting rights, the court used rational review to examine the plaintiffs' challenge, as opposed to the

---

[12]  The Secretary acknowledges that there was no challenge to straight-ticket voting in *McCrory*, and thus, that *One Wis. Inst.* is the only relevant case to have addressed the legality of a law eliminating straight-party voting.

flexible review applicable to this case. *Id.* at 945. And in that inquiry, the court held that Wisconsin's interests of joining a national trend of removing straight-party voting, encouraging a more informed electorate, and reducing spoiled ballots justified the slight burden on voters' rights.

This case is different. To start, Wisconsin allows both early voting and no-reason absentee voting, so it is easier to vote in Wisconsin than in Michigan. Second, the population burdened in this case is broader than that in *Thomsen*, and its reliance on straight-ticket voting is more compelling. The evidence demonstrates that African-Americans in Michigan have less educational attainment than whites. Therefore, the burdened population here overlaps with that in *Thomsen*. And because African-Americans have a much higher straight-ticket voting rate than whites, African-Americans in Michigan are not using straight-ticket voting as a mere "convenience."

Third, ample evidence—both lay and expert—confirms that PA 268 will cause dramatically longer wait times and details that specific increase in time for each straight-ticket voter. Indeed, Lyons protested that PA 268 will lead to a "nightmare" at the polls. Dkt. No. 137-3, p. 36 (Pg. ID 3260). A former Director of the Michigan Bureau of Elections predicted a three-minute increase for each straight-party voter and Associate Professor Allen's simulation led him to project at

least a 25% increase in time per straight-party voter.  Dkt. No. 141-19, p. 2 (Pg. ID 4049); *see also* Dkt. No. 108-4, p. 10 (Pg. ID 2497).

Lastly, the *Thomsen* plaintiffs offered no evidence that longer lines would deter voters.  Here, however, both elections officials and experts have represented that longer lines and wait times would deter voters.  *See* Dkt. No. 1-3, p. 17–18 (Pg. ID 51–52); *see also* Dkt. No. 108-4, pp. 12–13 (Pg. ID 2499–2500); *see also* Dkt. No. 1-15, pp. 10, 18 (Pg. ID 289, 297).  *Thomsen*, then, illustrates that the constitutionality of a law eliminating straight-ticket voting is a fact-intensive inquiry; that court's decision to uphold a Wisconsin law abolishing straight-ticket voting does not mean that Michigan's PA 268 is constitutional.

The Secretary also urges the Court to reject Plaintiffs' challenge on the grounds that PA 268 is consistent with a national trend, and just nine states allow straight-ticket voting.[13]  But that statistic, standing alone, is just a snapshot of national trends in voting rights regulations.  Indeed, national trends in voting regulations beyond straight-ticket voting reflect that Michigan's election laws are outdated in other respects and not comparatively favorable to voting rights.

---

[13]  Besides Michigan, the following states allow straight-ticket voting:  Alabama, Indiana, Kentucky, Oklahoma, Pennsylvania, South Carolina, Texas, and Utah. *Straight-ticket Voting States*, NAT'L CONFERENCE OF STATE LEGISLATURES (May 31, 2017),  http://www.ncsl.org/research/elections-and-campaigns/straight-ticket-voting.aspx#1.  In 2017, Texas enacted a law which will eliminate straight-ticket voting as of 2020.  *See* TEX. ELEC. CODE ANN. art. § 31.012 (West 2018).

Governor Snyder, for instance, declared that Michigan has an "archaic absentee voting law," and he emphasized that "bringing Michigan in line with other states regarding early, or easier, access to the polls is critical."  Dkt. No. 102-8, p. 2 (Pg. ID 2083).

In particular, thirty-seven states permit early voting.  *Absentee and Early Voting*, NAT'L CONFERENCE OF STATE LEGISLATURES (Aug. 17, 2017), http://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx.  And twenty-seven states allow no-reason absentee voting.  *Id.*  Taking these two facts together, Michigan is one of just thirteen states without both early voting and no-reason absentee voting.

Finally, of the fourteen states (including Michigan) that have abolished straight-ticket voting since 1994, only three still do not allow their residents to vote early or to vote absentee without an excuse.  *Straight-ticket Voting States*, NAT'L CONFERENCE OF STATE LEGISLATURES (May 31, 2017), http://www.ncsl.org/research/elections-and-campaigns/straight-ticket-voting.aspx#2.  These three states are Michigan, Missouri, and New Hampshire. Therefore, Michigan may be joining a national trend by eliminating straight-ticket voting, but it is still in the minority as to almost every other voting measure which eases access to the polls.

Notably, Michigan lags behind most states in voting wait times, despite the substantial time saved with roughly half of its voters using the straight-party option. According to a 2012 50-state study, Michigan had the sixth longest average voting wait time. Dkt. No. 1-3, p. 44 (Pg. ID 78). Likewise, Lyons noted that "sometimes you would hear of long line issues, even with straight-party voting." Dkt. No. 137-3, p. 14 (Pg. ID 3238). It is not enough, then, for the Secretary to contend that PA 268 does not offend the Constitution because no court has previously sustained a challenge to the elimination of straight-ticket voting and most states require voters to select each candidate individually.

Based on the above analysis, the Court finds that PA 268 imposes a burden on African-American voters that is not severe, but also not minimal. The Court also concludes that the Secretary's interests in PA 268 are not sufficiently weighty to warrant the corresponding burden on African-Americans' right to vote. Accordingly, the Court holds that PA 268 violates the Equal Protection Clause under the *Anderson-Burdick* framework.

