UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN STATE A. PHILIP RANDOLPH
INSTITUTE, MARY LANSDOWN, DION
WILLIAMS, and COMMON CAUSE,

Plaintiffs,

v.

RUTH JOHNSON, in her official capacity
as Michigan Secretary of State,

Defendant.

_____/

Case No. 16-cv-11844

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
MONA K. MAJZOUB

## OPINION AND ORDER DENYING EMERGENCY MOTION FOR STAY PENDING APPEAL [156]

## I.    Introduction

This case involves the constitutionality and legality of 2015 Public Act 268 ("PA 268") in Michigan, a law which eliminated straight-ticket voting in that state. The Plaintiffs are two African-American individuals, Mary Lansdown and Dion Williams, and two organizations, Michigan State A. Philip Randolph Institute ("APRI") and Common Cause.  The individual Plaintiffs vote in Michigan and the entity Plaintiffs operate in Michigan.  The Plaintiffs have asserted three claims against Michigan's Secretary of State, Ruth Johnson (the "Secretary").  They allege that PA 268 unduly burdens voting rights under the Equal Protection Clause (Count I), illustrates intentional discrimination against African-Americans in violation of

the Equal Protection Clause (Count II), and violates Section 2 of the Voting Rights Act ("VRA"), (Count III).

After trial in this case and on August 1, 2018, the Court issued a 103 page Opinion and Order and held that the Plaintiffs had proven all three of their claims.[1] There, the Court concluded that the Plaintiffs' proof, including their evidence regarding current voting conditions in Michigan, entitled them to a permanent injunction of PA 268. The Court did not hold that the Michigan Legislature can never eliminate straight-ticket voting, regardless of any changes in the voting patterns of Michigan residents or in the State's voting laws easing access to the polls, e.g. the adoption of no-reason absentee voting, early voting, or both. The Court instead determined that as long as access to the polls in Michigan remains as restricted as it is today and current straight-ticket voting rates persist, PA 268 is both unconstitutional and unlawful.

The Secretary disagreed with this ruling, as indicated by her August 14, 2018 emergency motion for a stay of the permanent injunction pending appeal. Dkt. No. 156. The Plaintiffs responded to the motion on August 20, 2018. Dkt. No. 159.

---

[1] The Court amended its Opinion and Order on August 9, 2018, simply adding a table of contents. *Mich. State A. Philip Randolph Inst. v. Johnson*, Case No. 16-cv-11844, --- F. Supp. 3d ----, 2018 WL 3769326 (E.D. Mich. Aug. 9, 2018) ("*Johnson IV*").

Presently before the Court is the Secretary's Emergency Motion for a Stay Pending Appeal of the Court's Opinion and Order Permanently Enjoining PA 268 [156]. The Court has not held a hearing on the motion and the motion is sufficiently briefed. For the reasons outlined below, the Court will DENY the Secretary's Emergency Motion for a Stay of the Permanent Injunction Pending Appeal [156].

## II.    Background

The Court will presume familiarity with the facts in this case. But recitation of the relevant procedural history is necessary to develop the context in which the Court will decide the pending motion. On July 22, 2016, the Court granted the Plaintiffs' motion for a preliminary injunction. *Mich. State A. Philip Randolph Inst. v. Johnson*, 209 F. Supp. 3d 935 (E.D. Mich. 2016) ("*Johnson I*"). And on August 15, 2016, this Court denied the Secretary's motion to stay the preliminary injunction pending appeal. *Mich. State A. Philip Randolph Inst. v. Johnson*, Case No. 16-cv-11844, 2016 WL 4267828 (E.D. Mich. Aug. 15, 2016). The Sixth Circuit, on August 17, 2016, denied the Secretary's motion to stay the preliminary injunction pending appeal, and thus, affirmed this Court's grant of Plaintiffs' request for a preliminary injunction. *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656 (6th Cir. 2016) ("*Johnson II*").