Plaintiffs have further demonstrated that they are entitled to a permanent injunction of PA 268. *See Jolivette*, 694 F.3d at 765. They have succeeded on the merits of their claim under the *Anderson-Burdick* framework. They have shown that they would suffer irreparable injury through the implementation of PA 268, as PA 268 unduly burdens the right to vote. *See Obama for America*, 697 F.3d at 436 ("A

70

restriction on the fundamental right to vote therefore constitutes irreparable injury." (citing *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986))). The injunction would not cause substantial harm to others, especially considering Michigan's long history of straight-party voting. Finally, an injunction would serve the public interest because that remedy would protect African-Americans' voting rights. A permanent injunction, then, is appropriate based on Plaintiffs' Equal Protection Clause claim under the *Anderson-Burdick* framework.

### B.    Intentional Discrimination (Count II)

When it enacted PA 268, the Michigan Legislature intentionally discriminated against African-Americans in violation of the Equal Protection Clause.

When deciding intentional discrimination claims, courts apply the framework set out in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). That framework first provides that "evidence of a policy's disparate impact may be probative in determining whether the policymaker harbored a discriminatory intent." *Spurlock v. Fox*, 716 F.3d 383, 397 (6th Cir. 2013) (citing *Arlington Heights*, 429 U.S. at 266). But "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Id.* (internal quotation marks omitted) (quoting *Arlington Heights*, 429 U.S. at 264–65). Rather, "[p]roof of racially

discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Id.* (internal quotation marks omitted) (quoting *Arlington Heights*, 429 U.S. at 264–65). To succeed on an intentional discrimination claim, a plaintiff need not prove that discriminatory intent was the legislature's only concern, or even "the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265 (footnote omitted). It is enough to show "that a discriminatory purpose has been a motivating factor in the decision." *Id.* at 265–66.

Whether a discriminatory intent or purpose exists is potentially informed by the following considerations:

> [t]he historical background of the decision[,] . . . particularly if it reveals a series of official actions taken for invidious purposes; [t]he specific sequence of events leading up [to] the challenged decision; [d]epartures from the normal procedural sequence; [s]ubstantive departures[,] . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached; and the legislative or administrative history[,] . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Spurlock*, 716 F.3d at 397 (first, second, third, fifth, sixth, seventh, and eighth alterations in original) (quoting *Arlington Heights*, 429 U.S. at 267–68).

### 1.    Disparate Impact

First, the Secretary maintains that PA 268 does not disparately impact African-Americans because PA 268 is widely-popular. As the Court has explained above, however, African-Americans in Michigan are far more likely to vote a straight-ticket than are whites. They also have relatively lower levels of educational attainment, and thus, will have greater difficulty completing a ballot than whites, leading to more time spent finishing a ballot and higher rates of ballot roll-off. Consequently, PA 268 disparately impacts African-American voters.

### 2.    Historical Background

The historical background of PA 268 suggests that the Michigan Legislature harbored a discriminatory intent or purpose. The overwhelming majority of African-American voters in Michigan staunchly support the Democratic Party. A 2014 Pew Research Center poll reflects that 81% of African-Americans in Michigan identify as or lean Democrat and only 8% identify as or lean Republican.[14] *Religious Landscape Study*, PEW RESEARCH CENTER, http://www.pewforum.org/religious-landscape-study/state/michigan/party-affiliation/ (last visited July 31, 2018). On the

_____

[14] The other 11% of African-Americans identify or lean toward neither party.

other hand, 40% of whites in Michigan lean Republican and 41% lean Democrat. *See id.* What is more, in 2016, in communities where African-Americans constituted 40% or more of the voting-age population, 94.8% of straight-ticket votes were for the Democratic Party. Dkt. No. 108-2, p. 25 (Pg. ID 2418).

Michigan legislators recognized these facts in passing PA 268 and were not just motivated by policy concerns in enacting the law. Indeed, Ronna Romney McDaniel conceded that she supported PA 268, in part, because it would help Republican candidates win elections. Dkt. No. 108-15, p. 7 (Pg. ID 2632). To be sure, she also considered PA 268 good policy. But she acknowledged that straight-ticket voting benefits Democrats more than Republicans. She was dismayed that straight-ticket voters' support of the Democratic Party had prevented some down-the-ticket Republican candidates from winning elections, including her father. And she thought PA 268 would stop that from happening in the future. Therefore, the Secretary's argument that policy concerns were the sole motivation for PA 268 is not borne out by the record.

Additionally, the Secretary emphasizes that the Court should not conclude that there was intentional discrimination here because states with large, and states with small, African-American populations have eliminated straight-ticket voting. This argument misses the touchstone of the intentional discrimination inquiry, however. The issue here is whether the Michigan Legislature harbored discriminatory intent

in passing PA 268. Thus, although the Secretary's allegation demonstrates that legislatures have not generally used the elimination of straight-ticket voting to intentionally discriminate against African-Americans, that allegation is not dispositive with respect to the intent of the Michigan Legislature in passing PA 268.

### 3.    Specific Sequence of Events

The specific sequence of events further supports Plaintiffs' intentional discrimination claim. Straight-ticket voting has been popular with Michigan voters for a long time. Michigan voters repealed laws eliminating straight-ticket voting by referendum in both 1964 and 2001. *See* 1964 Mich. Public Acts 240; 2001 Mich. Public Acts 269. In 1964 and 2001, at least 60% of Michigan voters supported the repeal of those laws. Dkt. No. 146, pp. 2–3 (Pg. ID 4380–81). More recently, in the 2016 election, nearly half of the State's voters used the straight-party option. Dkt. No. 108-2, p. 9 (Pg. ID 2402). But, as PA 268 includes an appropriation, it cannot be repealed by referendum. *See Mich. United Conservation Clubs v. Sec'y of State*, 630 N.W.2d 297, 298 (Mich. 2001).