The Court on January 19, 2018 denied the Secretary's motion for summary judgment. *See Mich. State A. Philip Randolph Inst. v. Johnson*, No. 16-cv-11844,

2018 WL 493184, at *3–4 (E.D. Mich. Jan. 19, 2018) ("*Johnson III*"). Following trial, the Court held that the Plaintiffs had proven all three of their claims by a preponderance of the evidence. *Johnson IV*, 2018 WL 3769326, at *1. The Court, therefore, permanently enjoined PA 268.

## III.  Legal Standard

The Secretary's motion for a stay pending appeal requires that the Court evaluate "(1) the likelihood that the party seeking the stay will prevail on the merits; (2) the likelihood that the moving party will be irreparably harmed; (3) the prospect that others will be harmed by the stay; and (4) the public interest in the stay." *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) (citing *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006)).  "These factors are not prerequisites that must be met," the Sixth Circuit has instructed.  *Serv. Emps. Intern. Union Local 1 v. Husted*, 698 F.3d 341, 343 (6th Cir. 2012) (internal quotation marks omitted) (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)).  Rather, they "are interrelated considerations that must be balanced together."  *Id.* (internal quotation marks omitted) (quoting *Griepentrog*, 945 F.2d at 153).

The elements on a motion for a stay pending appeal and a motion for a preliminary injunction are the same; the balancing of those elements is different, however.  *United States v. Omega Sols., LLC*, 889 F. Supp. 2d 945, 948 (E.D. Mich.

2012) (citing *Griepentrog*, 945 F.2d at 153). "[A] movant seeking a stay pending appeal will have a greater difficulty in demonstrating a likelihood of success on the merits," given the procedural posture on a motion for a stay pending appeal. *Id.* (citing *Griepentrog*, 945 F.2d at 153). Because "[a] motion for stay pending appeal is made after significant factual development and after the court has fully considered the merits," the moving party "must demonstrate that 'there is a likelihood of reversal.' " *Id.* (quoting *Griepentrog*, 945 F.2d at 153). This demanding standard is consistent with the belief that "there is a reduced probability of error, at least with respect to a court's findings of fact, because the district court had the benefit of a complete record[.]" *Id.* (internal quotation marks omitted) (quoting *Griepentrog*, 945 F.2d at 153). The Secretary, as the moving party, must meet this high burden. *See id.*

## IV. Discussion

The Secretary requests that the Court stay its permanent injunction on PA 268 pending appeal. Dkt. No. 156. As the Court concludes that the Secretary has not met her burden, the Court will decline the Secretary's invitation to stay the permanent injunction pending appeal. The Court will address the four factors on this motion in turn, and later the Secretary's contention that the Plaintiffs lack standing.

A.      Success on the Merits

The Court concluded in its trial decision that the Plaintiffs had proven all three of their claims, and that success on any one claim demanded that the Court permanently enjoin PA 268.  The Secretary's arguments here only reinforce that ruling.  Thus, the Court will hold that the Secretary is not likely to succeed on the merits on all of the claims in this action.

1.      *Anderson-Burdick* Claim (Count I)

In requesting a stay, the Secretary raises four principal arguments regarding Count I.  First, she maintains that the Court applied the wrong legal standard in assessing whether the State's interests supporting PA 268 justify the burden that PA 268 would impose on voters.  *See Burdick v. Takushi*, 504 U.S. 428 (1992); *see also Anderson v. Celebrezze*, 460 U.S. 780 (1983).  In particular, she contends that the relevant burden is the burden imposed on all Michigan voters, and that the Court wrongly determined that the burden at issue here is that faced by African-American voters.

But she cites no controlling authority for this premise.  The only opinion she has referenced in support is a three Justice concurrence which is not a controlling or even plurality Supreme Court opinion.  *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205–06 (2008) (Scalia, J., concurring in judgment) (noting that "[Supreme Court] precedents refute the view that individual impacts are relevant to

6

determining the severity of the burden it imposes," at least when analyzing "generally applicable, nondiscriminatory voting regulation[s]."). As three other Justices delivered a different rationale in the lead opinion in *Crawford*, the Secretary's proposed standard does not govern the Court's inquiry in this action.