The historic and present popularity of straight-ticket voting in Michigan suggests that a referendum, if it were allowed, might reasonably result in the repeal of PA 268. This is convincing evidence that preventing a referendum on PA 268

was at least one consideration motivating the Michigan Legislature to include an appropriation in PA 268.

Indeed, several Michigan state senators expressed that sentiment. During a hearing on SB 13, Senator Curtis Hertel Jr. stated that "the only time we put appropriations in a bill is to make sure that it's referendum-proof, because you think that what you're doing is not popular with the people of this state." Dkt. No. 108-12, p. 15 (Pg. ID 2615). Similarly, then-Senator Steve Bieda said "I find it really appalling that we have a provision in there for an appropriation to make it referendum-proof. We know why that is being done. You know why that is being done." *Id.* at p. 14 (Pg. ID 2614). He continued, saying that a senator had asked for a reason for the appropriation and "the response that he got was a proverbial cricket noise. We had no response to that. There is a reason to do this; the only reason to do this is a perceived partisan advantage." *Id.*

The Secretary is correct that there is no constitutional prohibition—federal or state—on the legislature reenacting a law previously defeated by referendum. Yet these specific events shed light on the legislature's motivation for attaching an appropriation to PA 268.

Additionally, SB 13 was initially tie-barred to HB 4724, which would have authorized no-reason absentee voting. Various Michigan officials, including the Governor and the then-Chair of the House Elections Committee, believed that no-

reason absentee voting might ameliorate the longer lines that PA 268 would create on Election Day.  *See* Dkt. No. 102-8, p. 2 (Pg. ID 2083); *see also* Dkt. No. 137-3, p. 36 (Pg. ID 3260).  Yet the Michigan state senate severed the tie-bar and passed SB 13 independently.

The Secretary argues that this tie-bar break only represents "politics, appropriately, at work."  Dkt. No. 141, p. 29 (Pg. ID 3445).  The Court disagrees. Instead, the severance of the tie-bar supports Plaintiffs' contention that PA 268 was intended to achieve political gain, and did so by thwarting African-Americans' ability to vote.

### 4.    Substantive Departures

The record also reveals that PA 268 was a substantive departure from ordinary legislative action.  Straight-ticket voting is popular throughout Michigan, as the Secretary highlights in trying to convince the Court that PA 268 does not disparately impact African-Americans.  Plaintiffs rightly respond that "[t]he obvious question then is why the legislature would want to eliminate this broadly popular method of voting."  Dkt. No. 145, pp. 8–9 (Pg. ID 4372–73).

To be sure, straight-ticket voting is most prevalent in communities with high populations of African-Americans.  But Zaagman, a lobbyist for clerk associations,

observed that "SB 13 will cause state-wide problems impacting urban, suburban and rural precincts across the state."  Dkt. No. 102-22, p. 2 (Pg. ID 2255).  Zaagman therefore encouraged clerks to "[t]ell [legislators] how many of [the clerks'] voters, both Republicans and Democrats, avail themselves of the straight-party option."  *Id.* As a result, the record suggests that the Michigan Legislature substantively departed from its usual conduct in enacting PA 268.

### 5.  Legislative or Administrative History

Much of the legislative or administrative history, including "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports" is discussed above.  *Spurlock*, 716 F.3d at 397 (internal quotation marks omitted) (quoting *Arlington Heights*, 429 U.S. at 268).  Yet the Court must note that the sponsor of SB 13, Senator Knollenberg, expressed both an indifference to whether PA 268 increased voting times and a belief that voting wait times, no matter how long, will not deter people from voting.

The Court recognizes that in interpreting legislative history, "the views of a single legislator, even a bill's sponsor, are not controlling."  *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 385 (2012) (citing *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 (1980)).  And also that "statements from only

a few legislators, or those made by legislators after the fact, are of limited value."

*McCrory*, 831 F.3d at 229 (citations omitted).  Therefore, even though the below

comments have limited import, they offer additional evidence of intentional

discrimination.

In a hearing on SB 13 before the House Elections Committee, Senator

Knollenberg said that:

> [t]o those in countries who don't have the right to vote, I assume how
> long it takes to vote isn't on their list of concerns. . . . It is time that
> Michigan's elections process becomes more about people, less about
> political parties, and even less about how long it takes to exercise one
> of our most fundamental rights.

*Elections Hearings*, MICHIGAN HOUSE OF REPRESENTATIVES VIDEO ARCHIVE 20:39–

20:46,    20:55–21:05,    (December    3,    2015),    *available    at*

http://house.mi.gov/MHRPublic/videoarchive.aspx.   And in a follow-up question

regarding this statement, Knollenberg said "to those individuals [in third world

countries] that can't vote, they just want to be able to vote, regardless of how long it

takes to vote.  In those countries where they've been able to vote for the first time,

they'll wait all day."  *Id.* at 21:49 to 22:11.

Although these comments do not establish that the Michigan Legislature

enacted PA 268 with discriminatory intent, they do reflect a flagrant disregard for

the burden that PA 268 would impose on African-Americans attempting to exercise

their right to vote.  (A burden that elections officials made clear during the legislative

hearings on SB 13.)  Thus, Knollenberg's comments offer insight—however small—into the Michigan Legislature's thinking in passing PA 268.  The legislative and administrative history, therefore, deepens the Court's understanding of the context in which the Michigan Legislature adopted PA 268.