Tellingly, the Secretary overlooks the wealth of Sixth Circuit precedent distilling the appropriate standard under the *Anderson-Burdick* framework. The Court followed that precedent in its trial opinion, and the Court's application of that case law establishes that the Secretary is not likely to prevail on the merits. In *Johnson II*, for example, the Sixth Circuit defined the burden as the impact on all voters, especially considering the disproportionate impact on African-American voters. 833 F.3d at 666. The Sixth Circuit was even more explicit in *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (citing *Crawford*, 553 U.S. at 190). There, it held that as a statute "results, at most, in a minimal disparate burden on some African Americans' right to vote, and because [Ohio's] legitimate interests are 'sufficiently weighty' to justify this minimal burden, [that statute] easily survives plaintiffs' equal protection challenge." *Id.* (quoting *Crawford*, 553 U.S. at 190). The Court accordingly finds that precedent permits the Court's weighing of the burden that PA 268 would impose on African-American voters in Michigan. Therefore, the Secretary has not demonstrated that the Court applied the wrong standard in its *Anderson-Burdick* analysis.

Additionally, the Court's balancing of the relevant burden against the State's supporting interests was consistent with Sixth Circuit case law. The Court found in its trial decision that PA 268 will significantly increase wait times and generate much longer lines for all Michigan voters, and that these effects will disproportionately impact African-American voters. The Court also found that these effects will deter African-Americans from voting on Election Day. As that finding correctly applies the above-described precedent, the Secretary is unlikely to prevail on Plaintiffs' equal protection claim under the *Anderson-Burdick* framework.

Second, the Secretary presses an argument that this Court—and the Sixth Circuit—has repeatedly rejected: that PA 268 would not burden voters because voters may still vote select candidates of their choice. *See, e.g.*, *Johnson II*, 833 F.3d at 663 ("In its motion for a stay pending appeal, the Secretary insists that PA 268 impacts only the manner of voting—not the right to vote. It is clear, however, that how a state chooses to regulate the *manner* that a person must cast a ballot undoubtedly impacts the individual right." (internal quotation marks and citations omitted))).

Next, according to the Secretary, she is likely to prevail on the merits because the Court determined that PA 268 will increase wait times without finding facts necessary for that conclusion. Dkt. No. 156, p. 21 (Pg. ID 4731). The Secretary maintains that the Court's factual findings were inadequate because the trial decision

8

lacks details regarding the current wait times throughout Michigan, the specific increase in voting wait times that PA 268 would generate, and the line between constitutional and unconstitutional wait times. *Id.* The Court is unconvinced.

The Secretary's allegations misunderstand the nature of the inquiry here; the relevant inquiry asks whether the Plaintiffs have demonstrated that the State's interests supporting PA 268 are not sufficiently weighty to justify the burden that PA 268 would impose on voters, and particularly on African-Americans. The Court, therefore, need not have defined precisely every fact related to both the wait times and longer lines caused by PA 268, and the corresponding voter deterrence. The Court was only charged with determining whether the Plaintiffs had met their burden.

Yet the Court engaged in the fact finding which the Secretary views as necessary. For current wait times, for example, the trial opinion reflects that voters in Flint waited on average fifty-two minutes to vote in the 2016 election. *See Johnson IV*, 2018 WL 3769326, at *9. Evidence regarding the 2012 election, although not current, still elucidates current voting conditions in Michigan, especially considering that the Secretary fails to identify any meaningful difference between voting circumstances in 2012 as compared to today. And, as the Court noted numerous times in its trial opinion, Michigan in 2012 had the sixth longest voting wait time among the fifty states. *See id.*

The Court also credited evidence of estimates regarding the specific increase in voting wait times that PA 268 would generate for Michigan voters. The Court accepted elections clerks' testimony at legislative hearings that Michigan voters ordinarily waited about twenty-two minutes to vote and that PA 268 could double this wait. *See id.* at *19. The Court noted that Christopher Thomas, who was the Director of Elections in Michigan for thirty-six years, said that it would take a straight-party voter three additional minutes to complete a ballot under PA 268, as compared to the straight-ticket ballot currently in use. *See id.* at *8. Expert evidence from Theodore Allen, an associate professor of Industrial Engineering at Ohio State University, buttresses this lay evidence. Allen conducted a simulation and concluded that eliminating straight-ticket voting would increase wait times in Michigan by at least 25% for each voter who submitted a straight-party vote. Dkt. No. 108-4, p. 10 (Pg. ID 2497). Because this evidence demonstrated by a preponderance of the evidence that PA 268 would drastically increase wait times and create much longer lines, the Court need not have stated the increase in time caused by PA 268 down to the exact second.