6.      **Totality of Circumstances**

In evaluating how these considerations fit together, the Court holds that the Michigan Legislature intentionally discriminated against African-Americans in violation of the Equal Protection Clause.   Specifically, the Court finds that eliminating the Democratic Party's success with straight-ticket voters—success especially driven by African-Americans residing in communities with high voting-age African-American populations—was a motivating consideration in the Michigan Legislature's enactment of PA 268.  The goal of ending the Democratic Party's success with straight-ticket voters, therefore, was achieved at the expense of African-Americans' access to the ballot.    Thus, the Michigan Legislature intentionally discriminated against African-Americans.

The circumstances here mirror those in two other voting rights cases in which courts have found intentional discrimination in violation of the Equal Protection Clause.  In *McCrory*, for instance, the Fourth Circuit held that the North Carolina

legislature engaged in race discrimination when it "intentionally target[ed] a particular race's access to the franchise because its members vote for a particular party, in a predictable manner[.]"   831 F.3d at 222.   "This is so," the court determined, "even absent any evidence of race-based hatred and despite the obvious political dynamics."   *Id.* at 222–23.

Likewise, in *Thomsen*, the court reasoned that "[t]he legislature's ultimate objective was political[.] . . . But the methods that the legislature chose to achieve that result involved suppressing the votes of Milwaukee's residents, who are disproportionately African American and Latino."   198 F. Supp. 3d at 925.   There was no finding of "pure racial animus" in *Thomsen*.   *Id.*   Yet the Wisconsin legislature still intentionally discriminated against minority voters because "suppressing the votes of reliably Democratic minority voters in Milwaukee was a means to achieve its political objective."   *Id.* (citing *Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984); *Rogers v. Lodge*, 458 U.S. 613, 617 (1982)).

The same is true in this case.   There is no evidence of racial animus.   It is unmistakable, however, that Michigan's Republican-dominated legislature enacted PA 268 to win elections—especially down-the-ticket contests—through suppressing African-Americans' reliably Democratic votes.   Accordingly, the Court concludes that the Plaintiffs have prevailed on their intentional discrimination claim under the Equal Protection Clause.

Plaintiffs' success on their intentional discrimination claim also warrants the remedy of a permanent injunction on PA 268.   Because Plaintiffs intentional discrimination claim arises under the Constitution "irreparable injury is presumed." *Obama for America*, 697 F.3d at 436 (citing *ACLU of Ky. v. McCreary Cty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003)).   In light of the above analysis, the Court concludes that granting the Plaintiffs' request for injunctive relief would not cause substantial harm to others and would be in the public interest.  Therefore, Plaintiffs' intentional discrimination claim, standing alone, establishes that they are entitled to a permanent injunction of PA 268.

### C.     Section 2 of the VRA (Count III)

The Plaintiffs have also proven that PA 268 disparately impacts African-Americans by denying or abridging their right to vote, and that in doing so, PA 268 links with social and historical conditions of discrimination to further that disparate impact.  Consequently, the Court holds that PA 268 violates Section 2 of the VRA.

Plaintiffs asserting claims under Section 2 of the VRA need not prove intentional discrimination.  *See Ohio Democratic Party*, 834 F.3d at 636 (citing *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 363 (6th Cir. 2002)).  Section 2 of the VRA instead provides that:

**(a)** No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

**(b)** A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

This section comprises both vote dilution and vote denial claims. *See Ohio Democratic Party*, 834 F.3d at 636. The former refers to claims "alleg[ing] that a districting practice denies minorities an equal opportunity 'to elect representatives of their choice[.]' " *Id.* (quoting 52 U.S.C. § 10301). The latter, by contrast, involves allegations related to the "denial of opportunity to 'participate in the political process.' " *Id.* (quoting 52 U.S.C. § 10301).

Here, the Plaintiffs raise a vote denial claim. The law governing such claims is not well-settled. *See Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 627 (6th Cir. 2016) (declining to set forth entire standard and instead ruling on

ground that plaintiffs had failed to prove disparate impact); *see also Ohio Democratic Party*, 834 F.3d at 636–37 (noting that "a clear standard for its application has not been conclusively established") (collecting cases).

It is clear, however, that vote denial claims demand two inquires. "[P]roof of a disparate impact—amounting to denial or abridgement of protected class members' right to vote—*that results from the challenged standard or practice is* necessary to satisfy the first element of the test[.]" *Ohio Democratic Party*, 834 F.3d at 637. The Sixth Circuit emphasized that this proof "is not sufficient to establish a valid Section 2 vote-denial-or-abridgement claim." *Id.*

Second, plaintiffs must demonstrate that the burden is partly "caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Ne. Ohio Coal. for the Homeless*, 837 F.3d at 627 (internal quotation marks omitted) (quoting *Ohio State Conference of the NAACP v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014)). Put another way, "the second step asks not just whether social and historical conditions 'result in' a disparate impact, but whether the challenged *voting standard or practice* causes the discriminatory impact as *it* interacts with social and historical conditions." *See Ohio Democratic Party*, 834 F.3d at 638 (citing 52 U.S.C. § 10301(a)–(b)). This element mandates consideration of the "totality of the circumstances," which may

become clear through evaluating the "Senate Factors" detailed in *Thornburg v. Gingles*, 478 U.S. 30, 43–45 (1986).[15] *Id.*

---

[15] The Senate Factors are as follows:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
> 6. whether political campaigns have been characterized by overt or subtle racial appeals;
> 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
> . . .
> [8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
> [9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36–37 (citing S. Rep. No. 97–417 at 28–29).