This precision principle is equally applicable to the Secretary's assertion that the Court failed to establish a bright-line between constitutional and unconstitutional wait times. Plaintiffs presented evidence showing that PA 268 would thrust wait times and voter lines past the constitutional and statutory boundaries, wherever those

boundaries may specifically lie.  Development of a bright-line rule here would not only manifest a lack of appreciation for the complex issues in this case, but it would also violate the spirit of the balancing test under the flexible, *Anderson-Burdick* framework.

Fourth, and finally, the Secretary argues that the Court did not find that longer lines would specifically deter African-Americans. Dkt. No. 156, p. 22 (Pg. ID 4732). This allegation is also unfounded.  The Court held that PA 268 would create disproportionately longer wait times and voting lines for African-American voters, given African-Americans' high straight-ticket voting rates and relatively low literacy rates.  The Court further found that long wait times and voting lines deter voters.  Because the negative effects of PA 268 are most pronounced for African-American voters, it follows that PA 268 will disparately deter African-Americans from voting.

The Secretary unpersuasively claims that these interrelated conclusions should come undone because the Court relied on conjuncture in its findings regarding literacy.  This argument, too, lacks merit.  Indeed, the Court credited the testimony and report of Plaintiffs' expert on literacy, Wayne State University Professor Daphne Ntiri.  Dkt. No. 108-5, pp. 4–5 (Pg. ID 2513–14).  She cited statistics indicating that in Michigan African-Americans have lower rates of education attainment than whites.  *Id.*  Ntiri's analysis regarding what people with

11

lower literacy can and cannot read convinced the Court that many of these people have trouble navigating Michigan's extremely long ballots, and that they would struggle even more if straight-party voting were no longer available to them.  As a result, the Court gave proper weight to the testimony presented regarding literacy.  Based on the above, the Court holds that the Secretary is unlikely to succeed on Plaintiffs' *Anderson-Burdick* claim under the Equal Protection Clause.

B.     Intentional Discrimination (Count II)

The Secretary is also not likely to prevail on Plaintiffs' equal protection claim regarding intentional discrimination.  The Court should ignore the testimony from Ronna Romney McDaniel, the Secretary says, because McDaniel was not a member of the Michigan Legislature which passed PA 268.  Dkt. No. 156, p. 19 (Pg. ID 4729).  But if the Court were to accept the Secretary's invitation, the Court would miss crucial context for the enactment of PA 268.  McDaniel was the chair of the Michigan Republican Party for much of the relevant time period.  Notably, the legislator who sponsored PA 268 said that he did not have the votes to obtain the law's passage and so he asked McDaniel to help him secure the votes, and she delivered.  Dkt. No. 137-4, p. 6 (Pg. ID 3270).  Given her integral role in the legislative process, the Court rightly examined her statements.

The Court previously held that the Michigan Legislature, as an avenue to win elections,  intentionally  discriminated  against  African-Americans  through

12

suppressing their predominately Democratic Party votes. *Johnson IV*, 2018 WL 3769326, at \*30. The Secretary responds that "a finding of politically-based discrimination is a defense to, and defeats, a racial discrimination finding." Dkt. No. 156, p. 19 (Pg. ID 4729). In support, she relies on cases addressing whether congressional redistricting was unconstitutional racial gerrymandering. *See Cooper v. Harris*, 137 S. Ct. 1455, 1473 (2017); *Easley v. Cromartie*, 532 U.S. 234, 243 (2001); *Hunt v. Cromartie*, 526 U.S. 541, 551–52 (1999).