### 1.    Disparate Impact

Plaintiffs have shown that PA 268 has a disparate impact on African-Americans, as they must under Section 2 of the VRA.   Indeed, this case is distinguishable from Sixth Circuit cases where election laws did not disparately impact African-Americans' right to vote.  In *Northeast Ohio Coalition*, for example, the Sixth Circuit determined that changes to Ohio's absentee ballot requirements did not disparately impact African-Americans.  837 F.3d at 628.  The court reached this conclusion "[b]ecause evidence of higher minority absentee-ballot usage [was] weak, and the record [did] not indicate that minority voters disproportionately benefited from assistance that is now proscribed[.]"  *Id.*

The *Ohio Democratic Party* court similarly rejected a Section 2 VRA claim for lack of disparate impact, finding "that Ohio's political processes [were] equally open to African Americans" and that "[African-American and whites'] registration numbers [were] statistically indistinguishable in every federal election since 2006." 834 F.3d at 639.

Conversely, there is strong evidence here that African-Americans vote a straight-ticket far more than other demographics.  Roughly 50% of Michigan voters submitted a straight-ticket ballot in the 2016 election.  Dkt. No. 108-2, p. 9 (Pg. ID 2402).   But this percentage dropped to 46.5% when assessing only voters in

communities where African-Americans constituted less than 40% of the voting-age population. *Id.* In majority African-American communities, however, 77.7% of voters used the straight-party option. *Id.* And 68.9% of voters in communities where African-Americans made up 40 to 49.9% of the voting-age population voted a straight-ticket. *Id.*

African-Americans' higher usage of the straight-party option indicates that the negative consequences of PA 268 will disparately impact African-Americans. Chief among the ramifications of PA 268 is that a substantial segment of people will not vote because of dramatically longer voting lines and wait times. Plaintiffs have demonstrated that PA 268 will deter people from voting through expert evidence, from Associate Professor Allen, and lay evidence, through Professor Charles Stewart III and elections officials like Chris Swope and Daniel Baxter. *See* Dkt. No. 108-4, pp. 12–13 (Pg. ID 2499–2500); Dkt. No. 1-15, p. 8, 16 (Pg. ID 287, 295); *see also* Dkt. No. 1-3, p. 18 (Pg. ID 52).

The Secretary responds that PA 268 does not disparately impact African-Americans as to deny or abridge their right to vote because "[PA 268] applies equally to all Michigan voters." Dkt. No. 141, p. 32 (Pg. ID 3448). This argument, however, conflates the definition of a facially neutral law with disparate impact. The Secretary is correct that PA 268, on its face, does not treat African-Americans differently than other demographics. But after examining the effects of PA 268, the Court concludes

that the law disparately impacts African-American voters.  Accordingly, the Court finds that the Plaintiffs have met their burden on the first element of the Section 2 VRA test.

## 2.   The Senate Factors

The second inquiry in a vote denial claim asks whether "a disparate impact in the opportunity to vote is shown to result not only from operation of the law, but from the interaction of the law and social *and* historical conditions that have produced discrimination." *Ohio Democratic Party*, 834 F.3d at 638.  The Senate Factors, outlined in *Gingles*, may offer insight into whether a plaintiff has made this showing.  And "there is no requirement that any particular number of [Senate] factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97–417 at 29).  The totality of the circumstances here, as informed by the Senate Factors,[16] illustrates that PA 268 violates Section 2 of the VRA.

---

[16] Senate Factors 1, 3 and 4 are not relevant to this case.  *See Johnson I*, 209 F. Supp. 3d at 951; *see also Johnson III*, 2018 WL 493184, at *15.

### a)  Factor 2:  Racially Polarized Voting

Racially polarized voting "exists where there is a consistent relationship between [the] race of the voter and the way in which the voter votes, or to put it differently, where black voters and white voters vote differently."  *Id.* at 53 n.21 (alteration in original) (internal quotation marks and citations omitted).  The record reveals that African-Americans and whites vote differently in Michigan.  Indeed, in Michigan 81% of African-Americans vote or lean Democrat, whereas only 41% of whites vote or lean Democrat.  *Religious Landscape Study*, PEW RESEARCH CENTER, http://www.pewforum.org/religious-landscape-study/state/michigan/party-affiliation/ (last visited July 31, 2018).  And only 8% of African-Americans in Michigan vote or lean Republican, but 40% of whites in Michigan vote or lean Republican.  *Id.*

Straight-party voting statistics further reveal the existence of racially polarized voting in Michigan.  In communities where African-Americans are 40% or more of the voting age population, nearly 95% of straight-ticket votes are for the Democratic Party.  Dkt. No. 108-2, p. 25 (Pg. ID 2418).  On the other hand, in communities where African-Americans are less than 40% of the voting age population, roughly 53% of straight-ticket votes are for the Republican Party.  *Id.*

In asserting that voting is not racially polarized in Michigan, the Secretary relies on *Anthony v. Michigan*, 35 F. Supp. 2d 989, 1005–06 (E.D. Mich. 1999). But the *Anthony* court's conclusion regarding racially polarized voting is consistent with this Court's finding. Although that court only addressed voting preferences in Wayne County, from 1986 through 1996, the court observed "that the white electorate often had markedly different voting preferences than the black electorate[.]" *Id.* at 1004.

The *Anthony* court rejected a VRA claim, and the Secretary implies that this rejection has some bearing on this case. The Secretary is mistaken, however. *Anthony* involved a vote dilution claim, not a vote denial claim like that at issue here. And that court did not mention, let alone analyze, straight-ticket voting. Therefore, Plaintiffs have illustrated that racially polarized voting exists in Michigan.