Yet gerrymandering cases are subject to a different legal standard than voting rights cases. Plaintiffs in gerrymandering cases must show "that race (not politics) was the 'predominant consideration in deciding to place a significant number of voters within or without a particular district.' " *Cooper*, 137 S. Ct. at 1479 (quoting *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015)). "That entails demonstrating that the legislature 'subordinated' other factors— compactness, respect for political subdivisions, partisan advantage, what have you— to 'racial considerations.' " *Id.* at 1463–64 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). Racial and political motivations are thus mutually exclusive in the gerrymandering context. *See id.*

Racial and political motivations coexist in the voting rights context, however. Plaintiffs alleging intentional discrimination based on voting rights legislation "need not show that discriminatory purpose was the 'sole[ ]' or even a 'primary' motive

for the legislation, just that it was 'a motivating factor.' " *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)).   Thus, the Secretary is mistaken when she asserts that, in this litigation, political discrimination is a defense to racial discrimination.   *See id.* at 222–23; *see also One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 925 (W.D. Wis. 2016).   The Secretary has therefore failed to show that she is likely to succeed on Plaintiffs' intentional discrimination claim.

C.     Section 2 of the VRA (Count III)

Likewise, she is not likely to prevail on Plaintiffs' Section 2 VRA claim.  She again asserts that, because straight-ticket voting is popular statewide, PA 268 will not disparately impact African-Americans.   But Kurt Metzger—who worked for thirty-seven years as a Regional Information Specialist with the United States Census Bureau—found that every community with a high percentage of African-American voters had extraordinarily high straight-ticket voting rates relative to those of Michigan as a whole.  Dkt. No. 108-2, pp. 9–10 (Pg. ID 2402–03).  And contrary to the Secretary's representations, the Court explicitly held that PA 268 will create dramatically longer lines and increased wait times, which will in turn deter African-Americans from voting.  *See Johnson IV*, 2018 WL 3769326, at *14–17.

14

The Secretary acknowledges that in 2012 voters in forty-four other states generally waited less time to vote than Michigan residents did. Dkt. No. 156, p. 27 (Pg. ID 4737). She then revealingly contends that fact "conclusively establishes that there is no link between [straight-party voting] and wait times because Michigan has much longer wait times than states without [straight-party voting]." *Id.* She continues that "Michigan's relatively long wait times are thus necessarily attributable to reasons other than SPV." *Id.*

This point only bolsters the Court's findings regarding African-Americans' access to the polls post-PA 268. Indeed, the record reflects that straight-ticket voting saves at least three minutes at the polls for every voter who uses that option, and 1.5 to 2.5 million voters submitted a straight-party ballot in the 2016 election. *See Johnson IV*, 2018 WL 3769326, at *8. Straight-ticket voting thus substantially decreases the amount of time that Michigan voters spend at the polls. In spite of this, Michigan still has the sixth longest wait time in the nation. PA 268 will only aggravate these troubling voting conditions. Additionally, the Court credited evidence showing that significantly longer wait times and drastically longer lines deter voters. *Id.* at *33. Because these effects would disparately impact African-Americans, PA 268 would deny or abridge African-Americans' right to vote. The

Secretary, therefore, is wrong to argue that she will succeed on Plaintiffs' Section 2 VRA claim because the Plaintiffs cannot prove disparate impact.[2]

In sum, Plaintiffs assert three claims, and the Court has determined that the Secretary is not likely to prevail on any one of these claims. As the Secretary must succeed on all three of Plaintiffs' claims to avoid a permanent injunction on PA 268, the merits prong heavily weighs in Plaintiffs' favor.

### D.    Irreparable Harm

The balance of harms further suggests that the Secretary is not entitled to a stay. True, two one-Justice opinions support the Secretary's position that a stay will irreparably harm the State. *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (noting that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

But the State's form of irreparable harm is lesser than that affecting Michigan voters as a result of PA 268. Courts presume irreparable injury where constitutional rights are imperiled or abridged. *See Obama for America v. Husted*, 697 F.3d 423,

---

[2]    The Court recognizes that a showing of disparate impact, standing alone, is insufficient to prove a violation of Section 2 of the VRA. *See Johnson IV*, 2018 WL 3769326, at *33–38. The Secretary, however, does not seriously challenge any other aspect of the Court's resolution of Plaintiffs' Section 2 VRA claim. *See* Dkt. No. 156, p. 26–27 (Pg. ID 26–27).