### b)  Factor 5:  Whether African-Americans Bear Effects of Discrimination in Certain Areas

The Plaintiffs offer substantial evidence that African-Americans bear the effects of discrimination in education, employment, health, and housing. And these effects make it more challenging for African-Americans to participate in the political process.

First, Plaintiffs have offered evidence of past discrimination.[17] They highlight evidence of past discrimination in education through citing a case addressing a remedy to desegregate Detroit schools. *See Milliken v. Bradley*, 418 U.S. 717, 752–53 (1974) (acknowledging segregation in Detroit schools, but rejecting lower courts' inter-district remedy, as the record did not contain evidence about whether other districts had engaged in racially discriminatory acts).

According to the Secretary, the record lacks evidence of past state-sponsored discrimination in employment. She argues that, after World War II, "Michigan moved to aggressively protect African-Americans in the employment context by becoming the eighth state to create strong state agencies to protect minority citizens." Dkt. No. 141, pp. 35–36 (Pg. ID 3451–52). Yet Plaintiffs offer evidence to the contrary. Specifically, they cite findings from The Color of Law, a book authored by Richard Rothstein, a Distinguished Fellow of the Economic Policy Institute and a Senior Fellow at the Thurgood Marshall Institute of the NAACP Legal Defense Fund. *See* Dkt. No. 140, pp. 31–32 (Pg. ID 3402–03). There, Rothstein observed that "[i]n 1948, for example, 45 percent of all job orders placed

---

[17]    The Court acknowledges Plaintiffs' evidence of past state-sponsored discrimination, and therefore, the Court "need not and [will] not decide whether proof of such *state-sponsored* discrimination is required under the second part of this analysis." *Veasey v. Abbott*, 830 F.3d 216, 265 (5th Cir. 2016) (en banc) (citing *Frank v. Walker*, 768 F.3d 744, 755 (7th Cir. 2014)). The Sixth Circuit, of course, has not already decided this issue for the Court. *See, e.g.*, *Ohio Democratic Party*, 834 F.3d at 636–37.

with the Michigan State Employment Service were for whites only," and that "Michigan did not adopt a Fair Employment Practices law until 1955, and even then it was poorly enforced." RICHARD ROTHSTEIN, THE COLOR OF LAW: A FORGOTTEN HISTORY OF HOW OUR GOVERNMENT SEGREGATED AMERICA 168 (Liveright Publishing Corp., 2017). Thus, in contrast to the Secretary's representation, there is evidence of official discrimination in employment in Michigan.

Plaintiffs additionally present evidence of state-sponsored discrimination in housing by, for example, citing to *Garrett v. City of Hamtramck*, 503 F.2d 1236 (6th Cir. 1974). In that 1974 case, the Sixth Circuit concluded "that [Hamtramck] ha[d] violated the plaintiffs' right to equal protection of the laws under the Fourteenth Amendment by engaging in activity intentionally designed to establish and add to segregation in housing patterns." *Id.* at 1247. Hamtramck did this by demolishing impoverished, predominately African-American neighborhoods under the cover of urban renewal. *See id.* at 1239–40. What is more, the parties entered an agreement whereby Hamtramck would build housing units for these displaced persons. But as of 2015—more than fifty years after these mostly African-American residents had been displaced—some of the promised homes had still not been built.[18]

---

[18] *See* Ed White, *Judge Keith Outraged by Incomplete Housing Discrimination Case*, ASSOCIATED PRESS (Aug. 2, 2015), https://www.freep.com/story/news/local/michigan/detroit/2015/08/02/judge-damon-keith-housing-discrimination/31024517/.

Plaintiffs also demonstrate how this past discrimination has lingered to today. Regarding education, Professor Ntiri notes that whites in Michigan are 7.3% more likely to have graduated from high school than are African-Americans in Michigan. Dkt. No. 108-5, p. 13 (Pg. ID 2522). The graduation rate for whites in Michigan, from 2011 to 2015, was 91.4%. *Id.* On the other hand, the graduation rate for African-Americans in Michigan during that same time period was only 84.1%. *Id.*

Further tying these statistics together, Ntiri found a positive relationship between the rate of illiteracy in a Michigan city and that city's African-American population. *Id.* at pp. 13–14 (Pg. ID 2522–23). Additionally, the record reveals that past discrimination in employment is still present today. Metzger shows that unemployment rates for African-Americans in Michigan are twice as high as that for whites. Dkt. No. 108-2, pp. 11, 16 (Pg. ID 2404, 2409).

For instance, in 2010 African-Americans in Michigan had an unemployment rate of 23.9%, whereas whites had an unemployment rate of 10.6%. *Id.* at p. 16 (Pg. ID 2409). Although the unemployment rate has declined for both African-Americans and whites in Michigan since 2010, African-Americans still lag behind whites on this measure. *Id.* Indeed, African-Americans had an unemployment rate of 10.1% in 2016 and whites had an unemployment rate of 4.6% in that same year. *Id.*

Plaintiffs also use data compiled by Metzger to elucidate health disparities between African-Americans and whites in Michigan.  For example, the infant mortality rate for African-Americans and whites has fluctuated between 2.3 and 2.9 to 1, respectively, from 2010 to 2015.  *Id.* at pp. 18–19 (Pg. ID 2411–12). Interpreting United States Census Bureau data, Metzger wrote that "African Americans in Michigan, regardless of age, are more likely to report a disability than are White, non-Hispanics." *Id.* at pp. 19–20 (Pg. ID 2412–13).