436 (6th Cir. 2012) (citing *ACLU of Ky. v. McCreary Cty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003)). And "[a] restriction on the fundamental right to vote therefore constitutes irreparable injury." *Id.* (citing *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986)). The irreparable injury to Michigan residents here is not abstract, as is the State's alleged irreparable injury. All Michigan voters will wait in significantly longer lines and will encounter much greater wait times if Michigan were to implement PA 268. These effects would deter a substantial number of people from voting by discouraging them from attending the polls or having them arrive at a polling station only to leave because of long lines and wait times. And African-Americans would disproportionately bear all of these consequences.

Furthermore, the public interest in denying the stay finds support in the continuation of Michigan's tradition of straight-ticket voting. The status quo, the Secretary maintains, is the elimination of straight-ticket voting. *See* Dkt. No. 156, p. 5 (Pg. ID 4715). To the contrary, since 1891 Michigan voters have been using the straight-ticket option. Implementing PA 268 at this date would engender a significant change in Michigan residents' exercise of their voting rights, and courts have cautioned against making such changes close to an election. *See Johnson III*, 833 F.3d at 669 ("This case does not involve the potential disruption of complicated election-administration procedures on the eve of Election Day; rather, denying the Secretary's request for a stay here will merely require Michigan to use the same

17

straight-party procedure that it has used since 1891."); *see also Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014) (observing that "[t]he Supreme Court has repeatedly instructed courts to carefully consider the importance of preserving the status quo on the eve of an election").

Based on these considerations, the balance of harms weighs in Plaintiffs' favor.

E.    Standing

The Secretary vigorously argues that the Plaintiffs lack standing to assert any one of their claims.  The Plaintiffs include both individuals and organizations.  For an individual plaintiff to show standing, "(1) 'he must demonstrate injury in fact—a harm that is both concrete and actual or imminent, not conjectural or hypothetical'; (2) 'he must establish causation—a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant'; and (3) 'he must demonstrate redressability—a substantial likelihood that the requested relief will remedy the alleged injury in fact.' "  *Davis v. Detroit Pub. Sch. Cmty. Dist.*, --- F.3d ----, 2018 WL 3763429, at *5 (6th Cir. Aug. 9, 2018) (quoting *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000)).  On the other hand, an organization can sue on behalf of its members "when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim requested nor the relief requested requires the

participation of individual members in the lawsuit." *Waskul v. Washtenaw Cty. Cmty. Mental Health*, --- F.3d ----, 2018 WL 3849275, at *2 (6th Cir. Aug. 14, 2018) (internal quotation marks omitted) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000)).

The Court initially rejected the Secretary's standing arguments when it resolved the Plaintiffs' motion for a preliminary injunction. *Johnson I*, 209 F. Supp. 3d at 944–45. In her summary judgment motion, the Secretary again contested Plaintiffs' right to bring this action. *See* Dkt. No. 102, pp. 19–27 (Pg. ID 1776–84). The Court disagreed, concluding that the law of the case doctrine established that the African-American Plaintiffs and organizational Plaintiffs had standing. *See Johnson III*, 2018 WL 493184, at *3–4. But the Court explained that it had not previously addressed standing as to Erin Comartin, a white Michigan resident and initially a named Plaintiff. *Id.* Based on the evidence presented at summary judgment, the Court held that Comartin lacked standing because she could not show that she would suffer an injury in fact stemming from PA 268. *See id.* (rejecting Comartin's argument that harm to her interest in democracy could show injury in fact here).

Citing the same evidence and making the same arguments as in her summary judgment motion, the Secretary maintains that the remaining Plaintiffs lack standing. The Court will again disagree, but this time on the merits.