Finally, African-Americans continue to bear the effects of discrimination in housing.  African-Americans in Michigan are far less likely to own a home than are whites.  In 2016, for instance, 76.8% of whites in Michigan owned a home; only 40.8% of African-Americans owned a home that year, however.  *Id.* at p. 23 (Pg. ID 2416).  The record contains evidence of segregation in Michigan.  Notably, a 2017 24/7 Wall Street article labeled the Detroit metropolitan area as the most segregated metropolitan area in the country.  Dkt. No. 137-8, pp. 19–21 (Pg. ID 3344–46).

### c)  Factor 6:  Whether Political Campaigns have been characterized by Overt or Subtle Racial Appeals

This Court has previously noted, and will conclude here again, that political campaigns in Michigan have been characterized by overt or subtle racial appeals. *See Johnson I*, 209 F. Supp. 3d at 952; *see also Johnson III*, 2018 WL 493184, at

*15.  These racial appeals include comments made in 2012 by Ron Weiser, who was then finance chairman of the Republican National Committee and who is now the Michigan Republican Party Chair.  *See* Dkt. No. 1-17; *see also* Dkt. No. 146, p. 6 (Pg. ID 4384).  Weiser, as noted above, was influential in assisting Senator Knollenberg with obtaining votes for PA 268.

In a Tea Party meeting, Weiser said that Republicans had a favorable outlook for the 2012 presidential election because, in Detroit, "[t]here's no machine to go to the pool halls and the barbershops and put those people on buses, and then bus them from precinct to precinct where they vote multiple times."  Dkt. No. 1-17, p. 4 (Pg. ID 311).  He continued, declaring that "there's no machine to get 'em to stop playing pool and drinking beer in the pool hall," and saying that, "[b]ut if you're not from Detroit, the places where those pool halls and barbershops are, you're not going to be going at 6:30 in November. Not without a side arm."  *Id.*

Additionally, former Republican Senator John Pappageorge was quoted in the Detroit Free Press in 2004 as stating that "if we do not suppress the Detroit vote, we're going to have a tough time in this election."  Dkt. No. 1-18, p. 2 (Pg. ID 313).

The Secretary does not challenge the accuracy of these statements.  Instead, she contends that these statements, occurring within a twelve year period, are insufficient to show a pattern of racial appeals.  Yet the Court simply highlights these statements to offer examples of the rhetoric heard during campaigns and, along with

the comments detailed in *Johnson I* and *Johnson III*, the Court finds that elections in Michigan have been characterized by racial appeals.

### d) Factor 7: African-Americans' Election to Public Office in Michigan

This factor, as the Court has noted twice before, weighs in favor of neither party. Some evidence favors the Secretary. Former President Barack Obama carried Michigan in both 2008 and 2012. African-Americans in Michigan have been elected to local, partisan offices and to judicial seats, like the Michigan Supreme Court. This fact loses some persuasive force, however, as incumbent candidates in judicial elections are designated as an incumbent on a ballot. *See* Mich. CONST. art. 6, § 24 (West, Westlaw through Nov. 2016 amendments). That designation advantages incumbents over new candidates.

But this consideration is neutral because in its 181-year history, Michigan has seen only one African-American hold a statewide, partisan office: Richard Austin was Secretary of State from 1971 to 1994.[19]

---

[19] *History & Culture*, MICH. DEP'T OF TRANSP., https://www.michigan.gov/mdot/0,4616,7-151-9623_11154-126425--,00.html (last visited July 31, 2018).

### e) Factor 8: Whether There is a Significant Lack of Responsiveness on the Part of Elected Officials

This consideration favors the Plaintiffs. Elected officials displayed a significant lack of responsiveness to the needs of minority communities in severing the tie-bar of HB 4724 to PA 268, where numerous elections officials predicted devastatingly long lines and wait times resulting from the implementation of PA 268. *See Veasey*, 830 F.3d at 263 (ruling that legislators demonstrated a significant lack of responsiveness to minority needs when they knew that the enacted legislation would have a disparate impact on minorities and rejected without explanation other proposed laws that would have ameliorated that disparate impact). The Court previously explained that elected officials showed a significant lack of responsiveness to minority needs by not calling a special election for the 13th Congressional District—a predominately African-American and Democratic-leaning district. *See Johnson III*, 2018 WL 493184, at *16. The decision to not call a special election meant that this congressional district would go unrepresented in Congress for eleven months.

The Secretary resists this conclusion by noting that a court in this district denied a preliminary injunction requesting that Governor Snyder hold a special election for this congressional seat. *See Rhodes v. Snyder*, 302 F. Supp. 3d 905, 906

(E.D. Mich. 2018). In *Rhodes*, the court concluded that the plaintiffs were not likely to succeed on their claim that Governor Snyder violated the Equal Protection Clause by not ordering a special election. *Id.* at 914.

The Secretary's reliance on *Rhodes* is unavailing. The Equal Protection Clause is not coterminous with the examination of elected officials' responsiveness to the needs of minority communities as set forth in the Senate Factors. This responsiveness inquiry, of course, sets a much lower bar. Therefore, the Court again finds that the decision to leave a predominately African-American area without congressional representation for nearly one year manifests a significant lack of responsiveness to the needs of minority communities.

The Secretary rightly notes that elected officials have sometimes responded to the needs of minority communities in Michigan through, for example, successfully managing Detroit's bankruptcy. Dkt. No. 141, p. 41 (Pg. ID 3457). That fact is not enough for the Court to balance this factor in her favor, however. Accordingly, this Court again determines that this consideration helps the Plaintiffs.