Plaintiff Mary Lansdown is an African-American and a registered voter in Flint.  Dkt. No. 1, p. 3 (Pg. ID 3).  She can vote absentee under an exception for voters over the age of sixty.  *See* MICH. COMP. LAWS § 168.758(d).  According to the Secretary, Lansdown lacks standing because she has not voted in person in twenty-three years, and therefore, cannot show that she will suffer injury in fact through the implementation of PA 268.  Dkt. No. 156, pp. 28–29 (Pg. ID 4738–39).  Lansdown can still attend the polls on Election Day, although she can vote absentee and has availed herself of that privilege.  Because she can still vote in person, PA 268 threatens her rights under the Equal Protection Clause and Section 2 of the VRA.  Accordingly, she has standing to challenge PA 268.

Plaintiff Williams is also an African-American, is registered to vote in Detroit, and is not eligible to vote absentee.  Dkt. No. 1, p. 4 (Pg. ID 4).  He "[a]lmost always" votes a straight-ticket in general elections.  Dkt. No. 102-14, p. 5 (Pg. ID 2117).  The Secretary claims that he lacks standing because he purportedly testified that nothing would stop him from voting on Election Day.  Dkt. No. 156, pp. 28–29 (Pg. ID 4738–39).  Williams did not make that representation during his deposition, however.  Dkt. No. 102-14, pp. 6–7 (Pg. ID 2117–18).  Instead, he said that when he voted in the 2016 general election, "because the lines were extremely long," it took him "about an hour, maybe an hour and a half" to vote.  *Id.* at p. 5 (Pg. ID 2117).  This testimony hardly suggests that Williams would vote regardless of how long it

would take him to exercise that right. Consequently, the Secretary has not demonstrated that Williams lacks standing to raise the claims asserted herein.

As for the institutional Plaintiffs, the Secretary alleges that these Plaintiffs cannot challenge PA 268 because they cannot show that their members would suffer an injury in fact. The Secretary, in particular, contends that the organizational Plaintiffs have not demonstrated that they have African-American members who vote in jurisdictions with high straight-party voting rates. Dkt. No. 156, p. 25 (Pg. ID 4735). The Court finds that the institutional Plaintiffs have made this showing.

An affidavit from the president of APRI establishes that it has numerous African-American members who vote in Michigan and use the straight-party option. *See* Dkt. No. 108-6, pp. 2–3 (Pg. ID 2533–34) (noting that APRI operates throughout Michigan and that "[its] members are predominantly African-American and many of them use the straight party voting device.").[3] Likewise, a senior counsel at Common Cause submitted an affidavit providing that the organization has as members African-Americans who vote in Michigan and vote a straight-party. Dkt. No. 108-7, p. 2 (Pg. ID 2536) (observing that "Common Cause has thousands of

---

[3] The Court struck a separate section of the affidavit by the APRI president, as that section included conclusory statements regarding voter confusion in violation Federal Rule of Civil Procedure 56(c)(1)(4). *See* Dkt. No. 123, pp. 4–6 (Pg. ID 2777–79).

members and supporters in Michigan, including African-Americans who use the straight party voting device").[4]

In light of the foregoing, the Plaintiffs have standing to assert their claims under both the Equal Protection Clause and Section 2 of the VRA.

## V.    Conclusion

After trial in this case, the Court issued a 103 page opinion in which it granted the Plaintiffs' request for a permanent injunction on PA 268, finding that the Plaintiffs had met their burden on all three of their claims.  *See Johnson IV*, 2018 WL 3769326.  The Secretary then filed an emergency motion for a stay of the Court's permanent injunction pending appeal.  Dkt. No. 156.  Based on the above analysis, the Court will DENY the Secretary's Emergency Motion for a Stay of the Permanent Injunction Pending Appeal [156].

IT IS SO ORDERED.

Dated:  August 23, 2018                                  /s/Gershwin A. Drain
                                                         GERSHWIN A. DRAIN
                                                         United States District Judge

---

[4]  Similarly, the Court struck a separate paragraph of this affidavit because that paragraph included conclusory statements regarding voter confusion.  *Id.* at pp. 3–4 (Pg. ID 2776–77).

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 23, 2018, by electronic and/or ordinary mail.

<u>/s/ Tanya Bankston</u>
Deputy Clerk