### f) Factor 9: Policy Underlying PA 268 is Tenuous

The policy underlying PA 268 is tenuous, as the Plaintiffs contend. "[B]ear[ing] on the fairness of [a procedure's] impact," in this review, is whether "the procedure markedly departs from past practices or from practices elsewhere in

the jurisdiction." S. Rep. No. 97–417, p. 29 n.117. PA 268 is a marked departure from past practices in Michigan as straight-party voting has been available in Michigan for 127 years. Additionally, the Secretary observes that "[straight-ticket voting] is very popular in urban and rural communities, cities and suburbs, [and] communities with high-and-low percentage [sic] of African-Americans." Dkt. No. 141, p. 27 (Pg. ID 3443). Indeed, approximately half of Michigan residents utilized the straight-ticket option in the 2016 election. Dkt. No. 108-2, p. 9 (Pg. ID 2402).

The stated policy motivating PA 268 is tenuous, given the aforementioned popularity, Michigan residents' use of straight-party voting for 127-years, and residents' repeal of 1964 and 2001 laws eliminating straight-ticket voting. The stated goals of PA 268—developing a more informed electorate, minimizing confusion in completing ballots, and encouraging completion of the nonpartisan section of the ballot—are also tenuous.

To be sure, these interests are legitimate. But they are only loosely tethered to the purpose of PA 268. Here, there is minimal evidence that forcing the electorate to vote for each candidate individually will make it more informed about candidates, especially considering the high number of contests and proposals on Michigan ballots.

The interest in limiting confusion is likewise tenuously linked to PA 268; Michigan residents have been voting a straight-ticket ballot for many years and do

so at high rates.  And the voter fatigue theory shows that encouraging voting in nonpartisan races is also a tenuous objective.  Accordingly, the Court concludes that PA 268 is only tenuously related to the legislative interests supporting its enactment.

### 3.     Totality of the Circumstances

Examining the totality of the circumstances, the Court finds that the Plaintiffs have demonstrated by a preponderance of the evidence that the disparate impact PA 268 imposes on African-Americans is linked to social and historical conditions of discrimination against African-Americans.  The record reveals that PA 268 will cause drastically longer lines and wait times at polling precincts; that African-Americans vote a straight-ticket far more than other demographics; and that longer wait times will deter voters from attending the polls.

As illustrated by the Court's discussion of the Senate Factors, the ramifications of PA 268 work in concert with social and historical conditions of discrimination to disparately impact African-Americans.  For example, PA 268 generates dramatically longer lines and wait times; and therefore, PA 268 deters voters.  These ramifications disparately impact African-Americans because they vote a straight-ticket at significantly higher rates than whites.  And social and historical housing discrimination will only intensify the negative consequences of

100

PA 268. Indeed, many African-Americans in Michigan reside, and thus vote, in the same precincts. Thus, precincts with high percentages of voting age African-Americans will be hit the hardest by the elimination of straight-ticket voting. In this way, PA 268 works to abridge or deny African-Americans' right to vote.

Similarly, historical discrimination in education has contributed to African-Americans' lower literacy rates as compared to whites. These lower levels of literacy will cause African-Americans to experience greater confusion with the PA 268 ballot; a ballot that will now require them to vote individually for at least eighteen additional partisan offices, beyond the numerous nonpartisan races and proposals. Dkt. No. 108-5, p. 18 (Pg. ID 2527); Dkt. No. 1-15, p. 9 (Pg. ID 288). In turn, lower literacy will make African-Americans more likely than whites to take a longer time voting or to abandon their ballots prior to completion.

Elections officials' significant lack of responsiveness to African-Americans' concerns is also intertwined with PA 268. PA 268 will deter African-Americans from going to the polls, giving them even less opportunity to encourage their elected officials to respond to their needs.

The evidence detailed above demonstrates that PA 268 disparately impacts African-Americans by abridging or denying their right to vote. In addition, the impact of PA 268 is linked to and exacerbated by social and historical conditions of

discrimination, including discrimination in employment, housing, and education.
Consequently, the Court holds that PA 268 violates Section 2 of the VRA.

Lastly, the remedy for this violation of Section 2 of the VRA is a permanent
injunction. PA 268 would cause Plaintiffs to suffer irreparable harm, as the harm
Plaintiffs would suffer under PA 268 "is not fully compensable by monetary
damages." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511
F.3d 535, 550 (6th Cir. 2007) (internal quotation marks omitted) (quoting *Overstreet
v. Lexington–Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). And,
as noted in the Court's discussion regarding Counts I and II, the Court finds that an
injunction of PA 268 would not cause substantial harm to others. An injunction
would also serve the public interest by ensuring that a law does not abridge or deny
African-Americans' ability to participate in the political process. As a result, the
above-detailed violation of Section 2 of the VRA justifies a permanent injunction of
PA 268.

## V.    Conclusion

In light of the foregoing, the Court determines that PA 268 impermissibly
infringes on African-Americans' right to vote, illustrates a discriminatory intent or
purpose on the part of the Michigan Legislature, and disparately impacts African-

Americans' opportunity to participate in the political process in conjunction with lingering effects of social and historical discrimination.  PA 268, then, violates both the Equal Protection Clause and the VRA.  The Court will accordingly GRANT Plaintiffs' request for a permanent injunction of PA 268.

IT IS SO ORDERED.

Dated:  August 1, 2018                                    /s/Gershwin A. Drain
                                                         GERSHWIN A. DRAIN
                                                         United States District Judge


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 1, 2018, by electronic and/or ordinary mail.
/s/ Tanya Bankston
Deputy Clerk